IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND
PROVIDENCE

KORMAHYAH KARMUE, Pro Se,
Plaintiff,

vs.

CASE NO. 17-CV-107-LM-AKJ

DAVID RENNINGTON, Chief Deputy of
United States Marshals Services
JOHN DOE #1, Deputy US Marshal
JOHN DOE #2, Deputy US Marshal
JOHN DOE #3, Warden of The
Donald W. Wyatt Detention Center
UNITED STATES MARSHALS SERVICES,
FEDERAL BUREAU OF PRISONS,
UNITED STATES OF AMERICA,
Defendants.

Amended
Motion Seeking Relief and Compensation
For Deprivation Of Constitutional Rights
Pursuant To Title 42 U.S.C. § 1983

## I. Jurisdiction

1. This is a civil action authorized by Title 42 U.S.C. § 1983, to redress the deprivation, under color of state law, of rights secured by the United States Constitution. This Court has jurisdiction over this matter pursuant to Title 28 U.S.C. § 1343. The Plaintiff seeks both declaratory relief pursuant to Title 28 U.S.C. §§ 2201 & 2202, and damages or compensation pursuant to Title 28 U.S.C. § 1343(a)(3).

## II. Plaintiff

2. The Plaintiff, KORMAHYAH KARMUE, who is presently incarcerated

-1-

at the Federal Medical Center - Devens, in Ayer, Massachusetts, in the custody of the FEDERAL BUREAU OF PRISONS; at the time of the events explained and covered in this matter was also a pre-trial detainee at the Donald W. Wyatt Detention Center, located in Central Falls, Rhode Island, was and remains in or under the custody of the aforemention Detention Center, the UNITED STATES MARSHALS SERVICES, the FEDERAL BUREAU OF PRISONS, and the UNITED STATES OF AMERICA. He is a resident of the State of Rhode Island, owning a home located at 31-33 Ida Street, Providence, Rhode Island 02909.

### III. Defendants

3. DAVID RENNINGTON, Defendant, in his personal and professional capacity as Chief Deputy Marshal of Rhode Island for the United States Marshals Services, who at all times mentioned in this complaint, was the person legally responsible for the overall care and security of the Plaintiff, as well as the day to day operations of the Rhode Island branch of the United States Marshals Services.

4. JOHN DOE #1, Defendant, which may be U.S. Marshal BRENTON MOORE, in his personal and professional capacity as a U.S. Marshal, who at the time mentioned in this complaint was assigned to the security detail of the Plaintiff.

5. JOHN DOE #2, Defendant, which may be U.S. Marshal ELDEN DASILVA, in his personal and professional capacity as a U.S. Marshal, who at the time mentioned in this complaint was assigned to the security detail of the Plaintiff.

6. JOHN DOE #3, Defendant, in his or her personal and professional capacity as the Warden of the Donal W. Wyatt Detention Center, whom at time mention was the person legally responsible for

-2-

the overall custody, care and security of the Plaintiff while housed at the Donald W. Wyatt Detention Center.

7. UNITED STATES MARSHALS SERVICES, Defendant, which in a professional capacity was the branch of the Federal Government which was directly responsible for the Plaintiff's security, custody and transportation, at times mentioned in this complaint.

8. FEDERAL BUREAU OF PRISONS, Defendant, which in a professional capacity is the branch of the Federal Government which is directly responsible for the Plaintiff's custody, care and security while serving his term of incarceration.

9. UNITED STATES OF AMERICA, Defendant, which is the entity directly responsible for the Plaintiff's confinement, place of confinement, custody, care and security at all time metioned in this complaint.

## IV. Facts

10. On April 23, 2015, between 12:00pm and 12:30pm, the Plaintiff was picked up at the Donald W. Wyatt Detention Center, by two (2) US Marshlas which may or may not have been U.S. Marshal Moore and U.S. Marshal DaSilva, but for the sake of this complaint will be referred to as "Doe 1" (Moore) and "Doe 2" DaSilva. Doe 1 was the U.S. Marshal which drove the vehicle that transported the Plaintiff and Doe 2 was the U.S. Marshal whom acted in the role of guard during the transportation of the Plaintiff to a pre-trial hearing which was to take place at the United States District Court courthouse for Rhode Island in Providence, Case No. 1:13-CR-00179.

11. Prior to the transportation of the Plaintiff, he was both handcuffed and placed in leg shackles which severly impaired his movement. Once the Plaintiff was secured he was moved by the

-3-

Marshals to an unmarked van, which the Marshals utilized for transportation of the Plaintiff.

12. Upon being placed in the van the Plaintiff sat where directed to do so by Doe 2, and requested that Doe 2 secure the safety-belt in the van. Doe 2 ignored this request and slammed the van door shut without comment.

13. While inroute to the United States District Court courthouse, Doe 1 was driving in excess of the legal speed limit, with little regard for the sefety and wellfare of his pasengers or the other drivers which he shared the road.

14. Durring the course of this erratic and dangerous trip, Doe 1 attempted to pass through a traffic light signal which had turned to "yellow" but had not yet progressed to "red".

15. As Doe 1 entered the intersection just below the traffic light signal, for reasons unbeknown to the Plaintiff, but which can reasonabley be assumed as for the purposses of expidition, Doe 1 increased the speed of the vehicle in which he was driving.

16. Then suddenly and without warning, Doe 1 abruptly engaged the break bring the vehicle to an instant and vicious stop. As no explination was given by Doe 1 for the stop, the Plaintiff assumes that it was done so as to avoid an accident of some kind.

17. Unprepared and unable to brace himself due to the handcuffs and shackles, as well as unsecured by a safety-belt, the Plaintiff was propelled forward into a steel divider which seperated the two (2) Marshals from the Plaintiff.

18. Subsequent to this collision and as a direct result of not being secured by a sefty-belt or having the ability to brace himself due to the restraints, the Plaintiff sustained serious injuries to

-4-

his neck, back, legs and hips.

19. As the accident occurred a short distance from the District Court courthouse, the Marshals continued on to the courthouse without inquiring as to the extent of the Plaintiff's injuries, and while ignoring his repeated pleas and request for medical assistance.

20. Upon arrival to the District Court courthouse, Doe 2 requested that the Plaintiff remove himslef from the floor of the van and enter the courthouse.

21. The Plaintiff once again attempted to tell the Marshals that he was injured and required medical assistance and further, would be unable to lift himself of the van floor and enter the courthouse.

22. The Marshals, refussing to believe the Plaintiff's pleas, dragged the Plaintiff from the floor of the van and into and through the courthouse, utilizing an elevator and eventually depositing the Plaintiff into a hold cell.

23. Once the Plaintiff was placed in the holding cell, he remained handcuffed and shackled while the two (2) Marshals left the room in which the cell was located.

24. After what can only be assumed as a few minutes, a third unnamed Marshal entered the room in which the holding cell was located.

25. The Plaintiff, upon seeing this unknown Marshal attempted to communicate the extent of his pain and need for medical treatment.

26. This Marshal, after hearing what the Plaintiff had to say left the room.

27. Approximately ten (10) minutes after the third Marshal left, Doe 1 and Doe 2 returned to the room which housed the holding cell,

with two (2) Emercency Medical Technicians, herein after "EMT", and a strtcher.

28. As the EMT's approached the hold cell, they were told by Doe 1 not to touch the Plaintiff and that the Plaintiff was faking injury.

29. When the Plaintiff was unable to stand or walk unassisted, Doe 1 and Doe 2 entered the holding cell and once again began to drag the Plaintiff through the courthouse.

30. Once inside the elevator which was being used to take the Plaintiff to the ground floor, the two (2) original Marshals, Doe 1 and Doe 2, and the two (2) EMTs, an additional set of Marshals joined the group.

31. While traveling to the ground floor, Doe 1 and Doe 2 let go of the Plaintiff's arms and waist, which the Marshals were utilizing to drag the Plaintiff in an almost standing position, in an attempt to prove that the Plaintiff was faking injury.

32. When the Plaintiff was unable to support his own weight and fell to the ground, Doe 1 and Doe 2 became infuriated.

33. When the Plaintiff fell to the floor of the elevator, Doe 1 and Doe 2 began to physically asault the Plaintiff.

34. Though the Plaintiff was being assaulted by the two (2) Marshals right infront of two (2) additional Marshals as well as the two (2) EMTs, no attempt was made to stop Doe 1 and Doe 2.

35. During the assault on the Plaintiff, Doe 1 removed what looked like a tazer or stun-gun from his person and used it three (3) times on the Plaintiff .

36. One of the time the Plaintiff was subjected to the shock of tazer or stun-gun, the instrument eith purposefully or accidently

made contact with the Plaintiff's left eye, causing blurred vision.

37. Once the elevator arrived at the ground floor the Plaintiff was lifted and placed into some sort of restraint chair which was then utilized to transport the Plaintiff to the awaiting ambulance.

38. At the ambulance the Plaintiff was removed from the restraint chair, placed on a strecher and lifted into the ambulance.

39. When the ambulance left the courthouse parking lot for the hospitol, one of the EMT's attempted to administer some medical care to the Plaintiff.

40. However this EMT was stopped from doing this by one (1) of the Marshals.

41. Shortly after the EMT stopped administering medical treatment, the Plaintiff was both mocked and threatened by Doe 2 while he recorded these events on his cell phone.

42. Upon arrival to the hospitol, the Plaintiff was rushed to an emergency room to receive care.

43. However, before the Plaintiff was permitted to enter the emergency room, he, the Plaintiff, was left outside the emergency room while the two (2) Marshals entered it.

44. Finally, the Plaintiff was wheeled into the emergency room and was questioned by the awaiting staff as what had happened to him and where on his body was he in pain.

45. As the Plaintiff attempted to answer these questions he was repeatedly interrupted by Doe 1 and Doe 2, who continuously told the medical staff that no accident had occurred and that the Plaintiff was making the whole thing up, including the pain and need for medical treatment.

46. When the doctor finally entered the emergency room he was

-7-

asked to step outside the Emergency Room so that he and the two (2) Marshals could speak in private.

47. Upon the doctor's return to the Emergency Room, he informed the rest of the medical professionals present, that the Plaintiff would be leaving Roger Williams Hospital immediately, to receive medical treatment at anoth location.

48. However, the Plaintiff was not taken to another medical facility for treatment, rahter staff from the Donald W. Wyatt Detention Center arrived at Roger Williams Hospital to return the Plaontiff to the Detention Center.

49. When the Plaintiff was returned to the Detention Center, he was provided no medical assistance or treatment of any kind, and was not returned to his usual housing assignment but was brought to an observation cell, which is commonly used for inmates which are believed to be suicidal.

50. While in this area, the Plaintiff would eventually see Dr. Edward A. Blanchette, whom would act extremely unprofessional toward the Plaintiff, accusing him of faking his injuries, attempting to minipulate the situation and calling him a "malingerer".

51. On the morning of April 24, 2017, the Plaintiff would eventually be taken to Memorial Hospital, as it had appeared to staff at the Detention Center that the Plaintiff's condition had deteriorated due to lack of treatment.

52. Memorial Hospital would eventually give the Plaintiff a CATT Scan and do a superficial examination of his left eye.

53. The Doctor would inform the Plaintiff that eventhough he, the Doctor, was not an eye specialist, the eye seemd to be okay minus the blurred vision, but should the vision continue

to deteriroate, a follow-up should be dome with a specialist.

54. After these tests were done, the Plaintiff would once again return to Donald W. Wyatt Detention Center and once again be moved or placed in the observation cell.

55. While in this cell, the Plaintiff would make several requests for medical assistance and treatment but would routinely be ignored or denied any treatment.

56. Dr. Blanchette, grew angrier and more frustrated with the Plaintiff repeatedly telling the Plaintiff to be quiet and even going so far as to tell Nurse White and other medical staff not to provide the Plaintiff with medical assistance.

57. Additionally during this time, the Detention Center staff would repeatedly take away the Plaintiff's wheelchair in an attempt to verify that he was faking his injuries.

58. The Plaintiff would continue to be abused both mentally and physically by the Detention Center staff for the remaineder of the Plaontiff's time at Wyatt Detention Center.

59. Due to this treatment, the Plaintiff would file numerous complaints, which lead to the Plaintiff's assignment to the Special Housing Unit.

60. However, placement in the Special Housing Unit did not deter or deminish the Plaintiff's resolve to ladge complaints against the Detention Center Staff.

61. One staff member would become so angry with the Plaintiff's continued filing of complaints, that he would eventually threaten the Plaintiff that his, the Plaintiff's, time could get a lot worse.

62. With no other recourse, the Plaintiff would continue to

to make request for medical treatment, especially evaluation by an eye specialist, however his complaint against staff would begin to slow down as no attention or concern was being given to them.

63. As his complaints became fewer, he would eventually be taken from the Special Housing Unit to the clinic in the Detention Center for medical evaluation and treatment.

64. During one of these visits to the clinic the Plaintiff would be told that they medical staff was directed to not provide any type of medical treatment or assistance to the Plaintiff, as any and all necessary medical treatment for the Plaintiff would be provided by the Bureau of Prisons when he, the Plaintiff, was moved into their custody directly.

65 Eventually the Plaintiff would be moved to the Federal Medical Center Devens under the direct custody of the Bureau of Prisons.

66. However, the medical treatment which was mentioned by the Detention Center staff, was still not provided.

67. The Plaintiff would meet with Dr. Danji, of the FMC Devens medical staff, and during an initial interview while the Plaintiff was explaining the particulars of his condition, the accident and subsequent assault, Dr. Danji while reviewing his file from the Detention Center, would accuse the Plaintiff of the same minipulative and false complaints and behaviors.

68. Subsequent to this treatment, the Plaintiff would file a grievence for the unprofessional behavior and failure to provide medical care.

69. After the filing, the Plaintiff would be pescribed 800mg of Ibuprophine, assigned to see Physical Therapy and placed

-10-

on a list to see an eye specialist.

70. The Plaintiff would eventually meet with Dr. Charles Howard who was an Eye Specialist and be examined.

71. During this meeting, Dr. Howard explained that it appeared that the Plaintiff had lost 85% of his vision in the left eye. Dr. Howard would prescribe corrective lenses for the Plaintiff, but explained that there was little hope that they would help. The Doctor eventually asked the plaintiff about the situation which lead to the loss of vision, prescribe eye drops and recommend a follow-up examination in a few months to see if any improvment had been made in the eye's vision.

72. As warned, the eye glasses did not improve the Plaintiff's vision, and he would make numerous trips to "Sick Call", to complain of migrains and increased pain and pressure in his left eye.

73. He was repeatedly informed my the medical staff at FMC Devens, that there was no other assistance they could provide.

74. About two (2) years later, the Plaintiff would meet with Dr. Howard for the follow-up, and at that time Dr. Howard would recomend that the Plaintiff obtain his last eye exam records from when he was last "on the street", so that a full history could be given to an out-side specialist.

75. The Plaintiff's continuous and increasing pain as well as FMC Devens refusal to provide medical care, has caused the Plaintiff to once again file complaints and grievences.

76. In February of 2016 the Plaintiff was assigned to Physical Therapy with a Ms. Quinn.

77. During this first meeting with Ms. Quinn to discuss a Physical Therapy plan, the Plaintiff was questioned by Ms. Quinn regarding why the Plaintiff had filed a grievence against her co-worker Dr. Danji and if the enrollment in Physical Therapy was enough to get the grievence removed.

78. The Plaintiff felt this line of questioning was both unprofessional and inappropriate and refused to answer the questions.

79. Eventually Ms. Quinn would give up her line of questioning and start the Plaintiff on a Physical Therapy work regiment, which consisted of lifting heavy weights.

80. When the Plaintiff informed Ms. Quinn that his back and hips could not support such heavey weight and that they should start with something lighter, Ms. Quinn became upset and said that he wasn't trying to follow the plan.

81. With Ms. Quinn being angry and frustrated with the Plaintiff, she refused his requests for the assignment of a walker to assist in his movement, but did assign the Plaintiff a cane, with the caviat that the cane could only be used for a limitted time.

82. After twelve weeks od physical therapy, Ms. Quinn became frustrated with the Plaintiff's lack of progress and explained that there was nothing more that she could do for him.

83. The Plaintiff took this time to request that the cane which had been assigned to him, be given to him for a longer amount of time, Ms. Quinn took the cane away and discharged the Plaintiff from physical therapy.

84. After six (6) hours without the use of a cane, the Plaintiff, who had seen no improvement in his condition, would

-12-

request to be placed in Physical Therapy, and issuance of a cane, however, the Plaintiff would be refused re-entry.

85. When the Plaintiff inquired as to why therapy was being denied, he was informed that Ms. Quinn had reported that the Plaintiff was "inconsistent" and that it was her belief that the Plaintiff was only trying to be in physical therapy in an effort to try and gain something.

86. Shortly after being denied physical therapy the Plaintiff would be assigned a cane but not untill many complaints and requests were filed.

87. The Plaintiff would eventually be examined by a Dr. Hardy, whom after examining the Plaintiff, prescribed both nerve and headache medication to help me with my pain and discomfort. He would also recommend that the Plaintiff should be given a specialized type of physical therapy and that if no improvment was seen, that the Plaintiff would have to receive surgery.

88. Over the time period the Plaintiff has been confined to FMC Devens, he has made repeated requests to see specialists for his, back, hip, and left eye, and has been repeatedly told that he will be taken to see these specialist but he never is.

89. The Plaintiff is in almost constant pain from the injuries sustained to his back, hips and knee's, as well as suffering from terrible migrains and disorientation from his left eye vision loss. Yet the staff at FMC Devens refuse to provide any further medical assistance, treatment or further evaluations of his condition.

90. It has become apparent to the Plaintiff that the Medical Staff at FMC Devens has either decided there is nothing more that

-13-

can be done for him, or that he is faking injuries and as such does not need or deserve their attention.

91. It is the contention of the Plaintiff that it is the latter of these two decisions as his treatment from the non-medical staff has taken a turn for the worst.

92. In the aftermath of filing his first complaint in District Court, the Plaintiff was removed from the lower bunk he has resided in for twenty-two (22) months, and assigned to an upper bunk. He was then threatened with placement in the Special Housing Unit if he did not move to the upper bunk.

93. In an effort receive some assistance with this problem, the Plaintiff wrote a letter to then Warden Jeff Grondolsky.

94. Warden Grondolskt would look into this matter and question then Unit Manager Ms. Huntin about my situation, he would also inquire with medical services.

95. Medical services explained to the Warden that everything that could be done for the Plaintiff was being done.

96. Ms Hunton however, would become angry and frustrated with the Plaintiff and schold him for not coming to her with his problem. She assured the Plaintiff that she would look into his problems and that for the time being he should remain in his lower bunk without concern.

97. On August 2, 2017, the Plaintiff would be told once again by his counselor that he would have to move to the upper bunk.

98. The Plaintiff addressed this request with Unit Manager Hunton, whom seemed anoyed with the Plaintiff's request.

99. The Plaintiff agreed to move to the upper bunk, but requested that his medical condition and his assignment of a

-14-

cane be placed on the record. He also requested that he be provided some assistance in moving his mattres to the upper bunk.

100. The Plaintiff would then return to his room and while receiving assistance from another inmate in moving his mattress to the upper bunk, would be removed from the Unit and placed in the Special Housing Unit.

101. The Plaintiff would spend ten (10) days in the Special Housing Unit for refussing a direct order, which he never did.

102. Upon release from the Special Housing Unit the Plaintiff has been assigned an upper bunk and in an effort to remain out of the Special Housing Unit, and with great pain and discomfort has remained in the upper bunk.

### V. Legal Claims

103. The facts conferred above, in lines 10 through 102, illustrate a concerted and systematic effort by the defendants and their agents, to deprive the Plaintiff of constitutionally protected and guaranteed rights, including, but not limited to, those enumerated in the succeeding paragraphs.

### VI. First Cause Of Action

104. The Defendants, and their agents, by denying the Plaintiff's repeated requests for medical assistance and evaluation, violated the Plaintiff's rights to be free from the infliction of cruel and unusual punishment, which is a right that is guaranteed and protected by the Eighth Amendment to the United States Constitution.

## VII. Second Cause Of Action

105. The Defendants, and their agents, by denying the Plaintiff of appropriate and necessary prescribed medications, treatment plans and the use of medical apparatus to assist in his everyday movements, showed a level of deliberate indifference and disregaurd for the Plaintiff's well being, which violates the Plaintiff's right to be free from cruel and unusual punishment, which is a right that is guaranteed and protected by the Eighth Amendment to to the United States Constitution.

## VIII. Third Cause Of Action

106. The Defendants, and their agents, by placing the Plaintiff in the Special Housing Unit for repeated requests for appropriate and necessary prescribed medications, treatments, use of medical apparatus, the Administrative Remedy process and assignment to a lower bunk, violated the Plaintiff's right to be free from unconstitutional administrative action which is a right that is guaranteed and protected by the Fifth and Fourteenth Amendments to the United States Constitution.

## IX. Fourth Cause Of Action

107. The Defendants, and their agents, by striking the Plaintiff with their hands, feet and other devices, violated the Plaintiff's right to be free from cruel and unusual punishment, which is a right guaranteed and protected by the Eighth Amendment to the United States Constitution.

-16-

## X. Fifth Cause Of Action

108. The Defendants, and their agents, by stiking the Plaintiff with their hands, feet and other devices, violated the Plaintiff's right to the protection of life and health, which is a right that is guaranteed and protected by the Fifth and Fourteenth Amendments to the United States Constitution.

## XI. Sixth Cause Of Action

109. The Defendants, and their agents, by denying the Plaintiff an opportunity to seek and receive redress for both the assault and denial of medical necessary treatment, violated the Plaintiff's to be free from abuse of discretion on the part of prison administrators, which is a right that is guaranteed and protected by the Fifth and Fourteenth Amendments to the United States Constitution.

## XII. Equity

110. The Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs described herein. The Palintiff is, and will remain to be, irreparablt injured and prejudiced by the conduct of the defendants unless the Court grants declaratory and injuctive relief as well as financial compensation for said conduct listed herein, which the Plaintiff now seeks.

## XIII. Relief

WHEREFORE, the reasons contained herein, the Plaintiff respectfully and humbly requests that this Honorable Court enter a judgement granting him :

-17-

1. A declaratory judgement that the defendants' acts, policies and practices herein described and complain of, violated the Plaintiff's rights which are guaranteed and protected by the United States Constitution.

2. A priliminary and permanent unjunction which:

    a) Prohibits any and all Defendants, their successors in office, agents and employees as well as any and all persons acting in concert or participation with, from denying the Plaintiff proper and necessary medical treatment and evaluation.

    b) Prohibits any and all Defendants, their successors in office, agents and employees as well as any and all other persons acting in concert or participation with, from transferring the Plaintiff to any other Federal Institution, without the Plaintiff's expressed consent, during the pendency of this law suit, or otherwise retaliating against him in any way.

3. A compensation or damages judgement against the Defendants for the acts, policies and practices herein described and complained of, which violated the Plaintiff's rights guaranteed and protected by the United States Constitution:

    a) Compensation for last wages due to the Plaintiff's loss of vision in his left eye, which will prohibit him from returning to his career as a long-haul truck driver, in the amount of $1,400,000.00.

    b) Compensation for the estimated increase to the cost of living expenses due to the Plaintiff's loss of vision in his left eye, as well as his limited ability to walk or stand, unassisted, for an extended period of time, or complete typical everyday activities like the climbing of stairs or the lifting

of an object which is more than 20lbs from the floor, in the amount of $1,600,000.00.

    c) Compensation for injuries sustained as a result of both the accident and the assault; pain and suffering from the accident, assault, mental abuse suffered from both the deliberate indifference and accusatory verbiage; as well as for the failure to provide appropraite and necessary medical treatment; in the amount of $7,000,000.00.

    4. The Plaintiff both humbly and respectfully requests any and all other forms of relief that this Honorable Court deems to be both appropariate and just.

                          Respecyfully Submitted,

                            Kormahyah Karmue, Pro se

### Declaration Of Truth

    I, Kormahyah Karmue, do hereby swear, under penalty of perjury by the laws of the United States of America, that the foregoing statements are true and complete to the best of my knowledge.

    Sworns by _____ on _10 17 2017_.
               Kormahyah Karmue                  Date