UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| KORMAHYAH KARMUE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 17-CV-107-LM-AKJ |
| | ) | |
| DAVID REMINGTON, et. al., | ) | |
| Defendants. | ) | |

### FEDERAL DEFENDANTS' MOTION FOR
### PARTIAL SUMMARY JUDGMENT AND MOTION TO DISMISS

BRENTON MOORE; ELDEN DASILVA;
JUSTIN CARVALHO; AL-KARIM
DHANJI, M.D.; KERRY QUINN; AND
UNITED STATES OF AMERICA

By Their Attorneys,

AARON L. WEISMAN
United States Attorney

/s/ Bethany N. Wong
BETHANY N. WONG
Assistant U.S. Attorney
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
(401) 709-5000
(401) 709-5017 (fax)
Email:  bethany.wong@usdoj.gov

## **TABLE OF CONTENTS**

I.    INTRODUCTION…………………………………………………….……………..1

II.    PROCEDURAL HISTORY…………………………………………….……..……5

        a.  Plaintiff's Administrative Tort Claims……………………………….…….5

        b.  Plaintiff's Complaint, Amendments, and Claims Against the Federal Defendants..5

III.    LEGAL STANDARD…………………………………………………….……..7

        a.  Pre-Discovery Summary Judgment is Appropriate Where
             Qualified Immunity Applies, and Where Conclusive Video
             Evidence Establishes that No Factual Basis for a Claim Exists………………...…….7

        b.  Claims Against the Government Must Be Dismissed
             Where the Government Has Not Waived Sovereign Immunity……………..…….10

IV.    FACTUAL SUMMARY………………………………………………………11

V.    ARGUMENT……………………………………………………...……………...14

        a.  Qualified Immunity Bars Plaintiff's Claims Against the
             Individual DUSMs in Their Individual Capacities (Claims 1-4)………..…….….14

            i.  Qualified Immunity Shields Federal Employees from Suit Unless
                  Their Actions Violate a Clearly Established Constitutional Right………..14

            ii.  Claim 1 Must Be Dismissed Because Failure to Restrain a
                  Prisoner with a Seatbelt Does Not Violate any Constitutional Right……..17

                1.  The Eighth Amendment Standard for Claims of Deliberate
                      Indifference to Conditions of Confinement Should Be Applied….17

                  2.  Failure to Restrain a Detainee with a Seatbelt Does
                      Not Violate any Clearly Established Constitutional Right…..……19

            iii.  Claims 2 and 3 Must Be Dismissed Because Handcuffing an Inmate
                  Who Is Resisting Constraints Does Not Violate any Constitutional Right..22

            iv.  Claim 4 Must Be Dismissed Because Defendants' Conduct in
                 Immediately Providing Medical Care to an Inmate Who Does Not Have
                 a Serious Medical Need Does Not Violate any Constitutional Right……..26

                  1.  Plaintiff Cannot Show that He Had a Serious Medical
                      Need Requiring more Medical Attention than He Received……..26

2. Plaintiff Cannot Show Deliberate Indifference by the DUSMs…..28

b. Plaintiff's FTCA Claims Based Upon the Actions
of the DUSMs Must Also Be Dismissed (Claim 9)………………….…………...31

i. The Discretionary Function Exception to the FTCA
Bars Plaintiff's Claims Regarding the Use of a Seatbelt……………….31

ii. Plaintiff's Remaining FTCA Claims Against the DUSMs
Must Also Be Dismissed as the Conclusive Evidence
Shows that the Plaintiff Will Be Unable to Establish Negligence……..…33

c. Absolute Immunity Bars Plaintiff's Claims Against
Defendants Dhanji and Quinn in their Individual Capacities (Claim 10)…………35

d. Plaintiff's New FTCA Claim of Medical Negligence at FMC – Devens
Must Be Dismissed for Failing to Exhaust Administrative Remedies (Claim 11)..36

VI. CONCLUSION………………….…………………………………….………………40

Defendants Brenton Moore, Elden DaSilva, Justin Carvalho, Al-Karim Dhanji, M.D.,

Kerry Quinn, and the United States of America (the "Federal Defendants"), by their attorney,

Aaron L. Weisman, move for pre-discovery summary judgment pursuant to Federal Rule of Civil

Procedure 56 and move to dismiss Plaintiff's complaint pursuant to Federal Rule of Civil

Procedure 12(b)(1) for the reasons set forth below.

## I.  <u>INTRODUCTION</u>

The allegations made by Plaintiff against the Federal Defendants in this case lack legal or

factual merit. Plaintiff attempts, without factual support, to bring constitutional claims against six

different federal employees in their individual capacities. However, each of the named federal

employees is entitled to either qualified or absolute immunity, and thus the law provides that the

claims against them be dismissed, prior to discovery. Further, although Plaintiff also attempts to

bring tort claims against the government based on the allegations he makes against the individual

employees, the threshold requirements of the Federal Tort Claims Act ("FTCA") are not met in

this case, and therefore the government's sovereign immunity has not been waived, and the

Court does not have subject matter jurisdiction over these claims. Further, conclusive video and

other record evidence shows that Plaintiff will be unable to establish his claims under the FTCA.

Thus, Plaintiff's claims against the Federal Defendants should be dismissed in their entirety.

Plaintiff Kormahyah Karmue is a federal inmate who was sentenced to 78 months of

imprisonment and 3 years of supervised release on August 26, 2015, after being found guilty of

conspiracy to commit arson, wire fraud, and mail fraud. (Federal Defendants' Statement of

Undisputed Facts ("SOUF") at ¶ 1)[1]. On April 23, 2015, Plaintiff was transported by the United

---

[1] Pursuant to Local Rule 56, the Federal Defendants are filing a separate Statement of Undisputed Facts in
support of this Motion. The Federal Defendants refer to their Statement of Undisputed Facts, and
accompanying exhibits, throughout this Motion.

States Marshals Service ("USMS") to the District Court for the District of Rhode Island for a hearing as part of the criminal case. Plaintiff alleges that during transport, he was not restrained with a seatbelt and "sustained serious injuries" during a sudden stop, resulting in such severe pain that he was unable to lift himself off the floor of the transport vehicle, and was instead dragged by the Deputy U.S. Marshals ("DUSMs") out of the van and into the federal court holding cell, where he remained handcuffed. (Second Amended Complaint ("SAC") at ¶¶ 16-18, 21-23). He then claims that emergency medical personnel arrived and were instructed not to touch him. (Id. at ¶¶ 27-28). Plaintiff alleges that he could not stand, and so the DUSMs once again dragged him to the elevator, where he was physically assaulted and "subjected to the shock of tazer or stun-gun…causing blurred vision." (Id. at ¶¶ 29-36).  He then alleges, seemingly in the alternative, that the DUSMs attempted to prevent him from receiving medical care, but also that he was transported by ambulance to Roger Williams Hospital Emergency Room, where he was ultimately discharged to the Wyatt Detention Facility. (Id. at ¶¶ 39-48). He was seen at Memorial Hospital, the next day. (Id. ¶ 51). After his sentencing, Plaintiff was transferred to the Federal Medical Center – Devens in Ayer, Massachusetts ("FMC-Devens"). (Id. at ¶ 65). Although not included in his administrative tort claim, Plaintiff now alleges in his Second Amended Complaint that "Dr. Danji" and "Physical Therapist Quinn" refused to provide him with medical care at FMC-Devens. (Id. at ¶¶ 67-69; 76-85).[2]

However, video recordings from security cameras at the federal courthouse from April 23, 2015, as well as medical records submitted to the USMS by Plaintiff, conclusively refute each of Plaintiff's allegations from that date. The video recordings unequivocally show Plaintiff

---

[2] The Federal Defendants assume that Plaintiff refers to Dr. Al-Karim Dhanji and Kerry Quinn, a physical therapist, who were employed with the United States Public Health Service at the FMC – Devens at the time of the allegations in the complaint. (SOUF at ¶¶ 47, 51).

stepping out of the transport van, walking without assistance to the inmate elevator, standing in the inmate elevator without incident, walking to the holding cell, being removed from handcuffs, speaking with an emergency medical technician ("EMT") who was called in response to his claim of injury during transport, walking again with minimal assistance from one EMT to the inmate elevator, suddenly falling to the elevator floor and resisting the DUSMs, being re-handcuffed, and being placed on a stretcher and into an ambulance. (SOUF at ¶¶ 6-26; Exhibits 1-16). The video from the elevator shows one DUSM un-holstering, but never deploying, a taser. (SOUF at ¶¶ 22-23; Exhibit 12). A data report from the taser issued to the DUSM confirms that the taser was never deployed. (SOUF at ¶ 24; Exhibit 17).

Medical records provided by Plaintiff to the USMS confirm that Plaintiff was provided medical attention by emergency medical personnel, by staff at the Roger Williams Hospital emergency room, and by staff at Memorial Hospital the following day. (SOUF at ¶¶ 27-33). The EMT records state that, while at the courthouse, Plaintiff was able to bend and straighten his legs and had no visible swelling, that Plaintiff insisted on ambulating and stated that he was able to walk, that Plaintiff did not want EMTs to touch him, that Plaintiff was combative in the elevator, and that the EMTs were unable to obtain Plaintiff's vitals due to his combativeness. (SOUF at ¶ 28; Exhibit 19 at p. 9). Further, records from Roger Williams Hospital state that Plaintiff yelled at medical personnel and that the EMTs reported to staff that they had not witnessed an assault. (SOUF at ¶ 30; Exhibit 19 at p.13). The only injury identified in the Roger Williams Hospital records provided by Plaintiff was a bruise and Plaintiff's report of pain. (SOUF at ¶ 30; Exhibit 19 at pp. 10-13) The Roger Williams Hospital records do not include a record of any complaint by Plaintiff regarding his vision or any issue with his eyes upon examination. (SOUF at ¶ 31; Exhibit 19 at pp. 10-13). Medical records from Memorial Hospital from the next day state that

Plaintiff did not have a contusion on his face or body, that he had "no recent change in vision," and that his head had "no signs of trauma." (SOUF at ¶ 33; Exhibit 19 at p. 16).

With respect to Plaintiff's claims against DUSMs Brenton Moore, Elden DaSilva, and Justin Carvalho in their individual capacities pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), Claims 1-4, these claims should be dismissed pre-discovery on the basis of qualified immunity for the following reasons:

- Plaintiff cannot establish the deprivation of a clearly established constitutional right with respect to his transport to the federal courthouse, as numerous cases have found that not using a seatbelt to transport a prisoner does not violate a constitutional right;

- Video evidence confirms that the minimal physical force used in response to Plaintiff's active resistance was objectively reasonable; and

- Video and contemporaneous records confirm that Plaintiff was not denied medical attention for a serious medical need.

With respect to Plaintiff's tort claims under the FTCA based on the events of April 23, 2015, Claim 9, the USMS' conduct and decisions about how to transport the Plaintiff, including not using seatbelts, are a matter of discretionary and policy decision-making, and thus liability for this decision is barred by the discretionary function exception to the FTCA. Further, the video evidence establishes that Plaintiff will not be able to establish negligence by any DUSM with respect to their transport of Plaintiff, the force used in response to Plaintiff's resistance or his access to medical care.

With respect to Plaintiff's Bivens claims against "Dr. Danji" and "Physical Therapist Quinn" at FMC-Devens, Claim 10, these individuals are entitled to absolute immunity as employees of the Public Health Service. In addition, Plaintiff did not administratively exhaust

any FTCA claim stemming from allegedly negligent medical care by Defendants Dhanji and Quinn, as required by the FTCA, and therefore Claim 11 must also be dismissed for lack of subject matter jurisdiction.

## II.   PROCEDURAL HISTORY

### a.   Plaintiff's Administrative Tort Claims

Plaintiff submitted an undated Standard Form 95 Claim for Damage, Injury, or Death to the Bureau of Prisons ("BOP") based on the events of April 23, 2015, which was referred to the USMS on June 9, 2016. (SOUF at ¶ 37; Exhibit 20). On September 27, 2016, Plaintiff submitted a second Standard Form 95 Claim for Damage, Injury or Death to USMS, again based on the events of April 23, 2015. (SOUF at ¶¶ 40-41; Exhibit 18).

### b.   Plaintiff's Complaint, Amendments, and Claims Against the Federal Defendants

On March 21, 2017, Plaintiff filed a complaint against various defendants in the District of Rhode Island, and the matter was referred to the District of New Hampshire for assignment by designation. (Dkt. Nos. 1, 4, 5). Plaintiff filed an amended complaint on May 15, 2017 (Dkt. No. 11), along with a number of other filings, including motions for preliminary injunctive relief. On June 27, 2017 the Court issued a report and recommendation, recommending that Plaintiff's various motions for preliminary injunctive relief be denied. (Dkt. No. 41).

On July 25, 2017, the Court issued a second report and recommendation, pursuant to 28 U.S.C. § 1915A(a), clarifying the claims and defendants in this action. (Dkt. No. 44). The Court ordered the U.S. Attorney's Office for the District of Rhode Island to identify the individual John Doe defendants. (Dkt. No. 45 at 2-3). The U.S. Attorney's Office filed a notice providing the identities of DUSMs Brenton Moore, Elden DaSilva, and Justin Carvalho on September 18, 2017. (Dkt. No. 53). On October 23, 2017, Plaintiff filed additional documents. (Dkt. No. 56).

On February 23, 2018, the Court construed Plaintiff's filings to be a Motion to Amend the Complaint. (See Text Order of February 23, 2018). The Federal Defendants did not object to the amendment of the complaint.

On May 18, 2018, the Court issued a new report and recommendation ("May 18th R&R"), clarifying the claims that remained in the case based on Plaintiff's Second Amended Complaint. (Dkt. No. 67). More specifically, the May 18th R&R allowed the following claims with respect to the Federal Defendants[3] to proceed:

- Claim 1: DUSMs Moore and DaSilva violated Plaintiff's Fifth Amendment due process right to be protected from a substantial risk of serious harm by allegedly failing to properly secure Plaintiff with a seatbelt during transport to the federal courthouse on April 23, 2015;

- Claim 2: DUSMs Moore and DaSilva violated Plaintiff's Fifth Amendment due process right by allegedly kicking, punching, and using a taser on Plaintiff in an objectively unreasonable manner while in an elevator at the federal courthouse on April 23, 2015;

- Claim 3: DUSMs Carvalho and John Doe #4 violated Plaintiff's Fifth Amendment due process rights by allegedly failing to intervene to protect Plaintiff during the incident alleged in Claim 2;

- Claim 4: DUSMs Moore, DaSilva, and Carvalho violated Plaintiff's Fifth Amendment due process right to adequate medical care by (a) allegedly denying Plaintiff's request for medical assistance and evaluation after he was injured during transport; (b) allegedly stopping EMTs from evaluating or treating Plaintiff in the holding cell; (c) allegedly stopping EMTs from evaluating or treating Plaintiff in an ambulance transporting the

---

[3] Defendants Chief Deputy U.S. Marshal David Remington, the United States Marshals Service, and the Federal Bureau of Prisons have been dismissed from this case. (See Dkt. No. 67 at 17-18; Dkt. No. 100).

Plaintiff from the courthouse to Roger Williams Hospital; and (d) allegedly stopping medical personnel at Roger Williams Hospital from examining or treating Plaintiff in the emergency room;

- Claim 9: The United States is liable under the FTCA for negligence based on the above claims;

- Claim 10: FMC-Devens physician Dr. Dhanji and physical therapist Quinn violated Plaintiff's Eighth Amendment right to adequate medical care by allegedly acting with deliberate indifference to Plaintiff's serious medical needs; and

- Claim 11: The United States is liable under the FTCA for negligence based on Claim 10.

Plaintiff filed several additional documents with the Court, including requests to further amend his complaint on June 18, 2018 (Dkt. No. 78) and on July 9, 2018 (Dkt. No. 79). On July 13, 2018, the Federal Defendants requested that they be given an extension of time to respond to Plaintiff's Second Amended Complaint until twenty-one days after the Court issued a ruling on the pending report and recommendation and Plaintiff's outstanding motions, which was granted by text order on January 23, 2019. (Dkt. No. 81; Text Order of January 23, 2019). On March 4, 2019, the Court approved the May 18th R&R, as amended by the February 4, 2019 endorsed order. (Dkt. No. 107).[4]

## III.   LEGAL STANDARD

### a.   Pre-Discovery Summary Judgment is Appropriate Where Qualified Immunity Applies, and Where Conclusive Video Evidence Establishes that No Factual Basis for a Claim Exists.

The Supreme Court formulated the qualified immunity doctrine in order to allow government officials the necessary latitude to exercise their authority without the chilling effect

---

[4] The amendments in the February 4, 2019 order do not pertain to the Federal Defendants.

and distraction of damages suits, and to ensure that only conduct that unquestionably violates the Constitution will subject an official to personal liability. See Harlow v. Fitzgerald, 457 U.S. 800, 814-815 (1982). The Supreme Court has "repeatedly stressed" that courts should apply qualified immunity "at the earliest possible stage of litigation." Pearson v. Callahan, 555 U.S. 223, 232 (2009) (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)). Qualified immunity is not merely a defense to liability, but an immunity from suit, and hence the burdens of the litigation process, including discovery and trial. See Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (citing Harlow, 457 U.S. at 817-18). The "driving force" behind the creation of the qualified immunity doctrine was a desire to ensure that "insubstantial claims against government officials be resolved *prior to discovery and on summary judgment if possible*." Anderson v. Creighton, 483 U.S. 635, 640, n. 2 (1987) (emphasis added); Pearson, 555 U.S. at 231 (2009). Thus, summary judgment on the basis of qualified immunity is appropriate pre-discovery where a plaintiff will be unable to show how discovery will allow him to rebut a defendant's showing of objective reasonableness or the absence of a violation of a clearly established constitutional right. See Stonecipher v. Valles, 759 F.3d 1134, 1149 (10th Cir. 2014).  The Supreme Court has stated that in responding to a motion for summary judgment on the basis of the defense of immunity, "plaintiffs may not play dog in the manger; and firm application of the Federal Rules of Civil Procedure will ensure that federal officials are not harassed by frivolous lawsuits." Harlow, 457 U.S. at 808 (quoting Butz v. Economou, 438 U.S. 478, 508 (1978)).

Under Federal Rule of Civil Procedure 56, a court must grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. F.R. Civ. P. 56(a). Although, under traditional summary judgment standards, the non-moving party is entitled to reasonable inferences to be drawn from

the facts, both the Supreme Court and the First Circuit have clarified that where the incident in question was recorded on video that refutes plaintiff's claims, dismissal through summary judgment is appropriate. See Scott v. Harris, 550 U.S. 372, 380-81 (2007) (rejecting claims under 42 U.S.C. § 1983 when video evidence contradicted plaintiff's allegations of excessive force); Hunt v. Massi, 773 F.3d 361, 365 n.2 (1st Cir. 2014) (refusing to credit plaintiff's version of events, that he was "too weak" to resist arrest, because it was "blatantly contradicted" by the record evidence); Perry v. Dickhaut, 125 F. Supp.3d 285, 296 n.7 (D. Mass. 2015) ("[A cellmate's] assertion that unnamed prison staff 'viciously assaulted' Plaintiff by kicking and punching him is insufficient to support the excessive force claims against [certain defendants]. In light of the comprehensive video recordings of Plaintiff's cell extractions, no reasonable juror could credit such evidence."); see also Lash v. Lemke, 786 F.3d 1, 6-7 (D.C. Cir. 2015) ("[T]he video recording makes the normal factual solicitude for the nonmovant at summary judgment both unnecessary and inappropriate. No matter what [plaintiff] claims now, we know to a certainty that he resisted arrest because we can see him doing so."); Thompson v. Mercer, 762 F.3d 433, 435-36, 439 (5th Cir. 2014) ("Although the court must construe evidence in the light most favorable to the non-moving party, we will not adopt a plaintiff's characterization of the facts where unaltered video evidence contradicts that account."). As the Supreme Court summarized, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." Scott, 550 U.S. at 380.

**b.  Claims Against the Government Must Be Dismissed Where the Government Has Not Waived Sovereign Immunity.**

"The district courts of the United States are 'courts of limited jurisdiction.  They possess only that power authorized by Constitution and statute.'" In re Olympic Mills Corp., 477 F.3d 1, 6 (1st Cir. 2007); (quoting Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994)). Before this Court can consider the merits of an issue, it must first determine whether the plaintiff has properly invoked its jurisdiction. See Steel Co. v. Citizens for a Better Env't., 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.") (internal citations omitted). All matters are presumed to lie outside the limited jurisdiction of the federal courts until the plaintiff establishes that subject matter jurisdiction is proper. Kokkonen, 511 U.S. at 377. Thus, the plaintiff has the burden of alleging facts sufficient to establish the court's subject matter jurisdiction. See Aversa v. United States, 99 F.3d 1200, 1209 (1st Cir. 1996).

The United States may not be sued without its consent.  See United States v. Mitchell, 463 U.S. 206, 212 (1983); Marina Bay Realty Trust LLC v. United States, 407 F.3d 418, 422 (1st Cir. 2005).  Thus, "[a]bsent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."  FDIC v. Meyer, 510 U.S. 471, 475 (1994).  Sovereign immunity is "jurisdictional in nature," Meyer, 510 U.S. at 475; the terms of any waiver of immunity "define that court's jurisdiction to entertain the suit."  United States v. Sherwood, 312 U.S. 584, 586 (1941).

The terms of consent to be sued may not be inferred, but "must be unequivocally expressed in statutory text."  Marina Bay Realty Trust LLC, 407 F.3d at 422 (quoting Lane v. Pena, 518 U.S. 187, 192 (1996)); FAA v. Cooper, 132 S.Ct. 1441, 1448 (2012).  Similarly, the

terms of consent must be "construed strictly in favor of the sovereign, and not enlarged beyond what the [statutory] language requires." United States v. Nordic Village, Inc., 503 U.S. 30, 33-34 (1992) (internal citations omitted); FAA v. Cooper, 132 S.Ct. 1441, 1448 (2012). Thus, if the matter is at all ambiguous, the issue is resolved in favor of the sovereign. Frahm v. United States, 492 F.3d 258, 262 (4th Cir. 2007) (quoting Lane, 518 U.S. at 192). If a court determines at any time that it lacks subject matter jurisdiction, the court must dismiss the action. Fed. R. Civ. P. 12(b)(1), (h)(3).

"District courts have wide discretion to determine which procedures to employ in resolving the jurisdictional issue." Bank One, Texas, N.A. v. Montle, 964 F.2d 48, 51 (1st Cir. 1992). In evaluating a motion to dismiss for lack of subject matter jurisdiction, a court may consider "whatever evidence has been submitted, such as depositions and exhibits." Carroll v. United States, 661 F.3d 87, 94 (1st Cir. 2011) (internal citations omitted); see also Gonzales v. United States, 284 F.3d 281, 288 (1st Cir. 2002); Dynamic Image Techns., Inc. v. United States, 221 F.3d 34, 37-38 (1st Cir. 2000).

## IV.   FACTUAL SUMMARY

There is no dispute that Plaintiff was transported by the USMS from Wyatt Detention Facility to Rhode Island District Court on April 23, 2015. The video recordings from Rhode Island District Court on April 23, 2015 depict the following:

- Exhibit 1 depicts Plaintiff, while wearing ankle chains, stepping out of the transportation van, with assistance, and then walking toward the federal courthouse without assistance. (SOUF at ¶¶ 6-7; Exhibit 1). This directly contradicts Plaintiff's allegations that (1) he was "unable to lift himself of [sic] the van floor and enter the courthouse" and that (2) DUSMs Moore and DaSilva "dragged the Plaintiff from the floor of the van…." (SAC at ¶¶ 21, 22).

- Exhibit 2 depicts Plaintiff walking, without assistance, into the inmate elevator. (SOUF at ¶ 8; Exhibit 2). This directly contradicts Plaintiff's allegation that

DUSMs Moore and DaSilva "dragged the Plaintiff…through the courthouse…." (SAC at ¶ 22).

- Exhibit 3 depicts Plaintiff riding on the inmate elevator with DUSMs Moore and DaSilva, without assistance, standing for the entirety of the elevator ride. (SOUF at ¶ 9; Exhibit 3). This directly contradicts Plaintiff's allegation that DUSMs Moore and DaSilva "dragged the Plaintiff…through the courthouse, utilizing an elevator…." (SAC at ¶ 22).

- Exhibits 4-6 depict Plaintiff walking, without assistance, from the inmate elevator to a holding cell. (SOUF at ¶¶ 10-11; Exhibits 4-6). This directly contradicts Plaintiff's allegation that DUSMs Moore and DaSilva "dragged the Plaintiff…through the courthouse…eventually depositing the Plaintiff into a hold cell" (SAC at ¶ 22).

- Exhibits 7-9 depict Plaintiff entering the holding cell, and DUSM DaSilva removing Plaintiff's handcuffs and leaving the cell. (SOUF at ¶¶ 12-13; Exhibits 7-9). This directly contradicts Plaintiff's allegation that "[o]nce the Plaintiff was placed in the holding cell, he remained handcuffed…." (SAC at ¶ 23).

- Exhibit 9 then depicts a DUSM entering the holding cell and speaking with Plaintiff while an additional DUSM stands at the door. (SOUF at ¶¶ 14-15; Exhibit 9). The camera does not depict the DUSMs touching Plaintiff in any way. (Id.)

- Exhibit 9 then depicts three DUSMs entering the holding cell, accompanied by two EMTs. (SOUF at ¶ 16; Exhibit 9). The camera then depicts an EMT speaking directly with the Plaintiff and gesturing to parts of Plaintiff's body. (SOUF at ¶ 17; Exhibit 9). This directly contradicts Plaintiff's claim that he was denied access to medical care.

- Exhibit 9 then depicts Plaintiff standing up, with assistance from a DUSM, and walking out of the holding cell, with assistance, initially from a DUSM and then from an EMT. (SOUF at ¶ 18; Exhibit 9). This directly contradicts Plaintiff's allegation that "[w]hen the Plaintiff was unable to stand or walk unassisted, Doe 1 and Doe 2 entered the holding cell and once again began to drag the Plaintiff through the courthouse." (SAC at ¶ 29).

- Exhibits 10 and 11 depict Plaintiff walking, with assistance from one EMT, from the holding cell to the inmate elevator. (SOUF at ¶ 19; Exhibits 10-11). This directly contradicts Plaintiff's allegation that "[w]hen the Plaintiff was unable to stand or walk unassisted, Doe 1 and Doe 2 entered the holding cell and once again began to drag the Plaintiff through the courthouse." (SAC at ¶ 29).

- Exhibit 12 depicts Plaintiff entering the inmate elevator with DUSMs Moore and Carvalho, and the two EMTs. (SOUF at ¶ 20; Exhibit 12).

- Exhibit 12 depicts Plaintiff suddenly falling to the ground and resisting the DUSMs. (SOUF at ¶ 21; Exhibit 12). Exhibit 12 does not depict any use of excessive force on the Plaintiff. This directly contradicts Plaintiff's allegation that "[w]hen the Plaintiff fell to the floor of the elevator, Doe 1 and Doe 2 began to physically assault the Plaintiff." (SAC at ¶ 33).

- Exhibit 12 depicts DUSM Moore removing a taser from its holster and pointing it at Plaintiff while he is resisting the DUSMs, but does not depict the taser being deployed on the Plaintiff. (SOUF at ¶¶ 22-23; Exhibit 12). Further, the data report from the taser issued to DUSM Brenton Moore on April 23, 2015 shows that the taser was not deployed on that date. (SOUF at ¶ 24; Exhibit 17). This directly contradicts Plaintiff's allegation that "[d]uring the assault on the Plaintiff, Doe 1 removed what looked like a tazer or stun-gun from his person and used it three (3) times on the Plaintiff. One of the time [sic] the Plaintiff was subjected to the shock of tazer or stun-gun, the instrument eith [sic] purposefully or accidently made contact with the Plaintiff's left eye, causing blurred vision." (SAC at ¶¶ 35-36).

- Exhibits 12-15 depict Plaintiff being placed on a transport chair, then onto a stretcher, and ultimately into an ambulance. (SOUF at ¶ 26; Exhibits 12-15).

EMT records, which were provided by Plaintiff to the USMS, state that Plaintiff did not want EMT crew to touch him, that Plaintiff had no visible swelling through clothing and was able to bend and straighten his legs, that Plaintiff insisted on ambulating and stated he was able to walk, that Plaintiff became combative in the elevator. (SOUF at ¶ 28; Exhibit 19 at p. 9). This contradicts Plaintiff's allegations that the EMTs "were told by Doe 1 not to touch the Plaintiff" and that "Plaintiff was unable to stand or walk unassisted" (SAC at ¶¶ 28-29). The EMT records also state that the EMTs were unable to obtain Plaintiff's vitals due to his combativeness and that he was transported to Roger Williams Hospital. (SOUF at ¶ 28; Exhibit 19 at p. 9). Partial medical records from Roger Williams Hospital, which were provided by Plaintiff to the USMS, (SOUF at ¶ 29), state that Plaintiff was yelling at medical staff at Roger Williams Hospital, that EMT personnel reported no witnessed assault, and that Plaintiff was ultimately diagnosed with "MVC", knee pain, and a bruise. (SOUF at ¶ 30; Exhibit 19 at 10-13). The medical records provided by Plaintiff from Roger Williams Hospital do not include any record of a complaint by

Plaintiff regarding his vision, or any issue with his eyes upon physical examination. (SOUF at ¶ 31; Exhibit 19 at pp. 10-13). Plaintiff, as admitted in the Second Amended Complaint, also received medical attention at Wyatt Detention Facility and at Memorial Hospital. (SAC at ¶¶ 50-51). According to additional records received from Plaintiff, on April 24, 2015, medical staff at Memorial Hospital recorded "Pt without contusion on face or body," "no skin rash or bruising," "no recent change in vision," and "no signs of trauma" on his head (SOUF at ¶¶ 32-33; Exhibit 19 at p. 16). These records all contradict Plaintiff's allegation that the DUSMs denied him access to medical care, or that they were deliberately indifferent to any serious medical need.

On September 27, 2016, Plaintiff submitted a Claim for Damage, Injury, or Death to the USMS, describing the alleged tort incident with the DUSMs on April 23, 2015, and stating that "the full extent of the damage, which resulted from the accident and subsequent assault by the U.S. Marshals, has yet to be fully diagnosed, as staff at The Federal Medical Center Devens seem unwilling to fully explore any pain, suffering or problems I have as a result of the aforementioned incidents." (SOUF at ¶¶ 40-42; Exhibit 18 at p. 3). However, this claim, which was addressed to the USMS and not the BOP, did not including any allegation of medical malpractice by Defendants Dhanji or Quinn. (SOUF at ¶ 43; Exhibit 18).

V.   **ARGUMENT**

a.   **Qualified Immunity Bars Plaintiff's Claims Against the Individual DUSMs in Their Individual Capacities (Claims 1-4).**

i.   **Qualified Immunity Shields Federal Employees from Suit Unless Their Actions Violate a Clearly Established Constitutional Right.**

"Qualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" White v. Pauly, ___ U.S. ___, 137 S.Ct. 548, 551 (2017) (quoting Mullenix v. Luna, 136 S.Ct.

305, 308 (2015)); see also Harlow, 457 U.S. at 818. An official who asserts a qualified immunity defense can only be held liable if the plaintiff suing him establishes that the official violated a constitutional right that "was clearly established at the time." Conlogue v. Hamilton, 906 F.3d 150, 155 (1st Cir. 2018); Lash, 786 F.3d at 5. The "existing precedent must have placed the statutory or constitutional question beyond debate." Id.; Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011).

As the First Circuit has explained, with respect to qualified immunity, "the doctrine's prophylactic sweep is broad. We view claims of qualified immunity through the lens of objective reasonableness. So viewed, only those officials who should have known that their conduct was objectively unreasonable are beyond the shield of qualified immunity and, thus, are vulnerable to the sword of liability." Conlogue, 906 F.3d at 154 (internal citation omitted). When a defendant invokes the defense of qualified immunity, the analysis is two-pronged: a court must determine whether the defendant violated the plaintiff's constitutional rights, and it must also determine whether the allegedly abridged right was "clearly established" at the time of the alleged misconduct. Id. at 155 (citing McKenney v. Mangino, 873 F.3d 75, 81 (1st Cir. 2017)).

In order to establish that a right was "clearly established," "the plaintiff must identify either controlling authority or a consensus of persuasive authority sufficient to put an officer on notice that his conduct fell short of the constitutional norm. Second, the plaintiff must show that an objectively reasonable officer would have known that his conduct violated the law." Id. The Supreme Court very recently "reiterate[d] the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.' As this Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case." White, 137 S. Ct. at 552 (citing Anderson, 483 U.S. at 640); Ashcroft, 563 U.S. at 742; see also Wilson v. Layne, 526

U.S. 603, 615 (1999). Doing otherwise "avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." Plumhoff v. Rickard, 572 U.S. 765, 779 (2014). Instead, in order for a constitutional right to be clearly established, its "contours [must be] sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it…*existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate*." Id. at 778-79 (emphasis added) (quoting Ashcroft, 563 U.S. at 741). In short, qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986); see also White, 137 S. Ct. at 551. The doctrine of qualified immunity applies in the context of Bivens actions. See Soto-Torres v. Fraticelli, 654 F.3d 153, 158 (1st Cir. 2011); Lash, 786 F.3d at 5.

Importantly, the Supreme Court has repeatedly clarified that in considering the defense of qualified immunity, the court must only consider the facts that were knowable to the defendant officers. White, 137 S.Ct. at 550; Kingsley v. Hendrickson, ___ U.S. ___, 135 S.Ct. 2466, 2476 (2015). As part of that analysis, courts have found that video records of an incident can be sufficient to determine what a reasonable officer would have known at the scene. See, e.g., Lash, 786 F.3d at 7 (rejecting plaintiff's argument that a video recording could not be relied upon).

In this case, Plaintiff cannot refute any applicable basis for the defense of qualified immunity because, in light of conclusive evidence, he cannot establish any constitutional violation, he cannot point to authority that would have put the DUSMs on notice that their conduct violated a constitutional right, and he cannot show that an objectively reasonably officer would have known that the conduct of the DUSMs violated the law.

>    ii.  **Claim 1 Must Be Dismissed Because Failure to Restrain a Prisoner**
>         **with a Seatbelt Does Not Violate Any Clearly Established**
>         **Constitutional Right.**

The Court has interpreted Plaintiff's Second Amended Complaint to include a claim that

DUSMs Moore and DaSilva violated Plaintiff's constitutional right to be "protected from a

substantial risk of serious harm while in pretrial detention by failing to properly secure Karmue

with a seatbelt while transporting" him. (Dkt. No. 67 at 12, Claim 1). However, courts have

repeatedly found that the failure to restrain an inmate with a seatbelt, standing alone, does not

violate the Constitution, and therefore Plaintiff cannot establish that any failure to secure him

with a seatbelt amounts to a violation of a "clearly established" constitutional right.

>    1.  **The Eighth Amendment Standard for Claims of Deliberate**
>        **Indifference to Conditions of Confinement Should Be Applied.**

The Due Process Clause of the Fifth Amendment prohibits subjecting pretrial detainees to

conditions of confinement that amount to pretrial punishment. The Eighth Amendment prohibits

prison officials from depriving sentenced inmates of the minimal civilized measure of life's

necessities. See Frene v. New Hampshire State Prison, 17-cv-305-JD, 2018 WL 1370272, *1

(D.N.H. Feb. 16, 2018) (unpublished). Thus, the Fifth Amendment provides at least as much

protection for pretrial detainees as the Eighth Amendment provides for convicted inmates. As

courts have noted, historically, "the standard applied under the Fourteenth Amendment [so as to

incorporate the Fifth Amendment] is the same as the Eighth Amendment standard." Baptista v.

Hodgson, 16-cv-11476, 2019 WL 319584, *4 (D. Mass. Jan. 24, 2019) (citing Ruiz-Rosa v.

Rullan, 485 F.3d 150, 155 (1st Cir. 2007)); Stile v. Cumberland County Sheriff, 14-cv-00406,

2018 WL 4688722, *22 (D. Me. Sep. 28, 2018).

In order for there to be a constitutional violation based on a condition of confinement for

a pretrial detainee, "First, the plaintiff must establish that, from an objective standpoint, the

conditions of his confinement deny him the minimal measure of necessities required for civilized living. Second, the plaintiff must show that, from a subjective standpoint, the defendant was deliberately indifferent to inmate health or safety." Suprenant v. Rivas, 424 F.3d 5, 18-19 (1st Cir. 2005) (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)); see also Burrell v. Hampshire Cty., 307 F.3d 1, 8 (1st Cir. 2002). Consistent with the Supreme Court's definition, the First Circuit has held that deliberate indifference requires that an official *subjectively* must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* the official must also draw the inference. See Miranda-Rivera v. Toledo-Davila, 813 F.3d 64, 74 (1st Cir. 2016). The First Circuit has likened the deliberate indifference standard to that used for determining criminal recklessness. See Suprenant, 424 F.3d at 19; Baptista v. Hodgson, 16-cv-11476, 2019 WL 319584, *5 (D. Mass. Jan. 24, 2019) (citing Burrell, 307 F.3d at 8). "Proof of deliberate indifference requires a showing of greater culpability than negligence but less than a purpose to do harm…." Coscia v. Town of Pembroke, Mass, 659 F.3d 37, 39 (1st Cir. 2011). "A factfinder can conclude that a government official was aware of a substantial risk of serious harm based on the fact that the risk was obvious. However, there is no deliberate indifference if an official responds reasonably to the risk." Miranda-Rivera, 813 F.3d at 74 (internal citations omitted).

The Court's July 25, 2017 Report and Recommendation noted that many of the First Circuit cases involving claims of deliberate indifference to conditions of confinement by pretrial detainees predate the Supreme Court's decision in Kingsley v. Hendrickson, ___ U.S. ___, 135 S. Ct. 2466 (2015), which applied an objective reasonableness standard to a claim of excessive force, possibly leaving open the question as to whether the Eighth Amendment standard should still be applied to deliberate indifference claims by pretrial detainees based on the conditions of

confinement. (See Dkt. No. 44 at 10 n. 7). However, in Miranda-Rivera, the First Circuit recognized Kingley's holding and applied Kingley's objective reasonableness standard to an excessive force claim, but applied the Eighth Amendment deliberate indifference standard, which includes the subjective component outlined in Farmer, to a pretrial detainee's claim of denial of medical care. 813 F.3d at 74. Similarly, in Zingg v. Groblewski, 907 F.3d 630 (1st Cir. 2018), the First Circuit again applied the Eighth Amendment standard of deliberate indifference to a denial of medical care claim by a pretrial detainee, recognizing both objective and subjective components to the deliberate indifference analysis. 907 F.3d at 634-35; see also Couchon v. Cousins, No. 17-10965, 2018 WL 4189694, at *6 (D. Mass. Aug. 31, 2018) (construing as binding the First Circuit's precedent in Suprenant and Burrell, which include both objective and subjective components in the deliberate indifference analysis).

Thus, for purposes of Plaintiff's claims that the DUSMs were deliberately indifferent to a substantial risk of serious harm, either by failing to use a seatbelt or by providing inadequate access to medical care, the Court should apply both the objective and subjective components of the deliberate indifference analysis. However, the Court need not resolve this issue, because under the application of either standard, the actions of the DUSMs toward the Plaintiff were objectively reasonable.

### 2. Failure to Restrain a Detainee with a Seatbelt Does Not Violate any Constitutional Right.

In the context of seatbelt restraints, courts have repeatedly recognized that, first, a failure to seatbelt an inmate, by itself, does not expose the inmate to a substantial risk to his safety or deny him the minimal measure of necessities required for civilized living, and second, there are often important safety reasons for the officers to *not* employ safety belts for prisoner transport, including the dangers of prisoners using seat belts to break handcuffs, escape, or cause injury.

See, e.g., Smith v. Sec'y for the Dep't of Corr., 252 F. Appx. 301, 304 (11th Cir. 2007)
(unpublished) ("[W]e cannot say that [a prisoner's] riding in a van equipped with the
manufacturer's car seats, seat belts, and windows is a necessity, such that riding in a van without
these characteristics is a deprivation of the minimal measure of life's necessities or is something
that modern society would find intolerable."); Jabbar v. Fischer, 683 F.3d 54, 58 (2d Cir. 2012)
("[A]s for the Eighth Amendment's objective requirement, the failure to provide a seatbelt is not,
in itself, 'sufficiently serious' to constitute an Eighth Amendment violation….[A]s for the Eighth
Amendment's subjective requirement, because the absence of seatbelts on inmate bus transport is
itself not an excessive risk, without more, 'deliberate indifference' – that is, that defendants
knew of, and disregarded, an excessive risk to inmate safety – cannot be plausibly alleged.");
Dexter v. Fort Motor Co., 92 F. Appx. 637, 642 (10th Cir. 2004) (unpublished) ("We have
identified no federal case holding that failure to seatbelt an inmate, standing alone, violates the
Eighth Amendment."); Spencer v. Knapheide Truck Equip. Co., 183 F.3d 902, 906 (8th Cir.
1999) ("[U]sing an objective standard, we do not think that the Board's purchase of patrol
wagons without safety restrains nor its manner of transporting individuals in these wagons were
policies that obviously presented a 'substantial risk of serious harm.'"); Bell v. Norwood, 325 F.
Appx. 306, 307-08 (5th Cir. 2009) (unpublished) (finding case frivolous where plaintiff asserted
that being transported without a seatbelt violated his constitutional rights); Booker v. Graham,
15-CV-02986; 2016 WL 5844158, at *3-4 (D.S.C. Aug. 31, 2016) (holding that plaintiff failed to
allege a constitutional claim against law enforcement officers for failure to seatbelt a prisoner
during transport); Vinson v. United States Marshals Service, No. 10-79, 2011 WL 3903199, *4-
*5 (D.S.C. Sep. 2, 2011) (finding that failure to use a seatbelt could not be the basis for an Eighth
Amendment Bivens claim); Young v. Michigan Dept. of Corrs., No. 04-10309, 2007 WL

20

2214520, *6 (E.D. Mich. July 27, 2007) ("Refusing to seat belt a prisoner during transport and then exceeding the speed limit does not constitute an 'excessive risk to inmate health or safety.'") (quoting Farmer, 511 U.S. at 837); Riddick v. Reiger, 03-cv-462, 2006 WL 2644924 at *6-7 (M.D. Fla. Sept. 14, 2006) (dismissing prisoner's claim regarding the failure to seatbelt him into the transport van and driving recklessly because such allegations "do not objectively state an Eighth Amendment claim"); Carrasquillo v. City of New York, 324 F. Supp.2d 428, 437-38 (S.D.N.Y. 2004) (dismissing prisoner's claim under Section 1983 because the "failure to provide seatbelts to prisoners is not a constitutional violation"); MacCaffray v. United States, No. 97-cv-403, 1998 WL 560047, *5 (D. Vt. 1998) ("The individual Defendants violated no clearly established interest for prisoners in being furnished with safety restraints during transport.); but see Brown v. Missouri Dep't. of Corr., 353 F.3d 1038 (8th Cir. 2004).

Thus, in transporting Plaintiff in a transport van without a seatbelt restraint, repeated case law states that, objectively, the DUSMs did not place Plaintiff at substantial risk of serious harm. This is consistent with USMS vehicle safety policy, which states: "[t]he inside rear door handles and rear seat belts must be removed or rendered inoperable on all vehicles used for prisoner transport" (USMS Policy Directive 9.21(E)(1)(j), In-District Prisoner Movements, Effective April 12, 2011, available at https://www.usmarshals.gov/foia/directives/prisoner_operations.pdf). Even if this action was negligent, which the government disputes, the case law shows that this practice is routine in the transport of prisoners, for a number of policy reasons, including safety. Thus, even under an objective standard, the DUSMs could not plausibly have been deliberately indifferent to a substantial risk of serious harm to the Plaintiff because there was no such risk – instead, they were acting to avoid the risk of harm to Plaintiff or others if he was given access to seatbelt restraints.

Further, because there is significant case law indicating that a failure to use a seatbelt to restrain an inmate does not provide the basis for a deliberate indifference claim, it cannot be the case that failure to use a seatbelt violates a clearly established constitutional right. If anything, the principle established by the relevant case law runs in the opposite direction. Thus, Plaintiff cannot establish that the DUSMs acted in a manner that was objectively unreasonable, and the DUSMs are entitled to qualified immunity with respect to Claim 1.

### iii. Claims 2 and 3 Must Be Dismissed Because Handcuffing an Inmate Who Is Resisting Constraints Does Not Violate any Constitutional Right.

The use of force by law enforcement in the restraint of a pretrial detainee is not a violation of a constitutional right; it is only the *excessive* use of force that implicates potential constitutional concerns. To prevail on an excessive force claim, the plaintiff must show that the force purposely or knowingly used against him was objectively unreasonable. See Kingsley, 135 S.Ct. at 2473. In determining whether the force used was "objectively unreasonable," the Supreme Court has described the following non-exclusive list of considerations: 1) the relationship between the need for the use of force and the amount of force used; 2) the extent of the plaintiff's injury; 3) any effort made by the officer to temper or limit the amount of force; 4) the severity of the security problem at issue; 5) the threat reasonably perceived by the officer; and 5) whether the plaintiff was actively resisting. Kingsley, 135 S. Ct. at 2473 (citing Graham v. Connor, 490 U.S. 386, 396 (1989)). "Liability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process." Kingsley, 135 S. Ct. at 2472 (citation omitted); see also Frene, 2018 WL 1370272 at *1.

The Supreme Court has recently cautioned that when analyzing qualified immunity in the context of an excessive force claim, a court must carefully examine the facts alleged to determine

whether prior case law addresses a sufficiently analogous scenario to place an officer on notice.

See Kisela v. Hughes, ___ U.S. ___, 138 S. Ct. 1148, 1152-1153 (2018) (per curiam) (cautioning courts against undue generality in their approach and noting that under its precedent officers are entitled to qualified immunity unless existing precedent "squarely governs the specific facts at issue.").

In applying this standard, courts necessarily consider the specific facts of the alleged incident. It is important to note in this regard that allegations can fail either because they do not on their face, plausibly allege conduct that meets the standard of excessive force, or because, under qualified immunity analysis, officers lacked clear notice from sufficiently similar precedent to know that a particular action could be regarded as unconstitutional. For example, where a complaint alleged that a corrections officer kicked a pretrial detainee who was on the ground in excruciating pain, ordered him to stand, and allowed other inmates to step over him, the court found that the excessive force claim should be dismissed because there was no allegation of injury from the kick, no discussion of the degree of force used, and the complaint suggested a non-malicious reason for the kick – to have the plaintiff rise to his feet – and thus the complaint failed to plausibly allege that the kick was anything other than a good faith effort to maintain or restore discipline. Wallace v. Cousins, No. 14-14767; 2017 WL 551816, at *4 (D. Mass. Feb. 8, 2017); see also Francisco v. U.S. Marshalls Service, No. 11-231; 2014 WL 652147, *5 (D.R.I. Feb. 19, 2014) (finding that, in contrast to allegations of unnecessary brutal beatings, plaintiff's allegations that correctional officers attempted to slam plaintiff onto the concrete floor and choked him with a stiff arm until he could not breathe in response to plaintiff's aggressive resistance were insufficient to plausibly allege a constitutional violation, where the force used was responsive to plaintiff's resistance and where the plaintiff was provided

with medical attention as soon as officers were able to restore discipline); Borlawsky v. Town of Windham, 115 F. Supp.2d 27, 30-31 (D. Me. 2000) (finding that kicking an arrestee, who claimed to be in and out of consciousness, in order to get the arrestee off the floor, did not amount to an intent to punish and did not give rise to a constitutional claim). Similarly, another court found that law enforcement's use of several non-deadly punches in order to gain control of an intoxicated individual who was actively resisting arrest and acting erratically was not unreasonable and was found not to violate a clearly established constitutional right, even though less force could have been used. See Griggs v. Brewer, 841 F.3d 308, 315 (5th Cir. 2016). Similarly, pushing, pulling, and lifting a resisting detainee have been considered reasonable uses of force for use on a pretrial detainee who is resisting control by officers. See, e.g., Ayala-Rosales v. Teal, 659 F. Appx. 316, 320-21 (6th Cir. 2016) (unpublished). In addition, courts have specifically held that there is no clearly established right for a suspect who actively resists law enforcement not to be subjected to the use of a taser. See, e.g., Dockery v. Blackburn, 911 F.3d 458, 466-67 (7th Cir. 2018) ("[A]n officer's use of a Taser against an actively resisting subject either does not violate a clearly established right or is constitutionally reasonable."); Lash, 786 F.3d at 7-8.

In this case, nothing in the video recording shows Plaintiff being dragged through the courthouse or being subjected to an unreasonable amount of force. Instead, the video shows Plaintiff walking, without assistance, to the inmate elevator and to the holding cell. (SOUF at ¶¶ 7-11; Exhibits 1-16). Additional video shows the plaintiff again walking, with minimal assistance from one EMT, to the inmate elevator. (SOUF at ¶ 19; Exhibits 10-11). The inmate elevator video shows Plaintiff suddenly falling to the floor and resisting the DUSMs. (SOUF at ¶¶ 21; Exhibit 12). The taser report and video recording conclusively show that a taser was *not*

deployed on the Plaintiff. (SOUF at ¶¶ 23-24; Exhibits 12, 17). Instead, DUSM Moore can be seen un-holstering the taser and threatening to use it on the Plaintiff, without actually deploying it, as a way to encourage the Plaintiff to cooperate without the need for further force. (SOUF at ¶ 22; Exhibit 12). The video then depicts Plaintiff continuing to resist and being placed in handcuffs. (SOUF at ¶ 25; Exhibit 12)

Thus, the irrefutable video evidence shows the DUSMs placing Plaintiff in handcuffs without resorting to the use of taser or any unreasonable amount of force, as alleged in Claim 2. (See Dkt. No. 67 at 12, Claim 2). Even though Plaintiff was actively disobeying orders, resisting constraints, and physically acting in a combative manner, as evidenced by the video recordings, the DUSMs simply took steps to maintain control over the inmate and place him in handcuffs, without resorting to additional force. Further, the medical records provided by Plaintiff from Roger Williams Hospital indicate that, at most, Plaintiff had a bruise and self-reported pain. (SOUF at ¶ 30; Exhibit 19 at pp. 10-13). Further, medical records from Memorial Hospital from the following day indicate no bruising on Plaintiff's face or body, no recent change in his vision, and no other sign of head trauma. (SOUF at ¶ 33; Exhibit 19 at p. 16).

Thus, in considering the factors delineated by the Supreme Court, the amount of force used was entirely appropriate for a pretrial detainee who was resisting constraints and moving his body in a manner that could cause injury to himself, to the DUSMs, or the emergency medical personnel; Plaintiff suffered minimal recorded injury; the DUSMs actively attempted to use the least amount of force necessary to contain Plaintiff; and Plaintiff was increasingly becoming a security risk through his active physical resistance. Thus, the actions of the DUSMs were objectively reasonable, particularly when compared to the more significant force at issue in cases such as Wallace or Borlawsky (see supra at 23) that courts have concluded does not rise to the

level of excessiveness. Further, defendants' efforts to contain Plaintiff were clearly within the bounds of the case law that had been developed at the time of Plaintiff's allegations. Based on the video recordings and medical records, Plaintiff's allegations regarding the use of excessive force are refuted, it is not plausible for any jury to conclude that the DUSMs violated any clearly established constitutional right, and each DUSM is entitled to qualified immunity with respect to Plaintiff's excessive force claims. Thus, Claims 2 and 3 must be dismissed.

<blockquote>

**iv.  Claim 4 Must Be Dismissed Because Defendants' Conduct in Immediately Providing Medical Care to an Inmate Who Does Not Have a Serious Medical Need Does Not Violate any Constitutional Right.**

</blockquote>

In order to violate a clearly established constitutional right of a pretrial detainee through the denial of medical care, a correctional officer must have engaged in acts or omissions that were "sufficiently harmful to evidence deliberate indifference to serious medical needs." Wallace, 2017 WL 551816 at *3 (clarifying, as noted earlier, that the standard for analyzing deliberate indifference claims is the same for convicted inmates as for pretrial detainees) (quoting Leavitt v. Corr. Med. Servs. Inc., 645 F.3d 484, 497 (1st Cir. 2011). To state an actionable claim of inadequate care, Plaintiff must satisfy both of two prongs: (1) an objective prong that requires proof of a serious medical need, and (2) a subjective prong that mandates a showing of deliberate indifference to that need. See Kosilek v. Spencer, 774 F.3d 63, 82 (1st Cir. 2014); see also Henry v. Hodoson, 16-CV-11606; 2018 WL 6045250, *4 (D. Mass. Nov. 19, 2018); Ayer v. Heath, No. 14-cv-261-JL; 2014 WL 4162869, *3 (D.N.H. Aug. 18, 2014).

<blockquote>

**1.  Plaintiff Cannot Show That He Had a Serious Medical Need Requiring More Medical Attention Than He Received.**

</blockquote>

"A 'serious medical need' is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity

for a doctor's attention." Miranda-Rivera v. Toledo-Davila, 813 F.3d 64, 74 (1st Cir. 2016)

(citation omitted); see also Chapman v. Finnegan, 950 F. Supp.2d 285, 297 (D. Mass. 2013)). "A

serious medical need is one that involves a substantial risk of serious harm if it is not adequately

treated." LaFauci v. Wrenn, No. 09-cv-454-PB; 2010 WL 2583373, at *5 (D.N.H. June 21,

2010). Bruising and minimal abrasions, for example, generally do not constitute a serious

medical need in this context. See Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203,

208-209 (1st Cir. 1990) (concluding that visible bruising and abrasions, requiring a sling, eye

patch, and disinfectant, do not constitute a serious medical need for treatment. "If that was all the

medical professionals could find to treat, we do not think that [plaintiff's] jailers could be

required to see more.")

     For example, another court within the First Circuit found that where an inmate

complained of chest pain and significant bruising on his body and face, although the inmate was

"badly bruised, such an injury, without more, does not allege a 'serious medical need' for

purposes of establishing an Eighth Amendment violation of the right to adequate medical care in

prison." LaFuci, 2010 WL 2583373 at *6. Similarly, another court found that there was no

evidence that the plaintiff had a serious medical need when the physician who examined plaintiff

following his arrest did not diagnose him with any condition or injury requiring medical

treatment, and the plaintiff was only given intravenous fluids in the hospital. See LaFrenier v.

Kinirey, 478 F. Supp.2d 126, 140 (D. Mass. 2007).

     Here, Plaintiff claims that he suffered such significant injury to his knee during his

transport on April 23, 2015 that he was unable to walk. This is flatly contradicted by video

recordings from the courthouse clearly depict Plaintiff walking, unassisted, through the

courthouse. (SOUF at ¶¶ 7-11; Exhibits 1-6). The EMT notes state that Plaintiff complained of

pain but had no visible swelling, that Plaintiff was able to bend and straighten his legs, and that Plaintiff insisted on ambulating and stated he was able to walk. (SOUF at ¶ 28; Exhibit 19 at p. 9). The records provided by Plaintiff indicate that Plaintiff was evaluated by EMTs on April 23, 2015; by emergency room personnel at Roger Williams Hospital on April 23, 2015; and by medical personnel at Memorial Hospital on April 24, 2015. (SOUF at ¶¶ 27-33; Exhibit 19 at pp. 7-17). He was diagnosed with am "MVC," knee pain, and a bruise on April 23, 2015, and the medical records from April 24, 2015 indicate no bruising on his body and no other sign of head trauma. (SOUF at ¶¶ 30, 33; Exhibit 19 at pp. 12-13, 16). Thus, there is simply no indication that Plaintiff was experiencing a serious medical need at any point on April 23, 2015. As the First Circuit stated in Gaudreault, if that was all the medical professionals could find to treat, the DUSMs cannot be required to have seen more.

### 2.   Plaintiff Cannot Show Deliberate Indifference by the DUSMs.

Even were the Court to conclude that Plaintiff's medical need was serious, in the constitutional sense, as noted above, "[d]eliberate indifference requires (1) that the official ... be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and (2) that he draw that inference." Miranda-Rivera, 813 F.3d at 74 (citing Farmer, 511 U.S. at 837). A showing of deliberate indifference may be made by demonstrating that the defendant provided medical care that was so inadequate as to shock the conscience, or, put otherwise, that was so clearly inadequate as to amount to a refusal to provide essential care. Zingg v. Groblewski, 907 F.3d 630, 635 (1st Cir. 2018) (citing Feeney v. Correctional Medical Services, Inc., 464 F.3d 158, 162 (1st Cir. 2006); Torraco v. Maloney, 923 F.2d 231, 235 (1st Cir. 1991)); Ruiz-Rosa v. Rullan, 485 F.3d 150, 156 (1st Cir. 2007) ("Deliberate indifference in this context may be shown by the denial of needed care as punishment and by decisions about

medical care made recklessly with actual knowledge of impending harm, easily preventable.")
(citation omitted); Chapman, 950 F. Supp.2d at 297; see also Ayer, 2014 WL 4162869 at *3
(finding that an inmate failed to demonstrate that delay in his medical care caused him
preventable harm or a worsening of his underlying condition). "[S]ubstandard care, malpractice,
negligence, inadvertent failure to provide care, and disagreement as to the appropriate course of
treatment are all insufficient to prove a constitutional violation." Ruiz-Rosa, 485 F.3d at 156.
Instead, the standard encompasses a "narrow band of conduct." See Feeney, 464 F.3d at 162.

Even if Plaintiff could establish a serious medical need, which he cannot, he cannot
demonstrate that the medical care that he was provided was so inadequate as to shock the
conscience, or was so clearly inadequate as to amount to a refusal to provide essential care.
Plaintiff has instead himself provided the evidence that he did in fact receive treatment. As the
First Circuit has observed, a reasonable response is enough to negate deliberate indifference.
Miranda-Rivera, 813 F.3d at 74. Further, deliberate indifference does not exist when an
incarcerated plaintiff disputes the timing or choice of a certain treatment, rather than the
complete lack of treatment. See Stile v. United States Marshals Service, 15-cv-494-SM, 2016
WL 3571423, *6 (D.N.H. May 9, 2016) (Report and Recommendation, adopted at 2016 WL
3582027) (unpublished).

For example, in a case where an inmate alleged that he repeatedly requested medical
attention for a painful toothache, which was causing visible swelling on his face, correctional
officers allowed him to be given Motrin but denied his requests to go the infirmary. Wallace v.
Cousins, No. 14-14767; 2017 WL 551816, at *1 (D. Mass. Feb. 8, 2017). The plaintiff in
Wallace went on to allege that three hours later, he again approached officers, and collapsed to
the ground from the pain, where an officer allegedly kicked him, and then picked him up and

brought him to the infirmary, where a nurse told officers that there was no severity in the plaintiff's medical situation, despite plaintiff's swollen face and cries of pain. Id. The court dismissed claims of deliberate indifference, finding that the inmate's allegations failed to support a plausible inference that the correctional officers "denied him needed medical care as a punishment or acted recklessly in the face of knowledge of imminent harm," as they arranged for the inmate to be seen and treated by medical staff. Id. at *3; see also Ayer, 2014 WL 4162869 at *3 (finding that an inmate failed to demonstrate that delay in his medical care caused him preventable harm or a worsening of his underlying condition).

In this case, as noted above, the video recordings show that there was no reason for the DUSMs to suspect that Plaintiff was suffering a serious medical need at all. Nonetheless, the DUSMs still contacted emergency personnel and allowed the EMTs to speak with the Plaintiff and assist Plaintiff in walking to the courthouse elevator. (SOUF at ¶¶ 16-19; Exhibits 9-11). The EMT notes, provided by the Plaintiff himself, further indicate that it was *Plaintiff* who stated that he did not want the EMTs to touch him and that the EMTs were unable to obtain Plaintiff's vitals because of his combativeness. (SOUF at ¶ 28; Exhibit 19 at p. 9). Even if the DUSMs told the EMTs that Plaintiff did not require medical attention, they still allowed Plaintiff to be transported to the emergency room at Roger Williams Hospital, where the records state that the EMTs reported that they witnessed no assault on Plaintiff. (SOUF at ¶ 30; Exhibit 19 at p. 13). The records also indicate that Plaintiff yelled at emergency room staff. (Id.) Plaintiff also received treatment from Memorial Hospital the next day, where he does not allege any interference by any DUSM, and where his medical evaluation revealed no bruising or signs of head trauma. (SOUF at ¶¶ 32-33; Exhibit 9 at p. 16). Thus, Plaintiff cannot plausibly claim that he was denied essential care, or was at any point at a substantial risk of serious harm. At the very most, his

treatment was delayed or even diminished due to his own refusal to cooperate, but to no medical effect. Thus, there is no basis for a claim of deliberate indifference under any standard.

Further, even if the DUSMs had not provided adequate access to medical care, there would still be no violation of a clearly established constitutional right in this case, where the DUSMs could not have been aware of a serious medical need and thus would not have been aware of a substantial risk of serious harm if treatment was delayed. They were instead aware that Plaintiff could walk and that he had not been subjected to a taser or an unreasonable amount of force. Further, it is indisputable that the DUSMs did arrange for Plaintiff to received medical attention. Thus their actions were unquestionably reasonable and were squarely within the actions supported by the cases that address the type of scenario they encountered on April 23, 2015. As such, Plaintiff will be unable to establish that the DUSM defendants violated a clearly established constitutional right, the DUSMs are entitled to qualified immunity, and Claim 4 must be dismissed.

> **b.  <u>Plaintiff's FTCA Claims Based Upon the Actions of the DUSMs Must Also Be Dismissed (Claim 9).</u>**

> **i.  <u>The Discretionary Function Exception to the FTCA Bars Plaintiff's Claims Regarding the Use of a Seatbelt.</u>**

In addition to dismissal of Plaintiff's constitutional claims against the named DUSMs, the Court should also dismiss Claim 9, that is, Plaintiff's claims "under the Federal Tort Claims Act ("FTCA") for the [same alleged] negligence and other tortious acts underlying" his <u>Bivens</u> claims against the DUSMs. (Dkt. No. 67 at 14, Claim 9). The FTCA's waiver of sovereign immunity is subject to several exceptions, the most important of which is the "discretionary function exception." 28 U.S.C. § 2680(a). The discretionary function exception preserves sovereign immunity for the discretionary acts of government employees, *even if the government*

31

*employee abused his or her discretion.* Id.; Carroll v. United States, 661 F.3d 87, 99 (1st Cir. 2011). If the discretionary function exception applies, the claim is outside of the limited waiver of immunity created by the FTCA, and the Court does not have subject matter jurisdiction over the claim. See Wood v. United States, 290 F.3d 29, 35 (1st Cir. 2002).

The Supreme Court has established a two-part test regarding the application of the discretionary function exception: 1) whether the acts are discretionary in nature, that is, whether the actions are a judgment of choice, and 2) whether that judgment is of the kind that the discretionary function exception was designed to shield. See United States v. Gaubert, 499 U.S. 315, 322-23 (1991); Berkovitz v. United States, 486 U.S. 531, 536–37 (1988). "If the challenged conduct is both discretionary and policy-based, there is no subject-matter jurisdiction for the claim." Carroll v. United States, 661 F.3d 87, 100 (1st Cir. 2011). When the federal employee is acting pursuant to a discretionary statute, regulation, or guideline, there is a strong presumption that the employee's conduct is grounded in policies underlying that provision. Gaubert, 499 U.S. at 324; see also Carroll, 661 F.3d at 104.

The USMS is responsible for the safe and secure transfer of prisoners within its custody. See 18 U.S.C. §§ 3621–22, 4002, 4008, 4013, 4082; 28 C.F.R. §§ 0.111(j), (k), (o). The safe and secure transfer includes the safety of the prisoner, the transporting deputies and the communities through which the prisoners are taken, as well as ensuring that prisoners are not in a position to break their restraints, escape, or attempt to injure those transporting them.

Plaintiff has not identified a regulation or policy that requires the USMS to utilize a seatbelt when transporting inmates. Instead, USMS policy states "With respect to prisoners, deputies transporting prisoners are not required to seat belt prisoners in the back seat(s) of GOVs." (USMS Policy Directive 9.21(E)(1)(j), In-District Prisoner Movements, Effective April

12, 2011, available at https://www.usmarshals.gov/foia/directives/prisoner_operations.pdf). This is consistent with USMS vehicle safety policy, which states that "[t]he inside rear door handles and rear seat belts must be removed or rendered inoperable on all vehicles used for prisoner transport" (Id. at  9.21(E)(1)(g)). As a result, courts have found that the discretionary function exception to the FTCA protects the decision of the USMS regarding the use of seatbelts while transporting a prisoner in the back of a passenger van. See, e.g., Roble v. United States, No. PX-16-4045, 2018 WL 1014928, at *5 (D. MD. Feb. 22, 2018); Vinzant v. United States; 458 F. Appx. 328, 333 (5th Cir. 2012) (unpublished); Vinson v. United States Marshals Service, No. 10-79, 2011 WL 3903199, *3 (D.S.C. Sep. 2, 2011); Reynolds v. United States, No. 04-cv-95, 2006 WL 5400338, *5 (N.D. Fla. Jan. 30, 2006); MacCaffray v. United States, No. 2:97-cv-403, 1998 WL 560047, *3 (D. Vt. Aug. 27, 1998). As one court explained "The decision of the [U.S. Marshal] as to whether to use safety belts is inherently grounded in social policy considerations of providing security to the public and employees of the USMS and protecting the safety of prisoners. Thus the failure to provide safety belts was based upon the exercise of a discretionary function on the part of the USMS." Reynolds, 2006 WL 5400338 at *5.

Thus, because any decision by the DUSMs about how to secure Plaintiff in the transport vehicle was discretionary in nature, the FTCA does not provide a waiver of sovereign immunity, and Plaintiff's tort claims against the United States resulting from the DUSMs' failure to use a seatbelt must be dismissed.

### ii.  Plaintiff's Remaining FTCA Claims Against the DUSMs Must Also Be Dismissed as the Conclusive Evidence Shows That Plaintiff Will Be Unable to Establish Negligence.

With respect to Plaintiff's other potential FTCA allegations regarding the DUSMs – that torts were committed in the use of force and provision of medical care to the Plaintiff – as

described above, the video evidence and other medical records establish that Plaintiff's

allegations are implausible. In order to make a negligence claim under the FTCA in Rhode

Island, Plaintiff must establish a legally cognizable duty owed by the defendants to him, a breach

of that duty, proximate causation between the conduct and the resulting injury, and actual loss or

damage. See Morales v. Chadbourne, 235 F. Supp.3d 388, 404 (D.R.I. 2017) (citing Mills v.

State Sales, Inc., 824 A.2d 461, 467–68 (R.I. 2003)). As with constitutional claims based on

excessive force, video evidence can also support the dismissal of negligence claims under the

FTCA that have been alleged alongside Bivens claims. See, e.g., Estate of Martin v. United

States; No. 13-cv-1386, 2015 WL 5568049, *3, *13-*14 (S.D. Cal. Sep. 22, 2015). More

specifically, where video evidence and medical records establish that actions taken by

correctional staff toward an inmate were reasonable under the circumstances and not an

intentional attempt to inflict physical injury, summary judgment dismissing FTCA claims of

assault and negligence is appropriate. See, e.g., Regassa v. C. Brininger, No. 14-CV-1122, 2018

WL 4635971, *6-*7 (M.D. Pa. Sep. 27, 2018). In short, where, as here, "opposing parties tell

two different stories, one of which is blatantly contradicted by the record, so that no reasonable

jury could believe it, a court should not adopt that version of the facts for the purposes of ruling

on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007).

The DUSMs in this case did not breach any duty that was owed to the Plaintiff as they,

quite simply, did not use impermissible force with respect to the Plaintiff and did not deny

Plaintiff medical care. The unequivocal evidence instead shows that the DUSMs did not drag

Plaintiff through the hallways of the courthouse, and when the Plaintiff began resisting the

constraints in the elevator, the DUSMs used the least restrictive methods to maintain control over

the Plaintiff and placed him in handcuffs. They also promptly requested emergency medical

attention on his behalf when requested, and although Plaintiff claims that the DUSMs interfered with his medical care, Plaintiff provides records showing that he did receive medical attention, including the day after the incident, when the DUSMs are not alleged to have interfered with the Plaintiff at all. The medical records submitted by the Plaintiff from the day after the incident state that Plaintiff was "without contusion on face or body" and had "no signs of trauma" to his head. (SOUF at ¶ 33; Exhibit 19 at p. 16). Instead, the DUSMs fulfilled their duty: to safely and securely transport Plaintiff. Thus, Plaintiff will be unable to establish the breach of any duty and he cannot establish any actual injuries. As such, Plaintiff does not have a plausible claim under the FTCA based on the actions of the DUSMs on April 23, 2015.

      **c.**   **Absolute Immunity Bars Plaintiff's Claims Against Defendants Dhanji and Quinn in Their Individual Capacities (Claim 10).**

Plaintiff has also brought claims that he "has suffered violations of his Eighth Amendment right to adequate medical care, in that FMC-Devens physician Dr. Danji and Physical Therapist Quinn, acting with deliberate indifference to Karmue's serious medical needs, denied Karmue adequate medical care." (Dkt. No. 67 at 14, Claim 10). However, the claims against Defendants Dhanji and Quinn must be dismissed because both individuals are entitled to absolute immunity as Public Health Service employees.

By statute, the Public Health Service Act grants absolute immunity to United States Public Health Service officers or employees for actions arising out of the performance of medical or related functions within the scope of their employment by barring all actions against them for such conduct. See 42 U.S.C. § 233(a); 28 U.S.C. §§ 1346(b), 2672; Hui v. Castaneda, 559 U.S. 799, 805-06 (2010) (holding Bivens claims against PHS employees barred by absolute immunity). At the time of the events alleged in the Second Amended Complaint, both Dr. Dhanji and Physical Therapist Quinn were employees of the Public Health Service at FMC-Devens.

(SOUF at ¶¶ 47, 51; Decl. of A. Dhanji at ¶ 2; Decl. of K. Quinn at ¶ 2). Thus, both individuals are entitled to absolute immunity, and the <u>Bivens</u> claims against them must be dismissed.[5]

### d. **Plaintiff's New FTCA Claim of Medical Negligence at FMC – Devens Must Be Dismissed for Failing to Exhaust Administrative Remedies (Claim 11).**

Under the FTCA, an administrative claim must be presented prior to the filing of a civil tort action against the United States. 28 U.S.C. § 2675(a); <u>see also</u> 28 C.F.R. §§ 543.30-.32 (FTCA exhaustion procedure for the BOP).  Specifically, the FTCA bars a plaintiff from filing a tort claim against the government in federal district court unless he first presents his claim to the appropriate federal agency.  <u>See</u> <u>Barrett ex rel. Estate of Barrett v. United States</u>, 462 F.3d 28, 36 (1st Cir. 2006) (citing 28 U.S.C. § 2675(a)).  Absent exhaustion, the Court lacks jurisdiction to entertain an FTCA claim.  <u>See</u> <u>McNeil v. United States</u>, 508 U.S. 106, 113 (1993); <u>Redondo-Borges v. U.S. Dep't of Hous. & Urban Dev.</u>, 421 F.3d 1, 7 (1st Cir. 2005).  In order to determine whether a claim has been "presented," the applicable regulation states that "a claim shall be deemed to have been presented when a Federal agency receives from a claimant…an executed Standard Form 95 or other written notification of an incident, accompanied by a claim

---

[5] Additionally, Plaintiff fails to establish this Court's personal jurisdiction over Defendants Dhanji and Quinn, as is his burden. <u>See</u> <u>CVS Corp. v. Taubman Centers, Inc.</u>, 225 F. Supp.2d 120, 123 (D.R.I. 2002). For a court's exercise of jurisdiction to comply with constitutional due process, the defendant must have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." <u>International Shoe Co. v. State of Washington</u>, 326 U.S. 310, 316 (1945). Plaintiff's Second Amended Complaint fails to allege a basis for personal jurisdiction or any facts that would state a prima facie case for personal jurisdiction. The allegations against Defendants Dhanji and Quinn allegedly took place in Massachusetts. Plaintiff has also not established that either Defendant Dhanji or Defendant Quinn have had minimum contacts with Rhode Island sufficient to subject these individuals to the jurisdiction of this Court. Instead, neither are residents of Rhode Island, nor do they work in Rhode Island. (SOUF at ¶¶ 49, 53). Further, both individuals estimate that they have been present in Rhode Island approximately five times in the past ten years, all unrelated to their employment or the allegations in the complaint. (SOUF at ¶¶ 50, 54). Therefore, this Court does not have personal jurisdiction over either individual and the claims against them in their individual capacities must be dismissed. <u>See</u> <u>Eveland v. Director of C.I.A.</u>, 843 F.2d 46, 50 (1st Cir. 1988). However, for the reasons stated here, if Plaintiff's <u>Bivens</u> claims were properly asserted against these individuals in a court with personal jurisdiction over them, these claims would still be subject to dismissal on the basis of absolute immunity.

for money damages….” 28 C.F.R. §14.2(a). Therefore, in order to bring a claim pursuant to the FTCA, a plaintiff must first have presented his claim to the appropriate federal agency, which, in this case, is the BOP.

It has been repeatedly recognized that although an administrative tort claim does not need to include every possible theory of liability, a plaintiff cannot present one claim to an agency and then initiate suit based on a different set of facts or add new facts that were not administratively exhausted. See Dynamic Image Technologies, Inc. v. United States, 221 F.3d 34, 40 (1st Cir. 2000); Roma v. United States, 344 F.3d 352, 363 (3d Cir. 2003) (finding that the facts concerning potential negligence by federal employees in failing to prevent a fire are distinct from the potential negligence involved in supervising the firefighting operations); McCoy v. United States, 264 F.3d 792-94 (8th Cir. 2001) (stating that where plaintiff’s administrative claim alleged malpractice in the amputation of his leg, but not continuing medical negligence regarding the entire course of diagnosis and treatment of a vascular disease that caused the amputation, he was barred from bringing a malpractice suit based on broader allegations of negligent continuing treatment of his vascular disease);  Deloria v. Veterans Admin., 927 F.2d 1009, 1011–12 (7th Cir.1991) (rejecting plaintiff’s argument that his sixty-three page administrative claim, which alleged a conspiracy to alter the plaintiff’s medical records, foreshadowed malpractice and negligence allegations); Orlando Helicopter Airways v. United States, 75 F.3d 622, 625–26 (11th Cir. 1996); Bembenista v. United States, 866 F.2d 493, 498-99 (D.C. Cir. 1989) (finding that where a sexual assault claim was the only tort alleged in the plaintiff’s Standard Form 95s, although numerous medical records were attached to the administrative claim, failure to include allegations of medical malpractice in the administrative claim barred an FTCA claim of medical malpractice); Smith v. United States, 157 F. Supp.3d 32, 37-38 (D.D.C. 2016) (finding that the

presentment requirement was not met with respect to a negligence claim where a plaintiff submitted aa Standard Form 95 alleging that federal employees committed intentional torts by forcing the plaintiff's signature and assisting in stealing personal property, but then filed a complaint alleging that federal employees negligently served as witness to plaintiff's testamentary acts); Ham v. United States, No. 07-29, 2008 WL 818197, *4 (W.D. Pa. March 26, 2008) (finding that where a prisoner's administrative claim focused on errors by two dentists, mentioning a third in passing, the prisoner could not move forward with a tort claim as to the conduct by the third dentist).

Specifically, the First Circuit has confirmed that when an amended complaint exceeds the scope of the administrative claim, the claims that were not exhausted must be dismissed. See Dynamic, 221 F.3d at 40. In Dynamic, the plaintiffs filed an administrative claim alleging a number of claims against the government based on allegedly false and misleading statements made by government personnel. The administrative claim did not discuss an incident where, when the plaintiff confronted government personnel about the alleged misleading statements, he was forcibly removed from the premises. His original complaint also did not discuss this incident. However, in an amended complaint, the plaintiff added claims of false arrest and emotional distress stemming from the incident. The First Circuit affirmed the district court's dismissal of these claims, because they had not been exhausted in plaintiff's administrative claim. 221 F.3d at 36-37, 40-41; see also Munsill v. United States, 14 F. Supp.2d 214, 218 (D.R.I. 1998) (disallowing a plaintiff, who had filed an administrative claim based on a failure to remove snow, to then pursue a claim of negligence based on failure to repair an eroded sidewalk or to disclose this condition).

In this case, Plaintiff filed two administrative claims regarding the events of April 23, 2015. His second administrative tort claim discusses medical issues is in the context of determining the alleged damages from April 23, 2015, stating: "the full extent of the damage, which resulted from the accident and subsequent assault by the U.S. Marshals, has yet to be fully diagnosed, as staff at The Federal Medical Center Devens seem unwilling to fully explore any pain, suffering or problems I have as a result of the aforementioned incidents." (SOUF at ¶ 42; Exhibit 18 at p. 3). However, Plaintiff's claim, which was addressed to the USMS and not the BOP, did not including an allegation of medical malpractice by Defendant Dhanji or Quinn. (SOUF at ¶ 43; Exhibit 18)[6]

Further, Plaintiff has shown that he is very familiar with the requirements of the administrative process, but he has chosen not to submit an administrative tort claim regarding any actions by Defendants Dhanji or Quinn. In fact, Plaintiff has made a number of internal requests and complaints to BOP staff involving his medical treatment, his work assignment, and his bunk position. (See SAC at ¶ 68; SOUF at ¶¶ 34-36). However, Plaintiff has not submitted an administrative tort claim to BOP or USMS regarding the actions of Defendants Dhanji or Quinn. (SOUF at ¶¶ 39, 44; Decl. of C. Magnusson at ¶ 6; Decl of G. Auerbach at ¶ 7). For example, on November 21, 2015, Plaintiff submitted an inmate request to staff, complaining that Dr. Dhanji refused to examine him and indicating that he had *threatened* to file an administrative claim: "Once I informed him of my intention to file an administrative remedy, Dr. Danji said he would

---

[6] In response to correspondence from the USMS's Office of General Counsel requesting additional information regarding his tort claim, Plaintiff responded, "I am sure you will recall the very serious nature of my Tort Claim regarding the incident which occurred on April 23, 2015, and the injuries I sustained in relation to said incident, as well as the issue concerning my present and future medical care and treatment." (SOUF at ¶¶ 45-46; Exhibit 19 at p. 1). Plaintiff did not seek to amend his administrative complaint to add medical negligence allegations in this correspondence.

prescribe a pain medication and place me on call out to see the physical therapist." (SOUF at ¶¶ 35-36; Exhibit 19 at p. 19). However, Plaintiff chose not to include allegations of medical negligence when he filed his administrative tort claim on September 27, 2016. (SOUF at ¶ 43; Exhibit 18).

This is not a case where Plaintiff failed to recognize potential legal theories arising out of the incident alleged in his administrative tort claim. The administrative claims brought by Plaintiff against numerous federal defendants surrounded the events of April 23, 2015, and to the extent Plaintiff later referred to his medical care, it was in the context of describing the extent of his alleged damages from April 23rd, rather than raising a new claim for damages based on medical negligence. Plaintiff, though well aware of the administrative process for filing a claim, to the point of threatening that he might do so if he did not receive the specific medication he demanded, did not file such a claim. Thus, he did not exhaust his administrative remedies with respect to any FTCA claim based on medical negligence by Defendants Dhanji or Quinn, sovereign immunity is not waived with respect to this claim, there is no subject matter jurisdiction over this claim, and Claim 11 must be dismissed.

## VI.   <u>CONCLUSION</u>

For all the above reasons, the claims against the Federal Defendants in this case (Claims 1-4, 9-11) should be dismissed in their entirety.

Respectfully submitted,

BRENTON MOORE; ELDEN DASILVA;
JUSTIN CARVALHO; AL-KARIM
DHANJI, M.D.; KERRY QUINN; AND
UNITED STATES OF AMERICA

By Their Attorneys,

AARON L. WEISMAN

United States Attorney

/s/ Bethany N. Wong
BETHANY N. WONG
Assistant U.S. Attorney
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
(401) 709-5000
(401) 709-5017 (fax)
Email:  bethany.wong@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 25th day of March, 2019 I electronically filed the within Motion with the Clerk of the United States District Court for the District of Rhode Island using the CM/ECF System.

The following participants have received notice electronically, and have been sent a copy of the digital exhibits via U.S. Mail:

Matthew C. Reeber, Esq.
Patrick J. McBurney, Esq.
Pannone Lopes Devereaux & O'Gara LLC
Northwoods Office Park
1301 Atwood Avenue, Suite 215 N
Johnston, RI 02919
mreeber@pldolaw.com
pmcburney@pldolaw.com

Michael G. Sarli, Esq.
Per C. Vaage, Esq.
Gidley, Sarli & Murusak LLP
One Turks Head Place
Suite 900
Providence, RI 02903
mgs@gsm-law.com
pcv@gsm-law.com

A copy was sent via U.S. Mail to the following participants:

Kormahyah Karmue
09741-070
Federal Medical Center – Devens
P.O. Box 879
Ayer, MA 01432

/s/ Bethany N. Wong
BETHANY N. WONG
Assistant U.S. Attorney