**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**


Kormahyah Karmue

     v.                             Civil No. 17-cv-107-LM-AKJ

David Remington, Chief Deputy
United States Marshal, et al.


**O R D E R**

Before the court is the federal defendants' motion for
partial summary judgment and to dismiss (doc. no. 112), which
was filed with a statement of undisputed facts (doc. no. 113).
Plaintiff Kormahyah Karmue has responded with objections to the
defendants' filings and his own statements of undisputed facts.
See Doc. Nos. 115, 121, 124, 128.  The federal defendants'
motion seeks summary judgment under Rule 56 of the Federal Rules
of Civil Procedure, or dismissal for lack of jurisdiction under
Rule 12(b)(1), as to all of Mr. Karmue's claims, which are
asserted under Bivens v. Six Unknown Named Agents of Fed. Bureau
of Narc., 403 U.S. 388 (1971), and the Federal Tort Claims Act,
28 U.S.C. § 1346(b)(1) ("FTCA").

I.  <u>Factual Background</u>

   A.  <u>April 23, 2015</u>

      1.  <u>Transport Van, Courthouse Hallways, and Holding Cell</u>

On April 23, 2015, Mr. Karmue was a pretrial detainee incarcerated at the Donald W. Wyatt Detention Facility ("Wyatt") awaiting trial on federal criminal charges pending against him in <u>United States v. Karmue</u>, No. 1:13-cr-179-WES-PAS-3 (D.R.I.). Verified Second Amended Complaint ("SAC") (Doc. No. 70, at 2-3). On that day, Mr. Karmue was transported to the federal courthouse in Providence, Rhode Island, by United States Marshals Service ("USMS") Deputies Brenton Moore and Elden DaSilva in a black unmarked prisoner transport van.  <u>Id.</u> at 3-4; Decl. of David Remington, Mar. 25, 2019 ("Remington Decl.") (Doc. No. 113-1, at 1).

Mr. Karmue was placed in the back seat of the van on a bench facing a steel partition that separated the prisoner compartment of the van from the driver's compartment.  SAC (Doc. No. 70, at 4).  Mr. Karmue's wrists were handcuffed; the handcuffs were attached to a waist chain; and his ankles were shackled together.  <u>Id.</u> at 3; Pl.'s Obj. to Defs.' Mot. Summ. J.

_____

[1]The facts, as set forth here, are gleaned from the summary judgment record and other documents of evidentiary quality filed in this case.  <u>See</u> Doc. Nos. 70, 112, 113, 115, 121, 124, 128.

and Mot. Dismiss ("Pl. Obj. V") (Doc. No. 128, at 1). Mr. Karmue asked Deps. Moore and DaSilva to secure his seatbelt, but neither deputy responded. SAC (Doc. No. 70, at 4). Mr. Karmue was transported, without a seatbelt, to the federal courthouse.

Mr. Karmue asserts that en route to the courthouse, Dep. Moore was driving the van in excess of the speed limit. Id. At some point during Mr. Karmue's transport, Mr. Karmue asserts, Dep. Moore sped up to beat a red light and then braked sharply to avoid a collision with an oncoming vehicle. Id.; Ex. 18, Defs.' Statement of Undisputed Facts ("SOUF"), Admin. Tort Claim Form 95, Sept. 27, 2016 (Doc. No. 113-5, at 4). Mr. Karmue asserts that the van came to an abrupt stop, and he was propelled into the steel partition in the van. SAC (Doc. No. 70, at 4). Mr. Karmue was unable to use his arms to block the impact of hitting the partition, or brace himself with his legs or arms. Id.

Mr. Karmue states that when he hit the partition, his knees, back, legs, and hips were injured. Id. 4-5. Mr. Karmue asserts that he asked Deps. Moore and DaSilva to provide him with immediate medical attention, but they continued driving to the courthouse, which was a short distance away. Id. at 5. Mr. Karmue states that the deputies did not say anything when he requested medical care. Id.

When the van arrived at the courthouse, the deputies parked in the sallyport, got out of the van, opened the van door, and unlocked the van's prisoner compartment to allow Mr. Karmue to get out of the van.  Id.; Video Ex. 1.[2]  The deputies directed Mr. Karmue to get out of the van and walk on his own power.  Pl. Obj. V (Doc. No. 128, at 2).  Video evidence the defendants submitted with the instant motion shows Mr. Karmue stepping out of the van, apparently with some difficulty, and with assistance from Dep. DaSilva.  Video Ex. 1.  While the video does not have any audio, Mr. Karmue and the deputies appear to be speaking to one another.  Id.

Mr. Karmue avers that after he was injured in the van, he "repeatedly complained that he was in pain but the Defendants refused to listen.  Marshal Moore was angry, hostile, and yelling at the Plaintiff, telling him he had to walk.  Plaintiff was forced to walk even though he was in pain and limping visibly."  Pl.'s Resp. to Defs.' SOUF After Reviewing Videos ("Pl. Obj. IV") (Doc. No. 124, at 3).  Mr. Karmue further

---

[2]The defendants have submitted sixteen video clips recorded in the federal courthouse on April 23, 2015, as Exhibits 1-16 (Doc. No. 113-2) to the Defendants' Statement of Undisputed Facts (Doc. No. 113).  For purposes of this Order, the court identifies those video exhibits as "Video Ex. 1," "Video Ex. 2," etc.  See Remington Decl. (Doc. No. 113-1, at 1) ("Attached as Exhibits 1-16 are true and correct copies of video recordings from security cameras located at the Federal Courthouse on April 23, 2015.").

alleges that the defendant deputies forced him to exit the van and walk through the courthouse, exacerbating "his pain and injuries."  Id. at 4.

The video shows that Mr. Karmue then, unassisted but with a pronounced limp, walked with Deps. Moore and DaSilva to the prisoner elevator located in the sallyport.  Video Exs. 1, 2. Mr. Karmue leaned on the wall while riding in the elevator. Video Ex. 3.  Mr. Karmue asserts he leaned on the wall for support due to the pain in his knees.  Pl. Obj. IV (Doc. No. 124, at 4).

Mr. Karmue exited the elevator and proceeded on foot, limping and moving slowly, accompanied by Deps. Moore and DaSilva, through a small room and down a hallway toward a holding cell.  Video Exs. 4-7.  The video shows that in the holding cell, Dep. DaSilva removed Mr. Karmue's handcuffs, left his ankle shackles on, and locked him into the holding cell, where Mr. Karmue sat on a bench.[3]  Video Exs. 8, 9.

Approximately five minutes after Mr. Karmue was placed in the holding cell, two unidentified USMS deputies entered Mr. Karmue's cell and spoke with him.  Video Ex. 9.  Mr. Karmue

---

[3]In the Second Amended Complaint, Mr. Karmue stated that he remained handcuffed while in the holding cell.  SAC (Doc. No. 70, at 5).

spoke to the deputies, while gesturing to one or both of his knees. The deputies then left the cell. Video Ex. 9.

Approximately eight minutes later, one of the unidentified deputies returned to the cell, accompanied by Deps. Moore and USMS Dep. Justin Carvalho and two Emergency Medical Technicians ("EMTs"), Michael Cairone and Stephany Blackwell. Video Ex. 9; Providence Fire Dep't Report, Apr. 23, 2015 ("EMT Report") (Doc. No. 113-6, at 9). Mr. Karmue states that before the EMTs entered the cell, Dep. Moore told the EMTs not to touch Mr. Karmue. SAC (Doc. No. 70, at 6); Pl. Obj. IV (Doc. No. 124, at 9). A computerized form apparently completed by EMT Cairone notes, in a section titled "Narrative," that "[patient] did not want [EMTs] to touch him." EMT Report (Doc. No. 113-6, at 10). Mr. Karmue asserts that he did not make that statement. The video shows EMT Cairone touching Mr. Karmue briefly on the shoulder when he first entered the cell, apparently in greeting, but otherwise neither EMT touched Mr. Karmue in the cell. Video Ex. 9.

The video shows the EMTs standing in the cell, speaking with Mr. Karmue, and looking at Mr. Karmue's leg with his pants on. Id. The EMT Report states that there was "no visible swelling thru clothing." EMT Report, at 2. Mr. Karmue asserts that he told the EMTs and deputies present that he was in too much pain to walk, but Dep. Moore instructed the EMTs not to

place Mr. Karmue on a stretcher at that time, stating that he had "walked in there so he can keep walking." Pl. Obj. IV (Doc. No. 124, at 5). The EMTs spent approximately forty-five seconds in the cell. Video Ex. 9.

At that point, the video shows Dep. Moore standing in front of Mr. Karmue while Mr. Karmue attempts to stand. Id. Dep. Moore and EMT Cairone appear to be helping Mr. Karmue stand, and then EMT Cairone supports Mr. Karmue by holding him under his left arm as they walk out of the holding cell. Video Ex. 9. The video then shows Mr. Karmue, while being assisted by EMT Cairone, hunched over and shuffling with a pronounced limp back through the same courthouse hallways and to the prisoner elevator, moving much slower than he had before. Video Exs. 9-11. According to the time stamp on the video, it took Mr. Karmue approximately thirty seconds to walk from the elevator to the holding cell, and approximately three minutes to walk the same route back to the elevator.[4] Video Exs. 3-7, 9-11.

_____

[4]Mr. Karmue had alleged, in his Second Amended Complaint, that Deps. Moore and DaSilva dragged him out of the van and through the courthouse because he could not walk. SAC (Doc. No. 70, at 5). After Mr. Karmue watched the video, he filed a sworn response to the federal defendants' summary judgment filings in which he "admits that he walked but contends that he was being forced to" do so. Pl. Obj. IV (Doc. No. 124, at 4).

## 2.  Prisoner Elevator and Medical Care

Mr. Karmue entered the elevator supported by EMT Cairone.
Once inside the elevator, Mr. Karmue leaned against the wall.
Video Ex. 12; Pl. Obj. IV (Doc. No. 124, at 4).  The video shows
that Dep. Carvalho and EMT Cairone were standing behind Mr.
Karmue in the elevator, and one or both of them appear to be
holding Mr. Karmue up by placing their hands on Mr. Karmue's
back, while Dep. Moore took hold of the left shoulder area of
Mr. Karmue's shirt and appears to have held Mr. Karmue upright
as Mr. Karmue leaned against the wall.  Video Ex. 12.  Dep.
Moore then attempted, unsuccessfully, to pull Mr. Karmue up
straight by pulling up the left shoulder of his shirt.  Id.

Dep. Moore, still holding Mr. Karmue's shirt, spoke to Mr.
Karmue for a few seconds.  Mr. Karmue states that at that point
he was unable to support his own weight any longer due to his
pain, and so he dropped to the floor of the elevator.  Pl. Obj.
IV (Doc. No. 124, at 6).  On the video, it appears that Mr.
Karmue's legs collapsed under him, and he fell to the floor.
Video Ex. 12.  Mr. Karmue states that he "tried to sit on the
floor since he could no longer support himself, but [Dep.] Moore
forcefully pulled him up and began to call him 'N----r' as the
Plaintiff fell down to the floor of the elevator due to his
injuries and excruciating pain from the accident."  Pl. Obj. IV
(Doc. No. 124, at 6).  The video shows that Dep. Moore, who Mr.

Karmue states was "infuriated" by Mr. Karmue's fall, SAC (Doc. No. 70, at 6), immediately grabbed both shoulders of Mr. Karmue's shirt and attempted to lift Mr. Karmue up, but he fell to the floor again. Video Ex. 12. In the video it appears that when Mr. Karmue fell to the floor, he fell into a seated position with his legs straight out in front of him and his back against the elevator wall. Id.

Once Mr. Karmue fell a second time, much of what happened while Mr. Karmue was on the floor of the elevator is not discernible in the video, as Dep. Moore's back obscures the camera angle.[5] Id. What can be seen is that after Mr. Karmue falls, his feet appear to be sticking straight out in front of him on the floor to the right of Dep. Moore, while part of Mr. Karmue's back remains visible to the left of Dep. Moore. Id. Mr. Karmue's feet do not appear to be moving. Id.

According to the time stamp on the video, four or five seconds after Mr. Karmue fell to the floor, Dep. Moore, while holding Mr. Karmue's shirt with his left hand, reached behind his back and took his Taser out of his back pocket with his right hand. Id. The video shows that Dep. Moore aimed the

---

[5]The court in no way intends to imply that Dep. Moore intentionally blocked the activity on the floor of the elevator from the camera and nothing about Dep. Moore's conduct in the elevator, to the extent it can be seen on the video, gives rise to such an inference.

Taser at Mr. Karmue's head and neck area, which was visible in the video. Id. The video then shows that twice, in close succession, a bright light emitted from the Taser, and shone on Mr. Karmue's head and chest area. Id. Dep. Moore then returned the Taser to his back pocket.[6]

While Mr. Karmue, in his initial complaint documents, asserted that Dep. Moore shot him with the Taser two or three times in the elevator damaging his eye, he now concedes that the damage to his eye, and the pain and shock he felt, was caused by the bright light and/or the electrical current to which he was subjected when Dep. Moore aimed the Taser at him. Mr. Karmue describes the following impact from "taser burn":

> [E]ven though the taser did not deploy any wires or
> barbs that struck his body directly, he felt a shock
> and burn in his eyes when the light struck his eyes
> twice as he sat on the floor. DUSM Moore did in fact
> activate the taser in front of Plaintiff's eyes which
> cause[d] pain and blurred vision as Plaintiff was on
> the floor being assaulted by Defendants.

Pl. Obj. IV (Doc. No. 124, at 8).

Mr. Karmue states, regarding what occurred on the floor of the elevator, that "[a]fter he fell, he was unable to stand. He

---

[6]USMS Chief Deputy David Remington, in his declaration, states that "[d]ata stored on the Tasers used by [USMS deputies] can be retrieved and reviewed in order to determine if and when a specific Taser has been fired." Remington Decl. (Doc. No. 113-1, at 2). Chief Dep. Remington further averred that he generated a report of the data for the Taser issued to Dep. Moore for April 23, 2015, and found that it was not fired on that day. See id.; Ex. 17, Defs.' SOUF (Doc. No. 113-3, at 2).

was not resisting, but rather, pleading for help as he was being assaulted and slammed on the floor numerous times in the elevator . . . [and] choked after he tried to rub his eyes." Id. at 7.

The video shows that after Dep. Moore put his Taser back in his pocket, Deps. Moore and Carvalho held or grabbed Mr. Karmue while he was still in a seated position. Video Ex. 12. Dep. Carvalho then let go of Mr. Karmue and appears to be pointing at Mr. Karmue and yelling at him. Id. It appears that Mr. Karmue responded to Dep. Carvalho, and, at one point, while still being held by Dep. Moore, Mr. Karmue lifted his left arm once, with his elbow bent. Id. Dep. Moore then forced Mr. Karmue down to the floor on Mr. Karmue's left side. Id. While Mr. Karmue is lying on the floor of the elevator, Dep. Moore's back is again blocking the camera view. What is visible is that Dep. Moore was standing or kneeling, bent over Mr. Karmue, and Dep. Moore's arms and upper body were moving. Id. Dep. Carvalho also bends down toward Mr. Karmue, but his actions are not entirely captured on the video. Id.

The video then shows Mr. Karmue on the floor on his left side while Dep. Moore grabs and holds both of Mr. Karmue's arms. Id. Dep. Carvalho then reached into his back waistband area and removed a pair of handcuffs, and placed them on Mr. Karmue. Id. After Mr. Karmue was handcuffed, the video shows Mr. Karmue

writing in place while lying on the floor, while the deputies stood over him.  Id.  Dep. DaSilva then enters the elevator along with the two unidentified deputies.  Dep. DaSilva then leans over Mr. Karmue, and appears, from the back, to be having physical contact with Mr. Karmue, as Dep. DeSilva's upper body and arms were moving, but the camera's view of the details of that contact is obscured by Dep. DeSilva's back.  Id.

While Dep. Carvalho and an unidentified deputy stood at the elevator door, Deps. Moore and DaSilva twice attempted to lift Mr. Karmue by grabbing him by his arm and shirt, and tried to bring him to a standing position, but Mr. Karmue again dropped to the floor each time.  Id.  Deps. Moore and DaSilva then continued to have some contact with Mr. Karmue, although their exact actions are not visible to the camera.  The deputies then let go of Mr. Karmue.  Id.  Mr. Karmue remained prone on the floor of the elevator and continued to writhe in place.  Id. Shortly thereafter, EMT Cairone and Dep. DaSilva lifted Mr. Karmue and carried him out of the elevator, and out of view of the camera.  Id.; SAC (Doc. No. 70, at 7).

Mr. Karmue alleges that once out of the prisoner elevator, he was "dropped and dragged to be placed in a chair.  His body was covered with a sheet which covered his injuries from the assault."  Pl. Obj. IV (Doc. No. 124, at 9).  Although views of the outside of the prisoner elevator from earlier on April 23,

2015 are part of the summary judgment record in this case, no video from the camera there was submitted to the court showing what occurred once Mr. Karmue was carried out of the elevator. Video from another location shows that shortly after Mr. Karmue left the prisoner elevator, he was brought into the sallyport via a wheelchair lift elevator, with his body, arms, and legs strapped into an evacuation chair supplied by the EMTs, with a blanket on his head which covered everything but his face. Video Exs. 13, 14.  Mr. Karmue was then wheeled through the sallyport and into an outside parking area.  Video Exs. 14, 15. Mr. Karmue appears to be yelling while in the evacuation chair in the parking area.  Video Exs. 14, 15.  Mr. Karmue was then transferred to a stretcher and placed in the ambulance.  Video Ex. 15.  The ambulance then left the parking area.  Id.

The defendants have asserted that Mr. Karmue is described in the EMT Report as being combative in the elevator.  The report states, that Mr. Karmue "became combative (in elevator) during packaging," and that the EMTs were "unable to obtain vitals due to [patient]'s combativeness."  EMT Report (Doc. No. 113-6, at 10).[7]

---

[7]It is not clear whether "during packaging" means that Mr. Karmue became combative in the prisoner elevator, or in the elevator wheelchair lift in the sallyport, where Mr. Karmue had been wrapped in a blanket and strapped into a chair for transport, after which he appeared to be yelling.

Mr. Karmue asserts that, en route to the hospital, he was not provided with medical care by the EMTs because Dep. DaSilva instructed the EMTs not to touch or treat him. SAC (Doc. No. 70, at 7). Mr. Karmue further asserts that, once the ambulance delivered him to Roger Williams Hospital ("RWH"), Dep. DaSilva and an unidentified USMS deputy advised the RWH medical staff not to provide medical care to Mr. Karmue. They allegedly told RWH emergency room medical personnel that Mr. Karmue was faking his injuries and his pain before Mr. Karmue was able to explain his condition to the medical providers. Id. Mr. Karmue states that the emergency room doctor then announced that Mr. Karmue would be leaving RWH to receive medical treatment elsewhere and did not examine or treat Mr. Karmue. Id. at 8.

The defendants have submitted a one-page document labeled "Emergency Room Visit Notes" of Dr. Michael Bonitati ("RWH ER Notes"), an RWH physician. Ex. 19, Defs.' SOUF, RWH ER Notes (Doc. No. 113-6, at 14). Those notes state:

> Kormahyah Karmue is a 40-year-old Male in police custody who was in a metal cage in a police van when the van stopped short and he reports striking knees on metal cage today. Patient ambulated from van to federal court and when in elevator he apparently slumped over and started yelling that he was assaulted. [Patient] yelling and screaming at police, nursing staff, ED staff upon arrival stating that he has "pain all over." Per Providence EMS patient was walking in front of them and then laid down in elevator and began yelling he was assaulted and would not walk from that point. Per EMS no witnessed assault.

14

RWH ER Notes (Doc. No. 113-6, at 14). Dr. Karmue was diagnosed with "MVC" and knee pain. Id. No other information or records from RWH have been submitted to the court.

Mr. Karmue disputes the accuracy of Dr. Bonitati's notes. Regarding his care at RWH, Mr. Karmue reports that:

> [a]s he explained to the nurse what had happened to him, the EMTs and the Marshals began to state that Plaintiff was faking injuries and he was not injured. This was after [defendant USMS deputies] had already spoken with hospital staff before Plaintiff was brought in. The nurse and the doctor seemed to not believe Plaintiff's statements because Defendants had told them Plaintiff was faking injuries.
>
> During this time, the Plaintiff was crying because he was in pain, and the doctor and nurses were refusing to give him any pain treatment. No X-ray or CT scan was done at this hospital. The Defendants and the nurse were mocking Plaintiff because he was crying in pain. [Dep.] Elden DaSilva was mocking Plaintiff while recording Plaintiff on [Dep.] DaSilva's cell phone, as Plaintiff was cuffed and chained to the bed. The Defendants told the doctor not to provide any treatment because they were going to transport Plaintiff back to [Wyatt] and he would be treated there.

Pl. Obj. IV (Doc. No. 124, at 10). Mr. Karmue was transported from RWH to Wyatt by Wyatt staff, SAC (Doc. No. 70, at 10), and had no further interactions with the USMS defendants relevant to the issues before the court in this case.

The following day, Mr. Karmue was brought from Wyatt to the Memorial Hospital Emergency Room because, he asserts, his physical condition had worsened. Id. at 8. Mr. Karmue

15

describes a cursory examination at Memorial which failed to address all of his complaints.  Id. at 8-9.  According to Memorial Hospital records the defendants submitted with the instant motion, Mr. Karmue told medical staff there he had "total body pain" from hitting the steel partition in the transport van and being assaulted the previous day.  Ex. 19, Def.'s SOUF, Memorial Hosp. ED Chart Apr. 24, 2015 ("Memorial Chart") (Doc. No. 113-6, at 17).  The records state that Mr. Karmue was without contusions on his face or body, had no recent change in vision, no skin rash or bruising, and no signs of head trauma.  Id.

B.  FMC Devens

Sometime after Mr. Karmue was sentenced, he was transferred out of Wyatt and incarcerated at the Federal Medical Center in Devens, Massachusetts ("FMC Devens"), a Federal Bureau of Prisons ("BOP") facility.  SAC (Doc. No. 70, at 10); Pl.'s Reply to R&R (Doc. No. 78, at 4).  Mr. Karmue remained at FMC Devens until he was released to a halfway house in Florida on September 5, 2019.  Mr. Karmue has alleged that he has suffered from ongoing medical problems due to the injuries he received on April 23, 2015, including an 85% loss of vision in his left eye, the inability to walk, and severe pain.  Mr. Karmue asserts that he attempted to receive appropriate diagnoses, examinations and

treatment for these issues throughout the approximately four
years he was at FMC Devens.

Mr. Karmue asserts that during his initial interview at FMC
Devens with Dr. Al-Karim Dhanji and other FMC Devens staff
members, he described and explained the injuries he received on
April 23, 2015 in the USMS transport van and in the courthouse
prisoner elevator. SAC (Doc. No. 70, at 10). Mr. Karmue claims
here that Dr. Dhanji, after reviewing Mr. Karmue's Wyatt
records, accused Mr. Karmue of faking his injuries and ongoing
medical complaints. Id. Mr. Karmue also states that "the full
extent of the damage, which resulted from the accident and
subsequent assault by the U.S. Marshals, has yet to be fully
diagnosed, as staff at [FMC] Devens seem unwilling to fully
explore any pain, suffering or problems I have as a result of
the aforementioned incidents." Admin Tort Claim Form 95, Sept.
27, 2016, Ex. 19, Defs.' SOUF (Doc. No. 113-6, at 26). In
February 2016, Mr. Karmue was directed to see Kerry Quinn, a
physical therapist at FMC Devens, for physical therapy. SAC
(Doc. No. 70, at 11). Mr. Karmue states that PT Quinn created a
physical therapy regimen that was inappropriate for his medical
condition, and that when he tried to talk to her about it, she
accused him of not trying to follow his treatment plan. Id. at
12. Mr. Karmue claims that PT Quinn refused him the use of a
walker, and gave him only limited use of a cane, which she took

from him when she discharged him from physical therapy treatment after twelve weeks because he was not making progress.  Id. Later, when Mr. Karmue again sought physical therapy, PT Quinn refused him treatment.  Id.

## II.   Claims Asserted Against Federal Defendants

Mr. Karmue has asserted the following claims against the federal defendants in his Second Amended Complaint[8]:

> 1.   USMS-RI Deputies Brenton Moore and Elden DaSilva violated Karmue's Fifth Amendment due process right to be protected from a substantial risk of serious harm while in pretrial detention by failing to properly secure Karmue with a seatbelt while transporting Karmue from the WDC to the federal courthouse on April 23, 2015.
>
> 2.   USMS-RI Deputies Brenton Moore and Elden DaSilva violated Karmue's Fifth Amendment due process rights, in that they kicked and punched him while he was on the floor, and used a Taser or stun-gun on him, in a manner that was objectively unreasonable, in an elevator in the courthouse on April 23, 2015.
>
> 3.   USMS-RI Deputies Justin Carvalho and John Doe #4 violated Karmue's Fifth Amendment due process rights when they failed to intervene to protect Karmue from being assaulted in a manner that was objectively unreasonable by USMS-RI Deputies Brenton Moore and Elden DaSilva on April 23, 2015, despite having the ability and opportunity to do so.
>
> 4.   USMS-RI Deputies Brenton Moore, Elden DaSilva, and Justin Carvalho violated Karmue's Fifth Amendment due process right to adequate medical care on April 23, 2015, when:

---

[8]The claims pending in this action against defendants other than the federal defendants are omitted from this list as they are not relevant to the instant motion.

a. Moore and DaSilva denied Karmue's repeated requests for medical assistance and evaluation for his knees and hips after he was injured during transport;

b. Moore and DaSilva stopped EMTs from medically evaluating and/or treating Karmue in a holding cell at the courthouse;

c. DaSilva stopped EMTs from medically evaluating and/or treating Karmue in an ambulance transporting Karmue from the courthouse to RWH; and

d. DaSilva and Carvalho stopped medical personnel at RWH from medically examining and/or treating Karmue in the RWH emergency room.

. . .

9. The United States of America is liable to Karmue under the Federal Tort Claims Act ("FTCA") for the negligence and other tortious acts underlying Claims 1-[4] above, to the extent those acts were committed by federal employees acting in the scope of their employment.

10. Karmue has suffered violations of his Eighth Amendment right to adequate medical care, in that FMC-Devens physician Dr. Danji and Physical Therapist Quinn, acting with deliberate indifference to Karmue's serious medical needs, denied Karmue adequate medical care.

11. Karmue has been subjected to medical negligence at FMC-Devens, rendering the United States liable to Karmue under the FTCA for the negligence and other tortious acts of Dr. Danji and Physical Therapist Quinn, to the extent Dr. Danji and Physical Therapist Quinn were federal employees acting in the scope of their employment.

May 18, 2019 R&R (Doc. No. 67) (amended by Feb. 4, 2019 R&R

(Doc. No. 99)), approved by, Mar. 4, 2019 Order (Doc. No. 107).

**Discussion**

I.   <u>Claims as to Which Defendants Seek Summary Judgment</u>

    A.   <u>Summary Judgment Standard</u>

"Summary judgment is warranted if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Luceus v. Rhode Island, 923 F.3d 255, 256-57 (1st Cir. 2019) (quoting Fed. R. Civ. P. 56(a)). "An issue is 'genuine' if it can 'be resolved in favor of either party,' and a fact is 'material' if it 'has the potential of affecting the outcome of the case.'" Xiaoyan Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (citation omitted). When a court considers a motion for summary judgment, "[t]he evidence . . . must be viewed in the light most favorable to the nonmoving party . . . and all reasonable inferences must be taken in that party's favor." Harris v. Scarcelli (In re Oak Knoll Assocs.), 835 F.3d 24, 29 (1st Cir. 2016).

Where the party moving for summary judgment bears the burden of proof on an issue, that party "must provide evidence sufficient for the court to hold that no reasonable trier of fact could find other than in its favor." Am. Steel Erectors, Inc. v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers, 536 F.3d 68, 75 (1st Cir. 2008). Once the moving party identifies the portions of the record that show the absence of any genuine issue of material

fact, the burden shifts to the nonmoving party to demonstrate, by reference to materials of evidentiary quality, that a trier of fact could reasonably resolve that issue in the nonmovant's favor.  See Irobe v. U.S. Dep't of Agric., 890 F.3d 371, 377 (1st Cir. 2018).  "Summary judgment is warranted if a nonmovant who bears the burden on a dispositive issue fails to identify 'significantly probative' evidence favoring his position."  Id. (citation omitted).

    B.  Qualified Immunity

    The defendants argue that they are entitled to qualified immunity as to Claims 1-4 because, as to each of those claims, Mr. Karmue cannot demonstrate that the defendants violated any clearly established constitutional right.  "Qualified immunity is a doctrine that shelters government officials from civil damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  McKenney v. Mangino, 873 F.3d 75, 80 (1st Cir. 2017) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)); see also Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018) (per curiam) (same).

    To determine whether qualified immunity applies:

    First, the court must determine whether the
    plaintiff's version of the facts makes out a violation
    of a protected right.  Second, the court must
    determine whether the right at issue was clearly

> established at the time of defendant's alleged
> misconduct.  This second step is itself divisible into
> two components.  To begin, the plaintiff must point to
> controlling authority or a consensus of cases of
> persuasive authority that broadcasts a clear signal to
> a reasonable official that certain conduct falls short
> of the constitutional norm.  Then, the court must
> evaluate whether an objectively reasonable official in
> the defendant's position would have known that his
> conduct violated that rule of law.

McKenney, 873 F.3d at 81 (internal quotation marks and citations

omitted).

> Because qualified immunity is intended to protect all
> but the plainly incompetent or those who knowingly
> violate the law, the existing precedent at the time of
> the officers' conduct must be clear enough that <u>every
> reasonable official</u> would interpret it to bar the
> conduct at issue.  Although plaintiffs are not
> required to identify controlling precedent with
> identical[] facts, . . . clearly established law must
> be sufficiently particularized to serve as a fair and
> clear warning that the officers' conduct is
> unconstitutional.

Hill v. Walsh, 884 F.3d 16, 21-22 (1st Cir. 2018) (internal

quotation marks and citations omitted) (emphasis in original);

see also White v. Pauly, 137 S. Ct. 548, 552 (2017).  "When a

defendant invokes qualified immunity, the burden is on the

plaintiff to show that the defense is inapplicable." Escalera-

Salgado v. United States, 911 F.3d 38, 41 (1st Cir. 2018).


C.  Fifth Amendment Seatbelt Claim (Claim 1)

Mr. Karmue alleges, in the claim this court previously

identified as Claim 1, that Deps. Moore and DaSilva, by failing

to secure him in the USMS transport van with a seatbelt violated his Fifth Amendment right to be protected from a substantial risk of serious harm to his health and safety under the circumstances.  The defendants argue that Deps. Moore and DaSilva are entitled to qualified immunity on this claim.

The Due Process Clause imposes a substantive obligation upon federal actors to refrain from treating a pretrial detainee with deliberate indifference to a substantial risk of serious harm to his or her health and safety.  Coscia v. Town of Pembroke, 659 F.3d 37, 39 (1st Cir. 2011) (discussing Fourteenth Amendment claims of pretrial detainees in state custody).  At a minimum, the plaintiff must allege facts showing that the defendant possessed a purposeful, knowing, or reckless state of mind, as "'liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.'"  Kingsley v. Hendrickson, 135 S. Ct. 2466, 2472 (2015) (citation omitted) (emphasis in original).  "Proof of deliberate indifference requires a showing of greater culpability than negligence but less than a purpose to do harm . . .."  Coscia, 659 F.3d at 39 (citing Farmer v. Brennan, 511 U.S. 825, 835 (1994)).

The critical question for the qualified immunity analysis in Mr. Karmue's case, with respect to the deliberate indifference claim this court identified as Claim 1, is whether

it was clearly established in April 2015 within the First
Circuit that it would violate the Constitution to subject an
inmate to a significant risk of serious harm to fail to fasten
the seatbelt of a handcuffed and shackled inmate in a transport
van.  There is neither First Circuit nor Supreme Court precedent
on that issue.  During the relevant time period, even as to
inmates who are shackled and handcuffed, courts have concluded
that, without more, the failure to provide seatbelts in
transport vans did not violate any federal constitutional right.
See, e.g., Dale v. Agresta, No. 1:15-CV-0140-SEB-MPB, 2017 WL
5517384, at *2, 2017 U.S. Dist. LEXIS 190183, at *9 (S.D. Ind.
Nov. 16, 2017) (shackled and handcuffed inmate whose transport
van was struck from behind in 2013 did not state Eighth
Amendment deliberate indifference claim against transport
officers who had not seatbelted him), aff'd on other grounds,
771 F. App'x 659, 661 (7th Cir. 2019) (transport officer was
entitled to qualified immunity on Eighth Amendment claim, as
inmate "did not have a clearly established right to a seatbelt"
where transport officer "did not do anything" to increase the
risk of harm), cert. denied, No. 19-7036, 2020 U.S. LEXIS 1106,
at *1, 2020 WL 837503, at *1 (Feb. 24, 2020 U.S.); see also
Jabbar v. Fischer, 683 F.3d 54, 58-59 (2d Cir. 2012) (prison
officials' failure to provide seatbelts in prison vehicles,
standing alone, does not violate inmate's Eighth Amendment

24

rights); Hooker v. United States, No. 12-cv-346-JNL, 2015 WL 1519856, at *1, 2015 U.S. Dist. LEXIS 46221, at *2 (D. Me. Mar. 31, 2015) (collecting cases for proposition that failure to provide seatbelts or other safety restraints in police transport vehicles does not violate federal rights).

The specific circumstances that attended Mr. Karmue's transport, however, as alleged in the Second Amended Complaint include operative facts that this court described, but did not reiterate when it summarized Claim 1, namely, that the defendant transport officer drove recklessly and that Mr. Karmue's request to be seatbelted was denied. See May 18, 2018 R. & R. (Doc. No. 67, at 7-8, 12). Those allegations, if ultimately shown to be true, would affect the result of the qualified immunity analysis. None of the appellate court cases cited by defendants concern reckless driving and circumstances where the inmate asked to be seatbelted. See, e.g., Scott v. City of Phil., No. CV 19-2871, 2019 U.S. Dist. LEXIS 129091, at *7, 2019 WL 3530909, at *3 (E.D. Pa. Aug. 1, 2019) (collecting district court cases predating 2011, dismissing deliberate indifference claims asserted by inmates who were transported without a seatbelt and who claimed to be injured by reckless driving, and contrasting cases from appellate courts where "plaintiff's allegations of reckless driving are coupled with allegations that the driver intended harm, refused to slow down after being

asked, or declined to fasten an inmate's seatbelt despite the inmate's protestations").  There is a consensus of persuasively reasoned federal appellate court cases that have addressed the question which have held that qualified immunity is not available with respect to the Eighth Amendment deliberate indifference claims of handcuffed and shackled inmates who have been transported unseatbelted in a van driven recklessly.  See Thompson v. Virginia, 878 F.3d 89, 102, 109 (4th Cir. 2017) (transport officers are not entitled to qualified immunity on excessive force and deliberate indifference Eighth Amendment claims, where driver and officer in passenger seat both knew that shackled/handcuffed inmate was exposed to substantial risk of serious harm from being physically tossed about, driver was speeding and driving recklessly in way intended to scare and injure inmate, and officer in passenger seat failed to take preventive measures despite subjective knowledge of those facts); Rogers v. Boatright, 709 F.3d 403, 409 (5th Cir. 2013) (prisoner stated claim where he alleged that defendant "operated the prison van recklessly, knowing that there was a substantial risk that [plaintiff] would be injured if the van stopped abruptly because [plaintiff] was shackled in leg irons and handcuffs and was not provided with a seatbelt" and because driver had "told another officer that other inmates similarly had been injured the prior week and during other incidents,

which 'happen[ ] all the time'"); Brown v. Fortner, 518 F.3d 552, 561 (8th Cir. 2008) (no qualified immunity on Eighth Amendment deliberate indifference claim as to officer who had ignored requests to slow down and drove recklessly while transporting inmate whom officer knew had been denied use of seatbelt); see also Scott v. Becher, 736 F. App'x 130, 133 (6th Cir. 2018) (rejecting qualified immunity where transport officer "was driving above the speed limit, swerving, and generally driving recklessly" and when inmates begged him to slow down, officer "refused, laughed, and instead accelerated"). Cf. McCowan v. Morales, 945 F.3d 1276, 1286, 1289 (10th Cir. 2019) (no qualified immunity on Fourth Amendment excessive force claim as to officers who gratuitously subjected compliant, handcuffed, non-threatening arrestee, who had complained of pre-existing injury, to un-seatbelted "rough ride" in patrol car in August 2015). Under the circumstances alleged by Mr. Karmue's verified second amended complaint regarding the officers' reckless driving and refusal to seatbelt Mr. Karmue, with knowledge that he could not brace himself in the event of a sudden stop, defendants are not entitled to qualified immunity at this stage of the case. The court thus denies the pre-discovery motion for summary judgment based on the affirmative defense of qualified immunity as to Claim 1.

D.   Excessive Force & Failure to Protect (Claims 2, 3, 9)

    1.   Excessive Force Standard

"[T]he Supreme Court has held that the appropriate standard for a pretrial detainee's Fourteenth Amendment excessive force claim is simply objective reasonableness." Miranda-Rivera v. Toledo-Dávila, 813 F.3d 64, 70 (1st Cir. 2016) (citing Kingsley, 135 S. Ct. at 2473-74 (holding that a pre-trial detainee need not necessarily prove the officer's intent to harm or punish, only that from an objective viewpoint, the officer's action was "not rationally related to a legitimate governmental objective or that it [was] excessive in relation to that purpose.")).[9]

> A court (judge or jury) cannot apply this standard mechanically.  Rather, objective reasonableness turns on the facts and circumstances of each particular case.  A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight.  A court must also account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security.
>
> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity

_____

[9]Because Mr. Karmue has brought Claims 2 and 3 against federal officials, rather than state officials, his due process claims arise under the Fifth Amendment rather than the Fourteenth Amendment.

of the security problem at issue; the threat
reasonably perceived by the officer; and whether the
plaintiff was actively resisting.  We do not consider
this list to be exclusive.  We mention these factors
only to illustrate the types of objective
circumstances potentially relevant to a determination
of excessive force.

Kingsley, 135 S. Ct. at 2473 (internal quotation marks,

alterations, and citations omitted).


2.    Failure to Protect Standard

"'An officer who is present at the scene and who fails to

take reasonable steps to protect the victim of another officer's

use of excessive force can be held liable under section 1983 for

his nonfeasance.'"  Gonsalves v. Rhode Island, No. 17-346 WES,

2017 U.S. Dist. LEXIS 203858, at *6, 2017 WL 6372666, at *2

(D.R.I. Dec. 12, 2017) (quoting Gaudreault v. Munic. of Salem,

923 F.2d 203, 207 n.3 (1st Cir. 1990)).[10]  An officer cannot be

held liable "for failing to intercede if he has no 'realistic

opportunity' to prevent an attack."  Gaudreault, 923 F.2d at 207

n.3.  However, "'[a] constitutional duty to intervene may . . .

arise if onlooker officers are instrumental in assisting the

actual attacker to place the victim in a vulnerable position.'"

---

[10]42 U.S.C. § 1983 provides a cause of action for plaintiffs
alleging that defendants, acting under color of state law,
violated their constitutional rights.  Bivens, while not
coextensive with § 1983, is the means by which a plaintiff can
assert that a federal official violated his or her
constitutional rights.

Gonsalves, 2017 U.S. Dist. LEXIS 203858, at *6-7, 2017 WL 6372666, at *2 (quoting Martinez v. Colon, 54 F.3d 980, 985 n.4 (1st Cir. 1995)).

### 3.  Pre-Discovery Summary Judgment

The defendants make two arguments in support of their request for summary judgment as to Claims 2 and 3.  First, they argue that the video evidence uncontrovertibly demonstrates that the defendants used an objectively reasonable amount of force in the courthouse elevator in response to Mr. Karmue's active resistance of being handcuffed.  Second, they argue that the defendants are entitled to qualified immunity on the basis that irrefutable video evidence shows that the defendants did not violate a clearly established constitutional right by their acts and/or omissions in the courthouse elevator on April 23, 2015 with regard to Mr. Karmue.

The defendants filed this motion "prediscovery."  At summary judgment, "the nonmoving party cannot rest on its pleadings, but must 'set forth specific facts demonstrating that there is a genuine issue for trial' as to the claim that is the subject of the summary judgment motion."  Saltzman v. Whisper Yacht, Ltd., No. CV 19-285MSM,2019 U .S. Dist. LEXIS 218088, at *15, 2019 WL 6954223, at *5 (D.R.I. Dec. 19, 2019) (quoting Oliver v. Digital Equip. Corp., 846 F.2d 103, 105 (1st Cir.

1988)), R&R adopted, 2020 U.S. Dist. LEXIS 30462, at *1, 2020 WL 872599, at *1 (D.R.I. Feb. 21, 2020).  In general, therefore, "[i]n light of its requirement of a factually supported record, summary judgment is unusual as a pre-discovery response to a pleading; it is usually reserved to a later phase of the case, after discovery has sharpened the parties' focus on the facts." Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 884 (1990) ("plain language" in Fed. R. Civ. P. 56(c) "mandates the entry of summary judgment, after adequate time for discovery").  Here, the defendants rely on authority holding that pre-discovery summary judgment is appropriate where video evidence conclusively demonstrates the existence of facts contrary to the nonmovant's assertions such that no reasonable jury could find in the nonmovant's favor as to those facts.  See, e.g., Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); Hunt v. Massi, 773 F.3d 361, 365 n.2 (1st Cir. 2014) (court "'need not accept [the plaintiff's] version of events if it is blatantly contradicted by the evidence'" (citation omitted)).

> Where a party alleges that an inadequate opportunity
> for discovery prevents it from mounting an opposition,
> Fed. R. Civ. P. 56(d) offers a safeguard against

judges swinging the summary judgment axe too hastily. Specifically, summary judgment may be deferred or denied if "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition.'" Fed. R. Civ. P. 56(d). Because district courts construe motions that invoke the rule generously, holding parties to the rule's spirit rather than its letter, the First Circuit requires substantial, not perfect, compliance. A litigant who invokes Rule 56(d) must make an authoritative and timely proffer showing: (i) good cause for his inability to have discovered or marshalled the necessary facts earlier in the proceedings; (ii) a plausible basis for believing that additional facts probably exist and can be retrieved within a reasonable time; and (iii) an explanation of how those facts, if collected, will suffice to defeat the pending summary judgment motion.

Nelson v. Formed Fiber Techs., Inc., 856 F. Supp. 2d 235 (D. Me. 2012) (internal quotation marks and citations omitted).

As detailed above, the plaintiff tells a different version of the facts than do the defendants as to what occurred during the courthouse elevator incident underlying Claims 2 and 3. Mr. Karmue states that he was not resisting the defendants, but that he fell to the floor due to being injured, in pain, and unable to stand up, and that the defendants reacted to his dropping to the fall by physically assaulting him without provocation. The defendants claim here that the video of the interaction between Mr. Karmue and the defendant deputies in the elevator irrefutably demonstrates that Mr. Karmue was physically resisting being handcuffed by the deputies, and in response, the deputies utilized minimal force to regain control of Mr. Karmue

and handcuff him.  Accordingly, the defendants contend, the video blatantly contradicts Mr. Karmue's version of the facts and demonstrates conclusively that no reasonable jury could adopt those facts or find that the defendants acted in an objectively unreasonable manner.

Contrary to the defendants' assertions, the video evidence of what occurred in the elevator does not irrefutably establish that Mr. Karmue's fall was an act of physical resistance or a voluntary act.  While a jury could agree with the defendants' characterization of the events on the video, a reasonable jury could also find that that the video depicts Mr. Karmue falling to the ground because he was in pain, and not because he was resisting.  Further, the evidence, taken as a whole, does not show that no reasonable jury could find in Mr. Karmue's favor. Specifically, the evidence, examined in the light most favorable to Mr. Karmue, shows that Mr. Karmue was subject to substantial impact with a metal partition in the transport van shortly before he arrived at the courthouse, that he was limping and moving as though he were injured or in pain prior to getting into the elevator, that he was unable to stand in the elevator, and that at the time Mr. Karmue fell to the elevator floor, and continuing until after Mr. Karmue was on the ground in Dep. Moore's physical control, no deputy had attempted to handcuff Mr. Karmue, and thus his actions were not made in an effort to

resist those restraints.  In short, the video is ambiguous as to what actually occurred in the elevator, and thus, as to whether the deputies' actions were objectively reasonable.

In addition to the courthouse video, the defendants point to the EMT Report, which, they describe as evidence that Mr. Karmue was combative in the elevator, and to a report from a doctor at RWH who was told that the EMTs did not witness an assault, and medical records from RWH and Memorial that do not indicate that Mr. Karmue suffered from serious injuries. Assuming, without deciding, that the defendants could properly introduce such evidence at trial, neither the video nor any other evidence the defendants have submitted conclusively refutes Mr. Karmue's version of events in a manner that renders pre-discovery summary judgment appropriate.  The medical records provided, like the video, are at least in part subject to different interpretations of events and do not blatantly contradict Mr. Karmue's version of events.

Further, Mr. Karmue has indicated that there are additional medical records, from Wyatt and FMC Devens, concerning his injuries that are relevant to his excessive force claims.  Also, as Mr. Karmue has not yet had an opportunity for discovery, he has not been able to depose the defendants, obtain statements or affidavits from witnesses, or obtain expert evidence that would support his claims, and nothing presented by the defendants

indicate that he would be unable to obtain any evidence to support his claims from those sources. Finally, Mr. Karmue points to certain video feed that the defendants did not submit with the summary judgment record, indicating that video from that feed is available and shows facts relevant to his excessive force and failure to protect arguments. The court finds that Mr. Karmue has met his burden at this stage of the proceedings, to demonstrate that the opportunity for additional discovery would likely reveal facts that would support his version of the disputed facts as to the claims against the federal defendants.

Therefore, the facts Mr. Karmue asserted in the second amended complaint are sufficient to assert Fifth Amendment excessive force and failure to protect claims against the defendant USMS deputies for their alleged conduct in the courthouse elevator on April 23, 2015. The court also finds that the evidence provided by the defendants in support of their summary judgment motion is insufficient to demonstrate that there is no genuine dispute of material fact as to whether the deputies' acts and omissions in the elevator were a reasonable response to Mr. Karmue's active resistance to being handcuffed. Therefore, as to the first prong of the qualified immunity test, the court finds that the facts, taken in the light most favorable to Mr. Karmue, "make[] out a violation of a protected

right," id., and do not entitle the defendants to qualified immunity.  See Miranda-Rivera, 813 F.3d at 72.

The court next considers "whether the right at issue was clearly established at the time of defendant's alleged misconduct."  Id.  The right at issue in this case, as the court credits Mr. Karmue's allegations, is the right not to be subjected to the force Mr. Karmue describes – being held down, choked, assaulted, and threatened and/or harmed with a Taser, for falling to the floor because he was unable to walk.  There can be no serious question that a reasonable officer, faced with an inmate who was unable to support his own weight due to pain, would have known at the time of the events alleged, that striking, choking and otherwise assaulting an injured, shackled inmate who was not attempting to resist handcuffing – a factual scenario not excluded by the summary judgment record here -- or failing to intervene in the use of such force, would violate Mr. Karmue's Fifth Amendment rights not to be subjected to excessive force and to be protected from harm.

Accordingly, the defendants have not demonstrated, on the record before the court, that they are entitled to qualified immunity as to the excessive force and failure to protect claims (Claims 2 and 3).  Further, for the same reasons set forth here, the defendants have not demonstrated that they are entitled to

relief on Claim 9, plaintiff's FTCA claim, to the extent that claim arises out of the conduct underlying Claims 2 and 3.

The court finds that there is a genuine dispute of material fact as to whether Deps. Moore and DaSilva inflicted excessive force on Mr. Karmue, and that there is a genuine dispute of material fact as to whether the noninterference in the use of force by Dep. Carvalho was reasonable. The court further finds that the defendants are not entitled to qualified immunity on the record before the court at this stage of the proceedings. Accordingly, the defendants' motion for summary judgment as to Claims 2 and 3, and to Claim 9 to the extent that claim arises out of the facts underlying Claims 2 and 3 is denied, without prejudice to the defendants' ability to reassert any appropriate argument in a summary judgment motion filed on a more complete record, after the parties have had an adequate opportunity to conduct discovery.

### E.  Denial of Medical Care (Claims 4 and 9)

#### 1.  Denial of Medical Care Standard

A federal pretrial detainee's Fifth Amendment due process rights are violated when a prison official denies or delays the provision of adequate medical care for an inmate's serious medical needs, and does so with deliberate indifference to those needs, resulting in "the unnecessary and wanton infliction of

pain." Wilson v. Seiter, 501 U.S. 294, 197 (1991); see also

Perry v. Roy, 782 F.3d 73, 78-79 (1st Cir. 2015). However,

"'liability for negligently inflicted harm is categorically

beneath the threshold of constitutional due process.'"

Kingsley, 135 S. Ct. at 2472 (citation omitted).

> [S]ubstantive due process requires the government to
> provide medical care to persons who are injured while
> being apprehended by the police. The boundaries of
> this duty have not been plotted exactly; however, it
> is clear that they extend at least as far as the
> protection that the Eighth Amendment gives to a
> convicted prisoner. Government officials violate the
> Eighth Amendment if they display deliberate
> indifference to a prisoner's serious medical needs.

Miranda-Rivera, 813 F.3d at 74 (internal quotation marks and

citations omitted). "A serious medical need is one that has

been diagnosed by a physician as mandating treatment, or one

that is so obvious that even a lay person would easily recognize

the necessity for a doctor's attention." Id. (citations and

quotation marks omitted). A pretrial detainee alleging that

defendants violated his Fifth Amendment right to medical care

for serious medical needs must also plead facts to demonstrate

that the defendants acted with deliberate indifference in that

the defendants were "aware of facts from which the inference

could be drawn that a substantial risk of serious harm exists,"

and actually drew the inference. Farmer, 511 U.S. at 837. A

factfinder can conclude that a government official was aware of

a substantial risk of serious harm based on the fact that the

risk was obvious.  Id. at 842.  However, there is no deliberate indifference if the defendant official responds reasonably to the risk.  Id. at 844-45; see also Coscia, 659 F.3d at 39 (deliberate indifference can consist of "a conscious failure to provide medical services where they would be reasonably appropriate").

### 2.  Pre-Discovery Summary Judgment

The defendants assert that irrefutable evidence submitted with their summary judgment motion shows that the deputies did not deny Mr. Karmue medical care, or delay Mr. Karmue's receipt thereof, because they obtained medical care for him by calling the EMTs immediately after he was injured and complained of pain, and because Mr. Karmue was taken to RWH for medical care. Further, the defendants assert, Mr. Karmue did not have any serious medical needs to which the defendants could be deliberately indifferent.[11]

---

[11]Defendants point to the following evidence submitted in support of their summary judgment motion:

- The EMTs stated that while Mr. Karmue complained of knee pain, Mr. Karmue had "no visible swelling thru clothing," that he "was able to bend and straighten legs," "insisted on ambulating, and stated he was able to walk." EMT Report (Doc. No. 113-6, at 10);

- The RWH diagnosed Mr. Karmue with knee pain and a contusion.  RWH ER Notes (Doc. No. 113-6, at 13-14);

Mr. Karmue, in his sworn statement, states that from the time he collided with the steel partition in the transport van, and lasting all of April 23 and 24, 2015, he experienced severe pain.  His reports of pain were recorded by the EMTs, Dr. Bonitati at RWH, and the medical staff at Memorial Hospital. See EMT Report (Doc. No. 113-6, at 9-10); RWH ER Notes (Doc. No. 113-6, at 12, 14); Memorial ED Chart (Doc. No. 113-6, at 17). Mr. Karmue further states that while the EMTs were called within a few minutes of Mr. Karmue's arrival at the courthouse, that the defendants denied him care and treatment by the EMTS by instructing the EMTs that they could not touch, examine, or treat Mr. Karmue, and that Mr. Karmue was faking his injuries. Mr. Karmue also claims that Deps. DaSilva and Carvalho similarly interfered with his care at RWH by telling the medical staff there that Mr. Karmue was faking his injuries.

The facts underlying Mr. Karmue's inadequate medical care clams, asserted under the Fifth Amendment (Claim 4) and the FTCA (Claim 9, in part), stated in the light most favorable to Mr. Karmue, demonstrate that he had a serious medical need in that he experienced extreme pain.  Mr. Karmue states that he was

---

- Mr. Karmue's Memorial Hospital's Emergency Room chart for April 24, 2015 stated that Mr. Karmue was "without contusions on face or body," had "no recent change in vision," "no skin rash or bruising" and "no signs of trauma."  Memorial Chart (Doc. No. 113-6, at 17).

injured by Dep. Moore's abrupt stop of the transport van, and that he experienced extreme pain and immediately sought medical care, and that he so advised Deps. Moore and DaSilva. The defendants do not -- and nor could they -- prove that Mr. Karmue was not in pain. "Severe pain 'can be a sufficiently serious medical need,'" to state a constitutional claim for inadequate medical care. Vick v. U.S. Marshals Serv. Deputies Brent Moore et al., No. 19-cv-267-SJM-AKJ, 2019 WL 7568227, at *6 (D.R.I. Oct. 11, 2019), R&R approved, 2020 WL 161023, at *1 (D.R.I. Jan. 13, 2020). While it is not visible, Mr. Karmue's assertion that he repeatedly expressed that he was in pain, is sufficient to allege that he had a serious medical need that was known to the defendant deputies. The evidence before the court further demonstrates that the deputies were aware of Mr. Karmue's pain because they were aware that he had hit the partition in the transport van when they stopped short, they were able to see him visibly limping and moving slowly. Finally, while there is no dispute that the EMTs were called, and that Mr. Karmue was taken to the RWH Emergency Room, Mr. Karmue states that the defendants sufficiently interfered with his receipt of medical care that he received an inadequate examination for his injuries and did not receive any treatment from the medical providers he saw.

Moreover, as noted above, discovery has not occurred in this case, and there are many medical records potentially

relevant to Mr. Karmue's medical care claims that are not in the summary judgment record. Mr. Karmue has stated that he intends to rely on those records to counter the defendants' assertions. Further, the records submitted by the defendants with their summary judgment motion, in addition to not being complete, are themselves insufficient to preclude the possibility that no reasonable jury could find in the plaintiff's favor as to his medical care claims.

The court finds, therefore, that on the present record, the defendants have not met their burden to demonstrate that no reasonable jury could find in Mr. Karmue's favor as to whether Mr. Karmue had a serious medical need, whether the defendant deputies were deliberately indifferent to that need, and whether he was denied adequate medical care for any serious medical needs he had. Additionally, the defendants have not met their burden to demonstrate that Mr. Karmue cannot establish that his clearly established Fifth Amendment right to adequate medical care was denied, and are thus not entitled to summary judgment at this stage of the case. Accordingly, the defendants' motion for summary judgment is denied as to Claim 4, and as to Claim 9, to the extent it arises from the events underlying Claim 4, without prejudice to their ability to reassert any appropriate argument at a later stage of the case after the parties have had an adequate opportunity to engage in discovery.

## 2.  Public Health Service Immunity (Claim 10)

Mr. Karmue asserts that Dr. Dhanji and PT Quinn, acting with deliberate indifference, failed to provide him with constitutionally adequate medical care for his serious medical conditions in violation of his Eighth Amendment rights.  The defendants argue that, as to Claim 10, defendants Dr. Dhanji and PT Quinn were medical treatment providers employed by the United States Public Health Service ("PHS") at the time they treated Mr. Karmue at FMC Devens while he was incarcerated at that facility.

Under § 233(a), PHS employees acting within the scope of their employment "are not personally subject to Bivens actions for harms arising out of such conduct." Hui v. Castaneda, 559 U.S. 799, 802 (2010).  The FTCA provides the only remedy available to a plaintiff alleging harm by a PHS employee acting within the scope of his or her employment. Id.  Here, the defendants have submitted Dr. Dhanji's and PT Quinn's sworn statements that they were, at the time of the events underlying Mr. Karmue's claims, commissioned officers employed by the PHS to provide medical services to federal prisoners at FMC Devens, and that their actions with regard to Mr. Karmue were taken within the scope of their employment.  Decl. of Al-Karim Dhanji,

M.D., Mar. 19, 2019 (Doc. No. 113-9, at 1); Decl. of Kerry
Quinn, Mar. 22, 2019 (Doc. No. 113-10, at 1).

Mr. Karmue has not offered any evidence to contradict Dr.
Dhanji's and PT Quinn's statements that they were PHS employees
and has not indicated that any discovery he could seek would
assist him in doing so.  Accordingly, the defendants' motion, to
the extent it seeks summary judgment as to Claim 10, is granted,
and those defendants are dismissed from this action.


## II.   Rule 12(b)(1) Motion to Dismiss

### A.    Rule 12(b)(1) Standard

"[T]he party invoking the jurisdiction of a federal court
carries the burden of proving its existence."  Jonson v. FDIC,
877 F.3d 52, 56 (1st Cir. 2017) (internal quotation marks and
citation omitted).  When ruling on a motion to dismiss for lack
of subject-matter jurisdiction, see Fed. R. Civ. P. 12(b)(1),
the court must "construe the [c]omplaint liberally and treat all
well-pleaded facts as true, according the plaintiff the benefit
of all reasonable inferences."  Hajdusek v. United States, 895
F.3d 146, 148 (1st Cir. 2018) (internal quotation marks and
citation omitted).  When dismissal is sought under Rule 12(b)(1)
based solely on the facts alleged in the complaint, dismissal
"is appropriate only when the facts [alleged] in the plaintiff's
complaint, taken at face value, fail to bring the case within

the court's subject-matter jurisdiction." Gordo-González v. United States, 873 F.3d 32, 35 (1st Cir. 2017). That said, when the United States challenges a claim under the FTCA with a Rule 12(b)(1) motion, the claim can survive "only if it [alleges] sufficient facts to demonstrate that the FTCA applies to the claim[ ] asserted and that none of the FTCA's manifold exceptions is apposite." Gordo-González, 873 F.3d at 36 (emphasis added). The court may also consider extrinsic evidence, such as exhibits and affidavits, without converting a Rule 12(b)(1) motion to dismiss into one for summary judgment. See Carroll v. United States, 661 F.3d 87, 94 (1st Cir. 2011) (in evaluating motion to dismiss under Rule 12(b)(1), court "construe[s] plaintiffs' complaint liberally and ordinarily 'may consider whatever evidence has been submitted'" (citation omitted)).

### B. Transport Without a Seatbelt

#### 1. Discretionary Function Exception

The United States moves to dismiss Mr. Karmue's FTCA claim (Claim 9) as it pertains to the conduct of the USMS defendants underlying Claim 1, in which Mr. Karmue alleges that Deps. Moore and DaSilva transported Mr. Karmue to court without securing his seatbelt. The defendants assert that Mr. Karmue's claims are based upon the USMS deputies' performance of a discretionary

function, and district courts lack subject matter jurisdiction over such claims under the FTCA's discretionary function exception.  The FTCA is "a limited waiver of sovereign immunity."  Hajdusek, 895 F.3d at 149.  It provides that

> the district courts . . . have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).  As a waiver of sovereign immunity, "'[t]he FTCA must be 'construed strictly in favor of the federal government.'"  Evans v. United States, 876 F.3d 375, 380 (1st Cir. 2017) (citation omitted).

> In addition, the FTCA's waiver of sovereign immunity is narrowed by exceptions.  One such exception, commonly called the discretionary function exception, bars liability for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

Id. (quoting 28 U.S.C. § 2680(a)).  "In evaluating a claim under the FTCA, a court must . . . determine whether the claim is based on a discretionary function as contemplated by section 2680; if so, the case must be dismissed for want of jurisdiction."  Hadjusek, 895 F.3d at 149.

The court utilizes a two-step process for conducting the discretionary-function analysis:

> First, [the court] must identify the conduct that allegedly caused the harm. Second, [the court] must ask whether this conduct is of the nature and quality that Congress, in crafting the discretionary function exception, sought to shelter from tort liability. The latter analysis encompasses two questions: Is the conduct itself discretionary? If so, is the discretion susceptible to policy-related judgments? The word "susceptible" is critical here; [the court] do[es] not ask whether the alleged federal tortfeasor was in fact motivated by a policy concern, but only whether the decision in question was of the type that policy analysis could inform. "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis."

Id. (quoting United States v. Gaubert, 499 U.S. 315, 325 (1991)) (other citations and internal quotation marks omitted); see also Gordo-González, 873 F.3d at 36 ("[S]ection 2680(a) will strip a court of jurisdiction only if the challenged conduct is both discretionary and policy-driven."). "[T]he burden [is] on the plaintiff to show that discretionary conduct was not policy-driven, and, hence, falls outside the [discretionary function] exception." Carroll, 661 F.3d at 100 n.15.

2. Reckless Driving

Here, Mr. Karmue claims that he was injured because Dep. Moore was operating the transport van in a negligent or reckless manner while Mr. Karmue was handcuffed and unseatbelted in the

prisoner compartment of the van. It seems apparent that negligent or reckless driving is not policy-related and would not be covered by the discretionary function exception. Cf. Estabrook v. United States, No. 16-CV-11772-ADB, 2018 U.S. Dist. LEXIS 210819, at *10, 2018 WL 6592092, at *4 (D. Mass. Dec. 13, 2018) ("'If one of the [federal] officials involved in this case drove an automobile on a mission connected with his official duties and negligently collided with another car, the exception would not apply,' because the discretion required by driving would not have been 'grounded in regulatory policy.'" (quoting Gaubert, 499 U.S. at 325 n.7)); see also, e.g., Dobrowski v. United States, No. 2:11-cv-02835 JAM-CKD, 2013 U.S. Dist. LEXIS 160382, at *8, 2013 WL 5954901, at *3 (E.D. Cal. Nov. 7, 2013) (denying motion to dismiss, on discretionary-function grounds, FTCA negligence claim based upon improper "selection of a gear before stepping on the gas [while driving a USMS van] and backing up without care"); Vinzant v. United States, No. 2:06-CV-10561, 2010 U.S. Dist. LEXIS 143672, at *3, *16, 2010 WL 1857277, at *1, *6 (E.D. La. May 7, 2010), aff'd 458 F. App'x 329, 329 (5th Cir. 2012) (ruling that plaintiff stated viable FTCA negligence claim by alleging that he was injured when marshals driving prisoner transport van "were speeding and carelessly weaving through traffic, despite the dangerous weather conditions").

The discretionary function exception, therefore, does not bar negligence claims asserted under the FTCA where, as here, the plaintiff asserts that he was injured both by the failure of the defendants to secure him with a seatbelt and by the pertinent federal employee's negligent or reckless driving. Accordingly, to the extent the defendants seek dismissal of Mr. Karmue's Claim 9, to the extent it relies on the conduct underlying Claim 1, the motion is denied.

### C.   FTCA Exhaustion

The defendants assert that Mr. Karmue's Claim 11, asserted under the FTCA, which arises out of the allegedly negligent and inadequate medical care Dr. Dhanji and PT Quinn provided to Mr. Karmue at FMC Devens, must be dismissed because Mr. Karmue has failed to exhaust his administrative remedies with regard to those claims. The United States's limited waiver of sovereign immunity under the FTCA only applies to those claims that were properly presented to the appropriate agency for an administrative remedy. See 28 U.S.C. § 2675(a). The First Circuit has held that the exhaustion requirement for an FTCA claim is jurisdictional. "The [FTCA] also contains an exhaustion requirement, which has been viewed as a 'non-waivable jurisdictional requirement' limiting the suit to claims fairly

made to the agency.'" Acosta v. U.S. Marshals Serv., 445 F.3d
509, 513 (1st Cir. 2006) (citation omitted).

The defendants have submitted evidence with their motion
demonstrating that Mr. Karmue has filed two administrative
claims with the USMS concerning the allegedly tortious conduct
of the defendant USMS deputies on April 23, 2015, but that he
has not filed any administrative claim with the BOP, the agency
with which Mr. Karmue would have had to file administrative
claims concerning his medical care at FMC Devens. See Decl. of
Cheryl Magnusson, Mar. 18, 2019 ("Magnusson Decl.") (Doc. No.
113-7, at 1). In his administrative tort claims with the USMS,
Mr. Karmue's only reference to medical care at FMC Devens is as
follows:

> [T]he full extent of the damage, which resulted from
> the accident and subsequent assault by the U.S.
> Marshals [on April 23, 2015], has yet to be fully
> diagnosed, as staff at [FMC] Devens seem unwilling to
> fully explore any pain, suffering or problems I have
> as result of the aforementioned incidents.

Admin Tort Claim Form 95, Sept. 27, 2016, Ex. 19, Defs.' SOUF
(Doc. No. 113-6, at 26). This statement, which is filed with
the wrong agency, and which does not name Dr. Dhanji or PT
Quinn, and does not refer with specificity to any act or
omission constituting negligence, is insufficient to exhaust his
FTCA claim arising out of his medical care at FMC Devens.

Mr. Karmue did file an Inmate Request to Staff form directed to the Health Services Administrator at FMC Devens in which he complained specifically that Dr. Dhanji refused to conduct a complete examination of Mr. Karmue, refused Mr. Karmue treatment for pain, called Mr. Karmue a liar, and didn't mention PT Quinn.  That document does not suffice to exhaust his claims with the BOP as required by § 2675(a).

Mr. Karmue has not properly exhausted his administrative claim with the BOP, concerning his medical care at FMC Devens, before asserting his FTCA claim (Claim 11) here.  Accordingly, the defendants' motion, to the extent it seeks to dismiss that claim for lack of subject matter jurisdiction, is granted.

**Conclusion**

For the foregoing reasons, the court GRANTS IN PART and DENIES IN PART the federal defendants' motion for partial summary judgment and to dismiss (doc. no. 112), as follows:

1.    The federal defendants' motion for partial summary judgment and dismissal (doc. no. 112) is DENIED as to Claims 1-4 and 9, without prejudice to the defendants' ability to assert an appropriate claim in a summary judgment motion filed at a later stage in this case after the parties have had the opportunity to conduct discovery;

2.    The federal defendants' motion for partial summary judgment and to dismiss (doc. no. 12) is GRANTED as to Claims 10 and 11.

3.    Dr. Al-Karim Dhanji and Physical Therapist Kerry Quinn are dismissed from this action.

SO ORDERED.

_____
Landya B. McCafferty
United States District Judge
Sitting by Designation

March 18, 2020

cc:  Kormahyah Karmue, pro se
     Bethany N. Wong, Esq.
     Matthew C. Reeber, Esq.
     Patrick J. McBurney, Esq.
     Michael G. Sarli, Esq.
     Per C. Vaage, Esq.