UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

Kormahyah Karmue

　　　　v.　　　　　　　　　　　　　　Civil No. 17-cv-107-LM
　　　　　　　　　　　　　　　　　　　Opinion No. 2023 DNH 012 P
Brenton Moore, et al.

**O R D E R**

Plaintiff Kormahyah Karmue, a former federal pretrial detainee, brings this civil rights suit under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics[1] against Deputy U.S. Marshals Brenton Moore, Elden DaSilva, Justin Carvalho, and John Doe.  Karmue also brings a negligence claim under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b)(1), against the United States. Karmue alleges that, on April 23, 2015, the defendant deputy marshals injured him while transporting him to a federal courthouse in Rhode Island for a pretrial hearing in his criminal case.

Defendants move for summary judgment in their favor, and Karmue objects. Karmue also moves for sanctions against defendants "for their intentional and/or negligent spoliation of critical evidence in this case."  Doc. no. 170 at 1.  Specifically, Karmue contends that defendants failed to preserve the van used to transport Karmue on April 23, 2015; a partial video recording from that day; and a Taser carried by Deputy Moore.  Karmue argues that, as a result, the court should draw certain adverse inferences against defendants.

---

[1] 403 U.S. 388 (1971).

For the following reasons, defendants' motion for summary judgment (doc. no. 174) is granted as to Karmue's civil rights claims, Counts I through IV.  The motion is granted in part and denied in part as to Karmue's negligence claim, Count V.  Karmue's motion for sanctions (doc. no. 170) is denied.  The court also grants defendants' unopposed motion to seal certain summary judgment exhibits relating to Karmue's medical records (doc. no. 177) and denies as moot the parties' joint motion to stay (doc. no. 192).

## STANDARD OF REVIEW

A movant is entitled to summary judgment when he "shows that there is no genuine dispute as to any material fact and [that he] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  If the moving party succeeds in making that showing, "the burden shifts to the nonmoving party, who must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor." Borges v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010).  The nonmoving party's failure to meet that burden by reference to "significantly probative" materials "of evidentiary quality" entitles the moving party to summary judgment. Flovac, Inc. v. Airvac, Inc., 817 F.3d 849, 853 (1st Cir. 2016); see also Guldseth v. Family Medicine Assocs. LLC, 45 F.4th 526, 533-34 (1st Cir. 2022) (stating that a litigant cannot use "conclusory allegations," "improbable inferences," or "unsupported speculation" to defeat a motion for summary judgment).  In evaluating a motion for summary judgment, the courts must view the evidence in the light most favorable to the nonmoving party, must

draw all reasonable inferences in that party's favor, and may neither make credibility determinations nor weigh the evidence.  Harris v. Scarcelli, 835 F.3d 24, 29 (1st Cir. 2016); Hicks v. Johnson, 755 F.3d 738, 743 (1st Cir. 2014).

## BACKGROUND

I.    Procedural History

Karmue filed his complaint, pro se, in 2017.  The court narrowed Karmue's claims, and defendants filed a motion for partial summary judgment and to dismiss, arguing, in part, that they were entitled to qualified immunity.  Noting that Karmue had not had an opportunity to engage in discovery, the court granted in part and denied in part defendants' motion, without prejudice to defendants' ability to renew their qualified immunity defense after the close of discovery.  Karmue v. Remington, No. 17-cv-107-LM, 2020 WL 1290605, at *11 (D.R.I. Mar. 18, 2020). Karmue obtained counsel in September 2020 and later filed the Third Amended Complaint, doc. no. 158.  The parties have had a complete opportunity to engage in discovery.

II.    Karmue failed to properly oppose the defendants' Statement of Undisputed Facts.

The District of Rhode Island's local rules require parties moving for summary judgment to file a statement of material facts separate from their motion.  LR Cv 56(a)(1)-(2).  "An objecting party that is contesting the movant's Statement of Undisputed Facts shall file a Statement of Disputed Facts," which identifies the disputed facts and the evidence supporting the dispute.  LR Cv 56(a)(3).  If the

objecting party fails to expressly deny or otherwise controvert any fact alleged in the moving party's statement of undisputed facts, that fact "shall be deemed admitted."  Id.

Defendants filed a comprehensive Statement of Undisputed Facts (doc. no. 175).  In response, Karmue did not file a "Statement of Disputed Facts," nor did he identify in his objection which specific facts he opposed.  Rather, Karmue's objection contains a section entitled "Disputed Material Issues of Fact," which neither identifies any of the facts from defendants' statement that are disputed nor contains any cohesive narrative of Karmue's version of events from which disputes can be reasonably ascertained.  Karmue also failed to file the handful of evidentiary materials he cited to in his objection.  The court noticed Karmue's oversight several months after he had filed his objection and, on its own motion, the court permitted Karmue to file his evidence late.

As a result of those deficiencies, it has been exceedingly difficult for the court to discern which facts Karmue disputes and which facts he does not.  For those reasons, the court has deemed undisputed all those facts from defendants' statement of material facts that are supported by the record and neither specifically identified by Karmue as disputed nor otherwise contradicted by evidence or argument.  See De la Vega v. San Juan Star., Inc., 377 F.3d 111, 116 (1st Cir. 2004) (observing that court cannot grant summary judgment in the moving party's favor merely because of the opposing party's failure to follow local rules or properly

4

object).  Regardless, the court still construes all of the facts in the light most favorable to Karmue and draws all reasonable inferences in his favor.

III.    Facts

    A.    Transport to the courthouse

In 2014, Karmue was indicted for assorted federal crimes and was detained pending trial.[2]  On April 23, 2015, deputy marshals Moore and DaSilva transported Karmue by van to the federal courthouse in Rhode Island for a pretrial hearing related to his criminal case.  The deputy marshals placed Karmue in handcuffs, a waist chain, and leg restraints for transport in the van.  Karmue requested that the deputies put him in a seatbelt,[3] but they did not do so.  Deputy Moore drove the van, while Deputy DaSilva rode in the passenger seat.

U.S. Marshals' policy requires prisoners to be "fully restrained" when transported, and "full restraints" consists of "handcuffs, waist chains, and leg irons."  Doc. no. 176-5 at 3.  The policy states that deputy marshals "are not required" to belt prisoners when transporting them.  Id. at 5.

_____

[2] Karmue was ultimately found guilty of several charges.  See United States v. Karmue, 841 F.3d 24 (1st Cir. 2016).

[3] Deputies Moore and DaSilva testified that Karmue did not ask to be placed in a seatbelt, and they dispute most other aspects of Karmue's account.  Under the standard for summary judgment, the court takes Karmue's version of events as true to the extent it is supported by factual rather than conclusory assertions and supported by evidence beyond mere speculation.  See Guldseth, 45 F.4th at 533-34 (stating that a nonmoving party cannot use "conclusory allegations," "improbable inferences," or "unsupported speculation" to generate genuine factual disputes).

As the van neared the courthouse, it came to an abrupt stop, which propelled Karmue into a metal partition that separates the prisoner compartment from the rest of the van.  Karmue hit his knees on the partition, hurting them.

Karmue's recollection about what led to the van's abrupt stop is limited. Karmue stated in interrogatory answers that "[i]n trying to beat a traffic light, the transport van came to an unanticipated and sudden stop to avoid a collision from an oncoming vehicle."  Id.  Karmue added that Deputy Moore was driving the van "recklessly, with excessive speed."  Doc. no. 176-4 at 2.

But in his deposition taken about two weeks after he produced his interrogatory answers Karmue clarified or limited those assertions,[4]  explaining that he could not estimate the van's speed and that his belief that the van was moving with excessive speed was premised on the impact he felt upon hitting the metal partition.  Doc. no. 190 at 284 ("I cannot tell you how fast we were going."). Karmue did not "recall being at an intersection," but he saw "lights crossing in front" of the deputy marshals.  Id. at 284-85 ("I don't know if it was an intersection . . . .  I saw lights, that's it.  I saw the street light there, like I said, but I don't know if it was an intersection."); id. at 285 ("Q. . . . [Y]ou saw a street light? A. I said I saw a light, like, you know – there's a light flashing, going back.  Q. You saw the emergency vehicle light? A. Yeah. Yep.").  Karmue also stated that, after the van

---

[4] Karmue's interrogatory answers were produced on March 15, 2021, and Karmue's deposition was taken on March 31, 2021.

stopped, he saw "a light," but he did not know if the van had stopped at that light or if they were in front of the light.  Id.

After the abrupt stop, a deputy marshal asked Karmue whether he was okay. Karmue responded that he was not okay and told Deputies Moore and DaSilva that he needed treatment, but the deputy marshals began driving again.[5]

      B.    <u>Karmue arrives at the courthouse, and the deputy marshals call for medical assistance.</u>

Deputy Moore drove the van through the intersection and into the courthouse's "sallyport," which was in a gated parking lot just beyond the intersection.  The sallyport is a garage where prisoners are unloaded and brought into the court's cell block area to await court proceedings.

Most of the events after Karmue and the deputy marshals arrived at the courthouse were recorded by courthouse security cameras.  At 1:26 p.m., Karmue stepped out of the van with help from Deputy DaSilva.  Karmue was fully restrained, meaning that he was wearing handcuffs, a waist chain, and leg irons. Karmue walked toward the courthouse without assistance, albeit with a pronounced

---

[5] Defendants dispute most of Karmue's account about the abrupt stop.  Deputy Moore testified that the van was moving between 3 and 5 miles per hour when he hit the brake pedal to avoid a police car that had activated its lights and entered the intersection just after the intersection stoplight turned green.  Deputy Moore explained that he would not have hit the van's accelerator because the turn to the courthouse was a very short distance away from the intersection.  Additionally, the deputy marshals testified that they did not hear Karmue hit the metal partition, nor did they hear any noise from the back of the van.

limp.  Deputy Moore told Karmue that he had to walk from the van to the holding cell.[6]

Karmue walked from the sallyport to an elevator, and then from the elevator to a holding cell, where a deputy marshal removed Karmue's handcuffs and waist chain.  Karmue then sat on a bench.

At about 1:34 p.m.—between five and six minutes after the deputy marshals left Karmue in the holding cell—the deputy marshals returned and spoke with Karmue.  Karmue reiterated to the deputy marshals that he had been injured during the transport.  The deputy marshals called for EMTs to bring Karmue to the hospital.

About 20 minutes later, at 1:53 p.m.,[7] Deputies Moore, DaSilva, and Justin Carvalho entered the cell followed by two EMTs.  One of the EMTs—Michael Cairone—briefly spoke with Karmue.  Karmue told Cairone that he had knee pain, but Cairone did not see any injury.  Karmue testified that a deputy marshal told the EMTs that he was faking his injury and not to believe his claim that he was injured.

The other EMT—Stephany Blackwell—stood back and watched Karmue, who remained seated while Cairone examined and talked to him.  The video shows

---

[6] The courthouse security camera recordings do not have audio, but Karmue testified that Deputy Moore told him as such.  Deputy Moore disputes Karmue's account.

[7] In the court's prior order addressing defendants' pre-discovery motion for summary judgment, the court incorrectly stated that the deputy marshals and EMTs arrived eight minutes after speaking with Karmue.  See Karmue, 2020 WL 1290605, at *2.

Karmue point to his knee and Cairone pointing to the same knee.  Less than a minute after the EMTs arrived, Cairone helped Karmue stand up, and Karmue walked with Cairone out of the cell block and toward the transport elevator. Karmue was still wearing his leg irons, but he was not wearing handcuffs.[8]

Karmue walked back to the elevator at a pace far slower than he had walked in.  When he arrived at the courthouse, it took Karmue less than a minute to get out of the van, go up the elevator, and to enter the cell block area.  On his return, Karmue took about four minutes to walk from the cell block to the elevator's second-floor landing.  In addition to walking very slowly, the video shows Karmue walking in a hunched posture.  Although Cairone provided Karmue some assistance by holding on to Karmue's arm while walking, Karmue walked under his own power. Cairone stated in his declaration that Karmue was able to walk down the hallway to the transport elevator.[9]

### C.   Elevator Scrum

The deputy marshals, the two EMTs, and Karmue entered the elevator together.  In the elevator, Deputy Moore grasped Karmue's shirt, while Cairone

---

[8] The video shows Deputy Moore grab what appears to be a restraint and prepare to put it on Karmue as he stands up.  However, Karmue stands up very slowly from the bench he was sitting on, and Deputy Moore appears to decide not to put any additional restraints on Karmue at this time.

[9] Blackwell testified that the EMTs offered to put Karmue on a stretcher while in the courthouse, but he refused and insisted on walking instead.  Karmue testified that he did not refuse the stretcher but rather Deputy Moore instructed the EMTs not to get the stretcher and told them Karmue had to walk.

continued to hold Karmue's arm.  Karmue remained standing but his hunched posture became more severe.  Karmue began to tilt toward the floor.  Both Cairone and Blackwell stood next to Karmue in the elevator, but Blackwell turned away from Karmue and faced one of the deputy marshals.

Soon after the elevator door closed, Karmue and Deputy Moore exchanged words with each other.[10]  Karmue testified that Deputy Moore was "aggressive, mad, [and] retaliating against" him and that Deputy Moore called him "the N word."  Doc. no. 190 at 290-91.[11]  Karmue testified that he told Deputy Moore that he could not sustain his weight because the pain was too great.  Id. at 291.

Immediately after his exchange with Deputy Moore, Karmue dropped to the floor.  Karmue fell to the floor because of his pain.[12]  Deputy Moore attempted to hoist Karmue back to a standing position, but he was unable to do so.  Deputy Moore directed Karmue to stand up, but Karmue did not do so.  Deputy Moore lifted Karmue into a seated position on the floor.  Karmue's back was against the elevator wall and Deputy Moore was positioned between Karmue and the elevator's other occupants.  Deputy Moore held Karmue's shirt at the shoulders.

In the following seconds, the video shows Karmue begin to lean away from Deputy Moore and toward Cairone, so that Deputy Moore no longer stood between

---

[10] The video recording depicts Karmue and Deputy Moore exchanging words but, as noted, does not have audio.

[11] Every other person who was in the elevator disputes Karmue's account.

[12] Deputy Moore, however, testified that Karmue went limp and "threw himself" to the elevator floor.  Doc. no. 176-7 at 15.

him and Cairone.  Blackwell testified that Karmue was "moving around and not being cooperative inside of the elevator."  Doc. no. 176-9 at 16.

As Karmue moved closer to Cairone and the floor, Deputy Moore unholstered his Taser, flipped a switch to turn it on, and pointed it at Karmue.  The elevator doors opened at the same time.  Blackwell quickly left the elevator, bumping into Deputy Moore as he tried to grab his Taser.  Cairone, however, was still in the elevator's corner, with Karmue on the floor in front of him and between Cairone and the door.

Deputy Moore testified that he told Karmue that he would use the Taser if he did not stop flailing his arms and ignoring the deputies' commands.  Deputy Moore testified that turning a Taser on (without firing it) has a deterrent effect.

The Taser has a built-in flashlight and laser.  Both the flashlight and laser automatically turn on when the Taser is turned on.  The Taser must be turned on to deploy the Taser's probes, which deliver its debilitating electric shock.  However, the Taser's probes do not deploy unless the Taser's trigger is pulled.

Karmue testified that the Taser was twice directed at his eyes and that he "felt the heat from the light" and that "it burned."  Doc. no. 176-6 at 94-95.  Karmue described the light as the "brightest" he had experienced in his life.  Id. at 97.  The video shows the Taser light and laser, and it shows Deputy Moore pointing it at Karmue for approximately two seconds.  It is unclear from the video whether the Taser light and laser are pointed at Karmue's face or his upper body.

Deputy Moore did not fire the Taser at Karmue.  A data report generated from the Taser carried by Deputy Moore on April 23, 2015, shows that the Taser was not fired on that date.  Karmue does not recall Deputy Moore firing the Taser. The video does not depict Deputy Moore firing the Taser or Karmue being hit by the Taser's probes.

Deputy Moore's main concern was the presence of the two EMTs in the elevator who "did not have the training we have to deal with the situation."  Doc. no. 176-7 at 24.  Deputy Moore did not hear Karmue say why he was on the floor; Deputy Moore heard Karmue yelling but Karmue was not "making any sense" to him.  Id.  Karmue testified that he was shouting because he was in pain.

Deputy Moore turned off and holstered his Taser, and Karmue laid on the floor in front of Cairone.  Deputies Moore and Carvalho bent over Karmue.  Because the deputy marshals and Karmue were in very close quarters away from the camera, the video recording is less clear about what is happening at this time.

Initially, Karmue stated in interrogatory answers that Deputies Moore and DaSilva punched and kicked him when he was on the floor.  Karmue, however, clarified during his deposition that he was not kicked or punched—at least not in the sense that the deputy marshals struck him by pulling their fists back and hitting him.  Doc. no. 190 at 294 (testifying that Deputy Moore did not "bring his arm back and punch" him).  Rather, Karmue testified that he meant that Deputy Moore used his arms, feet, or knees to push or press him into the floor.  Specifically, Karmue testified that Deputy Moore's "knee was punching at [his] body, pressing

into [his] body, and also his feet were punching into [his] body and pressing into [his] body." Id. at 293.

Likewise, Karmue testified that Deputy Moore did not pull his foot back to kick him, distinguishing what he experienced from "the kick that football players can do." Doc. no. 190 at 294; id. at 293 (testifying that "[y]ou don't have to actually pull your feet to kick a person"). Rather, Karmue testified that Deputy Moore's "feet pressing into [his] body and his knee onto [him] is the same thing," in Karmue's view, as a kick. Id. at 293. Karmue also testified that Deputy Moore can be seen on the video choking him by pulling on his clothing.

The video shows the deputies attempting to hold Karmue down on the elevator floor. Deputy Moore pulled at Karmue's clothing as Karmue moved on the floor. The deputy marshals used their bodies, including their hands and knees, to hold Karmue down, which eventually prevented him from moving. The deputy marshals reached for Karmue's hands and handcuffed him.

About one minute passed from the time Karmue fell to the elevator floor until Karmue was handcuffed. After Karmue was handcuffed, the deputies stood around Karmue, who continued to move around on the elevator floor. The deputies did not use further force to restrain Karmue.

A few minutes later, the EMTs brought an evacuation chair to the first-floor elevator landing. The deputy marshals and Cairone lifted Karmue and carried him out of the elevator. They strapped Karmue to the evacuation chair. The video shows the EMTs wheeling Karmue out of the sallyport to the courthouse parking

13

lot, where, using a sheet that had been on the evacuation chair, they transferred Karmue to a stretcher and loaded him into a waiting ambulance.

The EMTs attempted to examine Karmue for injuries in the ambulance. Karmue testified that, in the ambulance, Deputy DaSilva told Blackwell not to treat him.[13]  Blackwell's report from the incident states that Karmue had no visible swelling through his clothing, and he was able to bend and straighten his legs. Blackwell wanted to examine Karmue further, but she did not feel like she needed to do so immediately because Karmue was not suffering from any medical issue that required immediate intervention.

### D.   Subsequent Medical History

The ambulance brought Karmue to a local hospital.  Medical records from the hospital state that Karmue declined to have x-rays or treatment.  Karmue testified that the hospital records are false.  The records also state that Karmue was "uncooperative with staff" and "verbally abusive to nurses, PA, police, [and] EMS." Doc. no. 177-1 at 5.  Karmue denies this.  A physician diagnosed Karmue with knee pain.  Karmue testified that the physician was "very unprofessional" and refused to properly evaluate him because he was told that Karmue was faking his injuries. Doc. no. 190 at 303.

The day after the incident, medical providers performed a CT scan of Karmue's spine, chest, abdomen, pelvis, and brain.  A report says the results of the

---

[13] Blackwell testified that Karmue did not want her to touch him and that Karmue was using so much vulgarity that she could not converse with him.

scans were "essentially normal."  Doc. no. 177-3 at 22.  Medical records from the day state that Karmue had no contusions on his face or body.

On May 6, 2015, Karmue had an x-ray performed on both knees.  The x-rays indicated normal results for both knees.  Similar findings resulted from x-rays performed on September 23, 2015, and May 3, 2016.  Examinations of Karmue at the jail reported no bruises or external signs of injury.  Karmue testified that the medical providers who treated him at the hospitals and in prison were unprofessional and did not take his complaints seriously, accusing him of faking his injuries.

An August 15, 2017 medical record from FMC Devens states that Karmue suffered a "non work related injury yesterday morning."  Doc. no. 177-2 at 15.  Karmue underwent an x-ray and was diagnosed with mild degenerative disc disease.  The results from the x-ray were "otherwise unremarkable."  Id.

As to Karmue's eye, which he asserts was injured by the Taser's light or laser, a July 13, 2016 medical record from FMC Devens states that Karmue had a "clear cornea."  Id. at 13.  A report from a February 27, 2018 eye exam at FMC Devens states that there were "no significant findings" despite Karmue's complaints about worsening vision.  Id. at 18.

Karmue was released from prison in September 2019.  After Karmue was released from prison, an ophthalmologist, Dr. Mark Herschel, diagnosed Karmue with a corneal scar.  Dr. Herschel testified that Karmue told him he was hit in the eye by Taser probes.  Dr. Herschel opined that a Taser light or laser was very

unlikely to have caused the corneal scar,[14] and he would not expect exposure to either for two seconds to cause a corneal scar.  Another ophthalmologist, Dr. Danny Tu, testified that he does not think the Taser caused Karmue's eye injury.  Lastly, a defense expert, Dr. James Chodosh, opined that the Taser did not cause Karmue's eye injury.

Additionally, after Karmue was released from prison a physician diagnosed him with a herniated disc in his back.  The physician could not rule out that Karmue suffered the herniated disc from the abrupt stop of the transport van, though he noted that a sneeze could also cause a herniated disc.  A defense medical expert, Dr. Stuart Hershman, hypothesized that, when the transport van came to an abrupt stop, Karmue "may have felt as if he had been in a low-energy motor vehicle collision."  Doc. no. 176-19 at 7.  However, Dr. Hershman continued, stating that "[m]usculoskeletal injuries resulting from trauma are seldom subtle," and the lack of "significant musculoskeletal injuries" shown by the post-incident imaging was consistent with "muscle contusions and strains" as opposed to "significant injuries," including any "traumatic musculoskeletal injury" or degenerative back injuries.  Id. at 7-8.  Dr. Hershman opined that Karmue's diagnosis of degenerative disc disease was consistent with aging and not from any traumatic event.

---

[14] Dr. Herschel explained that a bright enough light could cause damage to a person's retina, but damage to the cornea was unlikely.  See doc. no. 176-13 at 3-4.  Dr. Herschel testified that, as far as he knew, he had never treated a patient who experienced a corneal scar because of a flashlight.

IV.   <u>Claims</u>

In this suit, Karmue brings four constitutional claims under the Fifth

Amendment (Counts I through IV) and one claim under the Federal Tort Claims Act

(Count V):

- Count I: Deputies Moore and DaSilva failed to seatbelt Karmue and abruptly stopped the transport van on the way to the courthouse.

- Count II: Deputies Moore and DaSilva used excessive force in the courthouse elevator by pointing the Taser at Karmue and when trying to restrain Karmue on the elevator floor.

- Count III: Deputies Carvalho and Doe failed to intervene when Deputy Moore used excessive force in the courthouse elevator.

- Count IV: Deputies Moore, DaSilva, and Carvalho unreasonably denied Karmue access to medical care.

- Count V: The United States is liable for the deputy marshals' negligence when driving the transport van, handling the Taser, and attempting to restrain Karmue.

**DISCUSSION**

Defendants move for summary judgment on all five of Karmue's claims.  As

to Counts I through IV, the deputy marshals assert that they are entitled to

qualified immunity.  As to Count V, the United States argues that the evidence does

not support a finding of negligence.  Karmue opposes summary judgment, and he

argues that defendants' failure to preserve certain evidence is sufficient to defeat

their motion for summary judgment.

I.      The deputy marshals are entitled to qualified immunity as to all of Karmue's
        Fifth Amendment claims.

        "Qualified immunity is a doctrine that shelters government officials from civil

damages liability 'insofar as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known.'"

McKenney v. Mangino, 873 F.3d 75, 80 (1st Cir. 2017) (quoting Harlow v.

Fitzgerald, 457 U.S. 800, 818 (1982)).  The court first determines whether the facts

set out a violation of a protected right.  McKenney, 873 F.3d at 81.  Second, the

court determines whether the conduct violated a "clearly established" right—

meaning controlling authority or a consensus of cases that an objectively reasonable

person in the defendant's position would have known his conduct violated.  Id.  The

bar is high: "Because qualified immunity is intended to protect all but the plainly

incompetent or those who knowingly violate the law, the existing precedent at the

time of the officers' conduct must be clear enough that every reasonable official

would interpret it to bar the conduct at issue."  Hill v. Walsh, 884 F.3d 16, 21-22

(1st Cir. 2018) (citations omitted).  Further, the plaintiff—Karmue—bears the

burden to show that the defense of qualified immunity is inapplicable.  Escalera-

Salgado v. United States, 911 F.3d 38, 41 (1st Cir. 2018).

        Karmue's constitutional claims arise under the Fifth Amendment's Due

Process Clause, which generally requires federal actors to refrain from using

excessive force on pretrial detainees and from treating pretrial detainees with

deliberate indifference to substantial risks of serious harm to their health or safety.

See, e.g., Kingsley v. Hendrickson, 576 U.S. 389, 396 (2015); Coscia v. Town of

18

Pembroke, 659 F.3d 37, 39 (1st Cir. 2011) (discussing Fourteenth Amendment claims of pretrial detainees in state custody).  Mere negligence, however, "is categorically beneath the threshold of constitutional due process."  Kingsley, 576 U.S. at 396.  Because the Fifth Amendment's protections are, in general, at least as generous as those provided to state pretrial detainees under the Fourteenth Amendment or to convicted inmates under the Eighth Amendment, the court is informed in its discussion by cases arising under all three amendments.  See, e.g., Ruiz-Rosa v. Rullan, 485 F.3d 150, 155 (1st Cir. 2007) ("Generally, the standard applied under the Fourteenth Amendment is the same as the Eighth Amendment standard.").

A.  Count I: Deputies Moore and DaSilva are entitled to qualified immunity because Deputy Moore did not drive the transport van recklessly.

The court begins with Karmue's claim that Deputy Moore violated his Fifth Amendment rights by recklessly driving the transport van and failing to secure his seatbelt.  Karmue contends that the evidence shows Deputy Moore drove the transport van recklessly and that the court can infer from defendants' destruction of evidence that Deputy Moore drove the transport van recklessly.

1.  A reasonable jury could not find on the evidence before the court that Deputy Moore drove the transport van recklessly.

To establish a violation of the Fifth Amendment's Due Process Clause based on conditions of confinement a pretrial detainee must provide sufficient evidence to demonstrate that the identified defendants acted with deliberate indifference to a

substantial risk of serious harm to the detainee's health.  See Coscia, 659 F.3d at 39; Zingg v. Groblewski, 907 F.3d 630, 634-35 (1st Cir. 2018).  As to prisoner transport specifically, the clearly established rule is that a defendant's failure to seatbelt a pretrial detainee during transport does not violate the detainee's Fifth Amendment rights unless the defendant also drove the transport van recklessly.  See, e.g., Jabbar v. Fischer, 683 F.3d 54, 57 (2d Cir. 2012) (holding that the failure of prison officials to provide seatbelts to inmates riding in prison vehicles does not, standing alone, violate an inmate's Eighth Amendment rights).  As the court previously found in this case, "[t]here is a consensus of persuasively reasoned federal appellate court cases that have addressed the question which have held that qualified immunity is not available with respect to the Eighth Amendment deliberate indifference claims of handcuffed and shackled inmates who have been transported unseatbelted in a van driven recklessly."  Karmue, 2020 WL 1290605, at *10.

Karmue relies on a trio of these cases—Brown v. Fortner, 518 F.3d 552 (8th Cir. 2008), Rogers v. Boatright, 709 F.3d 403, 408-09 (5th Cir. 2013), and Scott v. Becher, 736 Fed. Appx. 130, 133 (6th Cir. 2018)—to support his claim that Deputy Moore recklessly drove the transport van, violating a clearly established constitutional rule.[15]  In Brown v. Fortner, the Eighth Circuit held that a

---

[15] Karmue does not assert that Deputy Moore engaged in the type of intentionally dangerous and punitive driving that occurs in a so-called "rough ride," e.g., McCowan v. Morales, 945 F.3d 1276, 1286, 1289 (10th Cir. 2019), and Thompson v. Commonwealth of Virginia, 878 F.3d 89, 99-100 (4th Cir. 2017).

reasonable jury could find that the defendant drove a transport van recklessly when he "was driving in excess of the speed limit, following too closely to the lead van, crossing over double-yellow lines, and passing non-convoy cars when the road markings clearly prohibited doing so." 518 F.3d at 559.  Further, the inmates being transported asked the defendant to slow down, but the defendant ignored those requests.  Id.

In Rogers v. Boatright, the Fifth Circuit held that a reasonable jury could find the defendant drove a transport van recklessly when he was alleged to have darted "in and out of traffic at high speeds" before abruptly stopping to avoid another vehicle. 709 F.3d at 406, 408-09.  The abrupt stop caused a large cut on the plaintiff's head and, on his hand, a gouge "to the bone." Id.  The defendant told other officers that there had been prior similar incidents causing injuries to inmates and that it was not "a big deal." Id.  And, in Scott v. Becher—which arose after the incident here in any event—the Sixth Circuit found a clearly established violation of the plaintiff's constitutional rights when the defendant drove a prisoner transport van "above the speed limit, swerving, and generally . . . recklessly." 736 Fed. Appx. at 133.  Moreover, when the inmates begged the officer to slow down, he "refused, laughed, and instead accelerated." Id.

The common thread of these cases and others is that the defendants' reckless driving was coupled with facts suggesting the defendants' intent to cause harm or their consciousness of the serious risks to the prisoners' safety.  See also e.g., Brown v. Missouri Dep't of Corrs., 353 F.3d 1038, 1040 (8th Cir. 2004) (recklessness found

when defendants sped and followed vehicles closely and concurrently mocked inmates' concerns about the officers' driving); Thomas v. Rodriguez, No. 3:16-v-2211-AJB-JMA, 2017 WL 3896738, at *4 (S.D. Cal. Sept. 6, 2017) (collecting similar cases); Barela v. Romero, No. 06-41 JBDJS, 2007 WL 2219441, at *7 (D.N.M. May 10, 2007) (officer drove transport van at high speeds, stopped erratically, and laughed at prisoners who expressed concerns).

By contrast, courts have found that there is no violation of the clearly established rule when the defendant only stopped a transport van abruptly, causing injury to a shackled and unbelted prisoner.  E.g., Scott v. City of Phila., No. CV 19-2871, 2019 WL 3530909, at *3 (E.D. Pa. Aug. 1, 2019) (collecting cases and stating that "[a]llegations of reckless driving, such as speeding or slamming the brakes, even when coupled with the absence of safety restraints do not rise to the level of deliberate indifference sufficient to state a claim").  For example, in Thomas v. Rodriguez, the plaintiff, who, like Karmue, was shackled but unbelted for transport, alleged that the defendant "slammed the van's brakes suddenly," which caused the plaintiff to be "thrust violently forward, hitting his knees and head on a partition in front of his seat."  2017 WL 3896738, at *5.  The court dismissed the plaintiff's deliberate indifference claim, reasoning that it was unlike cases such as Brown and Rogers, which involved driving recklessly or erratically.  Id. at *4; see also Thomas v. Rodriguez, 2018 WL 1536738, at *4 (S.D. Cal. Mar. 29, 2018) (dismissing amended complaint that further alleged defendant was driving transport van at a high rate of speed and passing cars before abruptly slamming brakes).

22

Similarly, in <u>Simon v. Clements</u>,[16] the plaintiff alleged that "possibly in an attempt to get through a traffic light before it turned red, [the defendant] was driving at a high rate of speed when he slammed the van's brakes suddenly.  The force of the sudden breaking caused Plaintiff to be thrust violently forward, hitting his knees and head on a partition in front of his seat, causing injury."  No. 15-4925 JLS (PLA), 2016 WL 8729781, at *1 (C.D. Cal. June 10, 2016).  The court dismissed the complaint, contrasting the plaintiff's allegations to the prior body of caselaw, and reasoning that the facts alleged—without more—were insufficient to state a claim.  Id. at *2.

Here, the incident involved, at worst, Deputy Moore's attempt to beat a light before it turned red—an unsafe but frankly common maneuver that is dissimilar to the consistently erratic and highly dangerous driving that has led other courts to find a constitutional violation, clearly established or otherwise.[17]  See Thomas, 2017 WL 3896738, at *4; Simon, 2016 WL 8729781, at *1; Rodriguez v. Court Sheriff Official, No. 19-CV-605, 2019 WL 883790, at *2 (E.D. Pa. Feb. 22, 2019) ("While the Court does not condone running a red light and while it is unfortunate that Rodriguez was injured, Rodriguez has at most alleged that he was in a traffic

---

[16] <u>Thomas</u> and <u>Simon</u> both involved claims under the Eighth Amendment.

[17] Hitting the van's brakes to allow a previously unseen and unheard police car to safely pass and avoid an accident does not amount to conduct that violates the constitution.  See Elwell v. Correia, 585 F. Supp. 3d 163, 166 (D.N.H. 2022) ("An officer is not deliberately indifferent to the risk if he acted reasonably to avoid harm but was unsuccessful in that effort.").  For that reason, the court focuses on the alleged conduct that may have necessitated the abrupt stop, i.e., trying to beat a red light.

accident as a result of Defendant's bad driving and has thus failed to state a plausible deliberate indifference claim.").  Further, unlike Brown, Rogers, and Scott, there is no evidence that Karmue expressed any concern about Deputy Moore's driving and that Deputy Moore mocked Karmue for it.  Crediting Karmue's version of events for purposes of summary judgment, the evidence points to, at most, negligence, not behavior so antithetical to the "decencies of civilized conduct" that it rises to the level of a due process violation.  See Cnty. of Sacramento v. Lewis, 523 U.S. 833, 848-49 (1998) ("[W]e have made it clear that the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm. . . .  We have accordingly rejected the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct . . . liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.").

2.   Karmue has not shown that defendants spoliated evidence relevant to Count I.

In a separate motion for sanctions (doc. no. 170) and throughout his objection to defendants' motion for summary judgment, Karmue contends that defendants failed to preserve certain evidence, including the transport van used on April 23, which, he argues, justifies the drawing of an adverse inference that Deputy Moore was reckless.  Specifically, Karmue argues that the van might have been equipped with a "black box" that recorded its speed and that the van had a video camera from which defendants have not produced a recording.

Defendants deny that they have spoliated any evidence.  In support, they submitted the declaration of John Cinquegrana, the United States Marshals' "Service Motor Vehicle Officer" for the District of Rhode Island.  Doc. no. 173-1 ¶ 1. Cinquegrana averred that he is familiar with the transport vans used by the Marshals in Rhode Island, and he stated that the transport vans used in Providence in April 2015 were not equipped with any "black box" type device that can record the van's speed.  The vans were equipped with video cameras, but Cinquegrana stated that they are used only when transporting female prisoners.  According to Cinquegrana, the van used by the U.S. Marshals in April 2015 was removed from service in 2016 as part of a regular vehicle replacement process.

A trier of fact may infer from a party's spoliation of evidence relevant to a litigated issue that the evidence was unfavorable to that party.  Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 399 (1st Cir. 2012).  This rule is based on "the commonsense notion" that a party who destroys a piece of evidence or permits it to be destroyed when facing litigation and while knowing its relevancy to the case may have done so because the evidence hurts his position.  Testa v. Wal-Mart Stores, Inc., 144 F.3d 173, 177 (1st Cir. 1998).  To permit the trier of fact to draw that adverse inference, the movant must show that (1) evidence was destroyed or not preserved; (2) the opposing party had notice of a potential claim; and (3) the opposing party had notice of the relevance of that claim to the destroyed evidence. Gomez, 670 F.3d at 399.  However, the nonexistence of evidence alone cannot permit an adverse inference based on spoliation.  See id. ("It is a proposition too

25

elementary to require citation of authority that when there is no evidence to begin with, a claim of spoliation will not lie.").

No adverse inference is justified as to Count I.  Karmue argued that the van could have been equipped with a device to record its speed, but defendants produced undisputed evidence that it was not.  The nonexistence of evidence alone does not permit an adverse inference.  Id.

As to the van's video cameras, the facts are analogous to Gomez.  In Gomez, which involved a slip and fall at a supermarket, the plaintiff claimed that the defendant had destroyed a video of the accident because "the defendant had a store security system that employed a series of cameras; the defendant had exclusive control over that system; and no videotape was produced during discovery."  Id.  The First Circuit rejected that argument, concluding that "[t]hese facts are true but, without more, they are inadequate to show spoliation."  Id.  The First Circuit noted that a store employee had testified that the video cameras covered a "good majority" of the supermarket's selling floor, but found that this testimony did not "support a conclusion (or even a reasonable inference) that a security camera filmed the incident that transpired . . . ."  Id.  There was also evidence that the area of the selling floor at issue was not "usually" protected by camera surveillance, though it was "possible for surveillance to occur there," and an employee testified that "she had never seen or heard of a videotape of the accident."  Id.

Similarly, here, the van had a video camera and no videotape of the incident was produced during discovery.  It is undisputed that the cameras were not turned

on because they are used only when the marshals transport a female prisoner. While it was possible for a recording to have been created, someone would have needed to turn the camera on, and there is no evidence that occurred in this case. For those reasons, no adverse inference is warranted as to the defendants' failure to produce a video recording from the van.  See id.[18]

Deputies Moore and DaSilva are entitled to qualified immunity and, therefore, summary judgment, as to Count I.

B.    Count II: Deputies Moore and DaSilva are entitled to qualified immunity as to Karmue's excessive force claim because their use of force was objectively reasonable.

Next is Karmue's claim that Deputies Moore and DaSilva used excessive force when restraining him after he fell in the courthouse elevator.  Defendants argue that summary judgment is warranted because their limited use of force to restrain Karmue in the prisoner transport elevator was objectively reasonable considering Karmue's erratic behavior.

1.    The evidence in the record shows the deputy marshals' use of force was objectively reasonable in light of the need to restrain Karmue when he began acting unpredictably in a courthouse elevator.

A use-of-force must be objectively unreasonable to violate a pretrial detainee's rights under the Fifth Amendment.  See Kingsley, 576 U.S. at 397;

---

[18] Karmue develops no argument that the failure to collect evidence in the first instance can be considered spoliation.  See Gomez, 670 F.3d at 400 ("We need not reach the novel question of whether a failure to collect evidence may, in certain circumstances, be tantamount to spoliation.").  Accordingly, the court considers any such argument waived and does not express any view on that "novel question."

Miranda-Rivera v. Toledo-Dávila, 813 F.3d 64, 70 (1st Cir. 2016).  The court looks to several factors in determining whether force is reasonable or unreasonable, including, among others:

- the proportionality of the force used as against the purpose for using force;

- the extent of the plaintiff's injury;

- whether the officers made efforts to limit the amount of force;

- the threat reasonably perceived by the officer;

- and whether the plaintiff was actively resisting.

Kingsley, 576 U.S. at 397.  The court must not apply this standard "mechanically," and it must make its finding "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight."  Id.; see also Graham v. Connor, 490 U.S. 386, 396 (1989) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Constitution).

The First Circuit has found a use of force reasonable as a matter of law when there was a concern for bystanders' and officers' safety and the plaintiff only suffered what the court characterized as minor injuries, such as bruises and scratches.  See Dean v. City of Worcester, 924 F.2d 364, 369 (1st Cir. 1991) (arising under the Fourth Amendment).[19]  In Dean, officers incorrectly believed the plaintiff

---

[19] In analyzing whether defendants' use of force was objectively reasonable under the Fifth Amendment, the court is informed by cases arising under the Fourth Amendment, which has a similar objective reasonableness standard.  See Graham, 490 U.S. at 397.

to be an armed and dangerous escaped prisoner.  Id. at 366.  The officers drove up to the plaintiff at a bus stop and pushed him to the ground, causing his face to hit a sidewalk.  Id.  One officer put a gun to the plaintiff's head and "threatened to blow his head off if he moved."  Id.  The plaintiff, who did not resist the officers, received a "scratch on the neck, bruises on his back and a cut on the nose," but an examination at a hospital afterward found that the plaintiff had no "obvious signs of trauma."  Id. at 369.  The district court granted summary judgment in the defendants' favor, and the First Circuit affirmed, characterizing the scratches, bruises and cuts as "compelling evidence" that "confirmed" the objective reasonableness of the officers' use of force.  Id.

Similarly, in Fernandez-Salicrup v. Figueroa-Sancha, the First Circuit held that an officer's use of force on a non-resisting plaintiff suspected of committing a minor crime was justified considering the chaotic circumstances in which the use of force occurred.  See 790 F.3d 312, 326 (1st Cir. 2015) (arising under the Fourth Amendment).  During a protest at a school that had "turned chaotic," the plaintiff ran away from police officers who were attempting to quell the situation.  Id. at 315-16.  Officers caught up to the plaintiff, who stopped and immediately complied with officers' directions.  See id. at 316.  When the plaintiff criticized one officer for his harsh tone in speaking to her, the officer arrested the plaintiff for obstructing a police investigation and disorderly conduct.  Id. at 326-27.  In doing so, the defendant officer shoved the plaintiff "face-first against a wall" and handcuffed the plaintiff's wrist.  Id. at 327.  The First Circuit held that shoving the plaintiff against

the wall was not an excessive use of force, characterizing the shove as "unnecessary" in hindsight but "not unreasonable."  Id.

In cases where a genuine dispute existed about whether a use of force was reasonable, the circumstances facing the officers were calm, the plaintiff typically did not resist, and officers nonetheless used enough force on the plaintiff to cause visible or otherwise obvious injuries.  See, e.g., Alexis v. McDonald's Restaurants of Mass., Inc., 67 F.3d 341, 352 (1st Cir. 1995) (summary judgment not warranted when officer approached plaintiff who was suspected of criminal trespass and abruptly dragged her across a table and forcibly handcuffed her despite no evidence that plaintiff "posed a risk of flight, attempted to resist or evade arrest, or threatened the peace, property or safety of anyone"); Raiche v. Pietroski, 623 F.3d 30, 33-34, 37-39 (1st Cir. 2010) (officer tackled non-resisting motorcycle driver who was pulled over for failing to wear a helmet); Merilli v. Webster, 552 F.3d 12, 24 (1st Cir. 2009) (officer yanked non-resisting or fleeing theft suspect's arm with enough force to tear her rotator cuff).  In other cases, courts have denied qualified immunity when the plaintiff was actively surrendering to arresting officers, but an officer gratuitously pushed or shoved the plaintiff, even if it did not cause injury.  E.g., Rogoz v. City of Hartford, 796 F.3d 236, 245 (2d Cir. 2015) ("[S]ummary judgment has been found inappropriate in a case involving the use of gratuitous force beyond what was necessary to subdue."); Long v. Abbott, No. 2:15-cv-291-JAW, 2017 WL 8294145, at *21 (D. Me. Mar. 1, 2017) (finding officer was not entitled to qualified

immunity when he gratuitously shoved arrestee from behind as arrestee was standing up and putting his hands behind his back).

As with Karmue's Fifth Amendment claim regarding Deputy Moore's driving, Karmue's Fifth Amendment excessive force claim fails because the undisputed facts are insufficient to find a clearly established constitutional violation.  Based on all the circumstances, including the court's review of the video recording of the incident, it was objectively reasonable for the deputy marshals to conclude that Karmue, a partially-restrained pretrial detainee being transported around a federal courthouse, was behaving unpredictably in the elevator in the presence of two EMTs.  Considering those circumstances, it was reasonable for the officers to use a measured degree of force to fully restrain Karmue.

The force that the deputy marshals used did not cause Karmue any significant injury, and it was neither gratuitous nor completely unnecessary.  Even if, in hindsight, the deputy marshals' purposes could have been accomplished by a lesser amount of force than was used, not every push or shove seen as unnecessary in hindsight is "unreasonable" under the Constitution.  E.g., Fernandez-Salicrup, 790 F.3d at 327.  As the Supreme Court has recognized, "[o]fficers facing disturbances 'are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.'"  Kingsley, 576 U.S. at 399 (quoting Graham, 490 U.S. at 397).  The standard is not what would have been ideal in hindsight, but what was objectively reasonable at the time the incident occurred.

Id. ("[W]e have stressed that a court must judge the reasonableness of the force used from the perspective and knowledge of the defendant officer.").

Karmue contends that any use of force was excessive because he was not acting erratically or resisting the deputes but rather fell to the floor because he was in pain.  The deputy marshals, however, were not required ignore—at their or the EMTs' peril—the other circumstances.  Considering all of the circumstances at the time of the incident, an objectively reasonable officer would have had substantial reason to doubt Karmue's contemporaneous report that he was in so much pain that he could not stand.  Karmue was able to walk to the holding cell without assistance, sit upright on a bench for 20 minutes, and walk back to the elevator with minimal assistance from the EMTs and deputy marshals.  Only once the elevator doors were closed and he was in tight quarters with the EMTs and deputy marshals did Karmue fall to the floor.  Considering all of the circumstances, it was reasonable for the deputy marshals to determine in the few seconds after Karmue fell that force was needed to restrain Karmue to minimize the risks of harm to the deputy marshals and EMTs.

Karmue argues that, nonetheless, the deputies used an unreasonable degree of force to restrain him.  The court disagrees.  The deputy marshals' use of force— the aiming of the Taser at Karmue and the use of the deputy marshals' bodies to pin Karmue while they attempted to handcuff him—was objectively reasonable under the circumstances.

First, aiming the Taser at Karmue in an attempt to get him to comply was not excessive.  To be sure, the Taser light and laser shone in Karmue's eye for about two seconds, which caused Karmue some pain.  But aiming the Taser at Karmue was not excessive when weighed against the deputy marshals' need to obtain Karmue's compliance with their instructions.  Karmue suffered only a very minor injury as a result, namely, pain in his eye and some blurred vision.  Karmue argues that he suffered a much more severe injury—partial blindness and a corneal scar. The medical evidence, however, does not connect the Taser light or laser to that alleged injury.  Karmue himself testified that he would defer to the medical experts as to what caused his corneal scar.  And the medical experts—including Karmue's own—agreed that the Taser light or laser pointed at his eyes for two seconds would not have caused Karmue's corneal scar or partial blindness.

Second, the deputy marshals' use of their hands and bodies to pin Karmue while attempting to handcuff him was not unreasonable.  The video shows that, in its entirety, the scrum with Karmue lasted for barely one minute, and the deputy marshals stopped using force as soon as Karmue was handcuffed and both EMTs were able to leave the elevator.[20]  Taking the facts in the light most favorable to him, Karmue's noncompliance with the deputies' instructions was not forceful but merely evasive.  But, the deputy marshals' use of force to restrain Karmue was brief

---

[20] After Karmue was restrained, the deputy marshals made additional contact with Karmue when they attempted to hoist him off the elevator floor.  This contact was necessary, however, because it was for the purpose of getting Karmue to the hospital.  Karmue could not be left on the elevator floor indefinitely.

and proportionate to that level of noncompliance, and it caused Karmue no visible or apparent injuries.  Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (holding that absence of serious injury can be relevant to inquiry as to whether use of force was objectively reasonable and "extent of injury may also provide some indication of the amount of force applied").

Finally, Karmue argues that Deputy Moore choked him, which he contends is not a reasonable use of force.  But Karmue clarified in his deposition that he meant that Deputy Moore pulled on his clothing, as can be seen in the video when the deputy marshals tried to obtain a steady hold on Karmue as he moved around the elevator floor.  Karmue was able to breathe and there is no evidence that any deputy marshal placed any body part or weight on Karmue's neck causing him to choke.  And, as noted, an examination of Karmue after the incident revealed no serious or minor injuries—not even scratches, bruises, or cuts.  In sum, the facts, drawn in the light most favorable to Karmue, are insufficient to permit a reasonable jury to conclude that the deputy marshals used an objectively unreasonable degree of force against Karmue when attempting to restrain him.

> 2.   Karmue has not shown that defendants spoliated evidence relevant to Count II.

As with Count I, Karmue argues that the court should draw an adverse inference as to the deputy marshals' use of force because defendants failed to preserve certain evidence, including the actual Taser that Deputy Moore carried on April 23 and recordings from a video camera positioned in the courthouse sallyport

and outside the transport elevator.  Karmue contends that this missing video would show the deputy marshals "picking [Karmue] up and dropping him, dragging him, and treating him in the most brutal fashion."  Doc. no. 170 at 3.

In response, defendants say that they no longer have "possession, custody, or control of the taser" that Deputy Moore carried on April 23.  Doc. no. 173 at 3.  As to the video, defendants submitted evidence showing that the same day the elevator incident occurred, the courthouse's judicial security inspector was asked to download all videos depicting Karmue at the courthouse on that day.  Because the courthouse's video storage system only has space for 30 days of security videos, the inspector "watched hours of video from the courthouse security cameras to find depictions of [Karmue]."  Id.  The inspector preserved all videos that he reviewed that showed Karmue.  Defendants produced all of those videos to Karmue in discovery.  Any other video from the courthouse was automatically overwritten after 30 days.

> a.  The Taser is not likely to reveal evidence that would aid Karmue in overcoming summary judgment.

First, as to the Taser, although it was not preserved, producing it would not have revealed evidence that aids Karmue in overcoming summary judgment.  Karmue argues that, with the Taser itself, his experts would have evaluated the strength of the Taser's light, the "radiation" the laser emitted, and whether either was enough to cause injury.  Doc. no. 183 at 14.

But the medical experts testified that the Taser's light or laser would not produce the corneal scar or partial blindness suffered by Karmue.  Karmue merely

speculates that the light or laser could have been sufficiently powerful to cause those injuries.  To provide his position a less speculative footing, Karmue could have determined the power of the Taser's light and laser by obtaining a Taser of the same model and testing it.  Karmue did not—despite having a complete discovery period to do so.

Karmue contends that Deputy Moore's Taser was "modified" and "altered," so a test of the actual Taser would be necessary to determine its effects.  Doc. no. 183 at 12-13 ("The fact that the subject taser was altered by Deputy Moore and the fact that it too has now disappeared should, in and of itself, preclude summary judgment.").  Karmue bases this claim on the following testimony from Deputy Moore: "I believe I took the cartridge which holds the probes off the front of the [T]aser."  Doc. no. 176-7 at 22.  Unloading a Taser does not make it "modified" or "altered" in any sense meaningful to the issues before the court.

Thus, even assuming defendants improperly failed to preserve the Taser carried Deputy Moore on April 23, it would be unreasonable to conclude that preserving it or producing it would have revealed evidence that helps Karmue's claims.

        b.   <u>The missing video would not likely show evidence that helps Karmue overcome summary judgment.</u>

Second, as to the video recording from outside the transport elevator in the courthouse sallyport, the evidence does not indicate that a video depicting Karmue was destroyed or otherwise not preserved.  Defendants submitted evidence that they rigorously viewed all the courthouse video from the day of the incident and

produced all the videos that depicted Karmue.  There is no evidence any video depicting Karmue was destroyed or not preserved.

But even if a video recording depicting Karmue from the sought-after angle existed at some point, it is unreasonable to infer it would reveal the evidence that Karmue claims it would.  Karmue argues that the video would show him being lifted, dragged, and beaten.  A thorough review of the video recordings that were produced reveals that the potentially relevant portion of the missing video angle would cover approximately two minutes, beginning from when Deputy Moore and Cairone hoist Karmue off the elevator's floor and out of the elevator and ending when Karmue appears on an evacuation chair alongside the EMTs in the courthouse sallyport.

It is only during this two-minute period that Karmue cannot be seen on any video recording but theoretically may have been visible at some point on the camera angle requested by Karmue.  Karmue's claim that the video would show him being beaten, dragged, or otherwise abused is undermined by what the videos do show. The videos show that, after Karmue was restrained in the elevator, the EMTs brought an evacuation chair to a narrow elevator landing in the sallyport, which is the space the missing video recording would cover.  The video from inside the elevator shows Cairone and the deputy marshals hoisting a restrained Karmue off the floor to the elevator landing where the evacuation chair was waiting.  Karmue is not visible in any recording for the following two minutes; after those two minutes,

the video camera from the courthouse sallyport shows the EMTs wheeling Karmue, now strapped to the evacuation chair, away from the first-floor elevator landing.

From these undisputed facts—plus the reality that Karmue was examined the day after the incident and doctors found he had no significant injuries—it cannot be reasonably inferred that the missing video angle would depict anything other than the EMTs and deputies lifting Karmue up and strapping him to the evacuation chair.  That does not help Karmue overcome summary judgment. Karmue does not presently argue that strapping him to an evacuation chair in service of his own request for medical attention would be an objectively unreasonable use of force.

Deputies Moore and DaSilva are entitled to qualified immunity, and therefore summary judgment, as to Count II.

C.    Count III: Deputies Carvalho and Doe are entitled to qualified immunity because they had no duty to intervene against a reasonable use of force.

Karmue alleges that Deputies Carvalho and Doe should have intervened to stop Deputies Moore and DaSilva's allegedly unreasonable use of force in the transport elevator.  "An officer may be held liable not only for his personal use of excessive force, but also for his failure to intervene in appropriate circumstances to protect an arrestee from the excessive use of force by his fellow officers." Wilson v. Town of Mendon, 294 F.3d 1, 6 (1st Cir. 2002); Gaudreault v. Municipality of Salem, 923 F.2d 203, 207 n.3 (1st Cir. 1990).  Because the court has found that there was no excessive use of force by the other deputies, Karmue's claim against Deputies

Carvalho and Doe for failing to intervene necessarily fails.  Deputies Carvalho and Doe are entitled to summary judgment as to Count III.

D.    Count IV: The deputies are entitled to qualified immunity because the evidence is insufficient for a reasonable jury to find Karmue had a "serious medical need."

In his final constitutional claim, Karmue alleges that he was unreasonably denied medical care by the deputy marshals.  Specifically, he alleges that he requested medical care immediately after hitting the metal partition in the prisoner transport van.  The deputy marshals, however, did not seek medical attention for Karmue until they arrived at the courthouse.

To show a violation of the Fifth Amendment based on a failure to provide medical care, the defendants must have acted with deliberate indifference to Karmue's serious medical need.  See Miranda-Rivera, 813 F.3d at 74 (detailing standard for deliberate indifference claims arising under the Fourteenth Amendment).  The analysis has two prongs: first, an objective prong requiring proof of a serious medical need and, second, a subjective prong that shows the defendant's deliberate indifference to that need.  Id.

"A 'serious medical need' is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Id. (citation omitted).  The medical need must pose a "sufficiently substantial 'risk of serious damage to [the detainee's] future health.'"  See Farmer v. Brennan, 511 U.S. 825, 843 (1994) (applying Eighth Amendment and quoting Helling v. McKinney, 509 U.S. 25, 35 (1993)).  The effect, if

any, of a delay in treatment can also be used to determine the seriousness of a prisoner's medical needs. Abernathy v. Anderson, 984 F.3d 1, 6 (1st Cir. 2020).

For example, in Gaudreault, the First Circuit addressed a pretrial detainee's claim of deliberate indifference to his serious medical needs under the Fourteenth Amendment. 923 F.2d at 208. The plaintiff alleged that he was assaulted during his arrest, which caused him visible bruises and abrasions, and that prison officials, despite his request, failed to provide him any medical treatment. Id. The morning after the arrest, the plaintiff again requested medical attention, and an officer eventually agreed to send the detainee to the hospital. Id. Medical records from the hospital documented plaintiff's bruises and abrasions, and the hospital provided the plaintiff with a sling for his left arm as well as an eye patch. Id. X-rays came back normal. Id. Notwithstanding the plaintiff's complaints about the seriousness of the abuse he suffered during his arrest, the First Circuit held that the plaintiff did not have a "serious medical need," reasoning as follows:

> The doctors and nurses who examined [plaintiff] on the morning after his arrest, in short, found him bruised but unbroken, requiring no more medical care than a sling, an eye-patch and the application of some disinfectant. If that was all the medical professionals could find to treat, we do not think that [plaintiff's] jailers could be required to see more. While [plaintiff's] injuries may have been "obvious" in the sense that his bruises and abrasions were visible, the medical record demonstrates that he did not display any needs so patent as to make lay persons such as [defendants] remiss in failing to arrange for immediate medical attention.

Id.

Karmue's claim of deliberate indifference to a serious medical need fails because the evidence cannot support a finding that, before medical attention was provided to him, Karmue had a medical need that was "so obvious" that "even a lay person would easily recognize the necessity for a doctor's attention."[21]  The transport van arrived at the courthouse moments after Karmue hit the metal partition and requested medical attention.  Although he had a limp and walked gingerly, Karmue managed to walk under his own power from the van to the courthouse cell.  It took Karmue less than a minute to walk, wearing handcuffs, a waist chain, and leg irons, from the van to the courthouse cell.  Subsequent examinations by medical providers failed to identify any serious injuries, which further undermines the contention that a lay person would have easily recognized Karmue required medical attention.  See Montes v. Ponce Municipality, 79 Fed. Appx. 448, 450-51 (1st Cir. Oct. 31, 2003) (affirming, in unpublished decision, district court's finding that no reasonable jury could find a pretrial detainee had a serious medical need when he "only needed over-the-counter pain killers" as treatment for injuries suffered during alleged beating).

The only fact cutting in the other direction as to the existence of a serious medical need is Karmue's own complaint that he was pain.  As the court observed in ruling on the pre-discovery motion for summary judgment, "[s]evere pain can be a

---

[21] Of course, no physician diagnosed Karmue with any condition requiring treatment in the time between when Karmue hit the partition in the transport van and when the EMTs were called.  For that reason, the court focuses on whether Karmue had a condition that was so obvious a lay person could recognize the need for medical attention.

41

sufficiently serious medical need." Vick v. U.S. Marshals, No. 19-cv-267-SJM-AKJ, 2019 WL 7568227, at *6 (D.R.I. Oct. 11, 2019), R&R approved, 2020 WL 161023, at *1 (Jan. 13, 2020).  But, considering the facts as they have been developed after the full discovery period, it would not have been apparent to a lay person that Karmue was suffering from pain so severe that he had a "serious medical need."  In particular, Karmue was able to walk from the transport van to the holding cell, and the video shows him then sitting on a bench in the holding cell without incident for about 20 minutes.

To be sure, Karmue's walking became much more labored when he left the holding cell, which could have made the degree of his pain more apparent to a lay person.  But the deputy marshals had already called for medical assistance at that point; the change in Karmue's gait and posture occurred only after the deputy marshals had already acted reasonably by seeking medical attention for him within 30 minutes of his arrival at the courthouse.  See Miranda-Rivera, 813 F.3d at 74 ("[T]here is no deliberate indifference if an official responds reasonably to the risk.").  In fact, Karmue was assisted by Cairone, an EMT, as he walked out to the waiting ambulance.

Karmue contends that those facts are not dispositive considering his claim that the deputy marshals told the EMTs not to treat him.  But both EMTs stated that, even if the deputy marshals told them not to treat Karmue, they would have

provided Karmue the same medical attention.[22]  It is undisputed that Karmue was provided medical care.  Karmue criticizes the quality of that medical care and the professionalism of his medical providers, but those criticisms cannot form the basis for a deliberate indifference to medical needs claim.  See, e.g., Feeney v. Corr. Med. Servs., 464 F.3d 158, 162-63 (1st Cir. 2006).

At bottom, the facts undercut any claim that Karmue's need for medical attention was so obvious that a lay person would have recognized that need in the several minutes between when he suffered the injuries (in the van) and when EMTs were called (when he was in the holding cell).  While the potential seriousness of Karmue's condition may have become more apparent later, EMTs had already been called and Karmue did receive medical attention.  For those reasons, the deputy marshals are entitled to summary judgment as to Count IV.

II.   Count V: The United States has not shown that it is entitled to summary judgment as to Karmue's negligence claim.

Finally, the United States moves for summary judgment on Karmue's claim of negligence brought pursuant to the Federal Tort Claims Act.  The United States argues that dismissal is required because Karmue cannot maintain claims for both excessive use of force and negligence.  The United States also argues that Karmue's claims cannot proceed because of the lack of evidence about his injuries.  Finally, the United States asserts that it did not breach any duty it owed Karmue because

---

[22] The EMTs also stated that the deputy marshals did not so instruct them, but the court considers the facts in the light most favorable to Karmue for purposes of summary judgment.

the deputy marshals did not act indifferently to Karmue's health and safety; did not deny him medical care; and did not employ impermissible force against him. Karmue did not respond or object to the United States's argument as to Count V.

The United States is entitled to summary judgment as to Karmue's negligence claim to the extent it involves conduct already found by the court to have been reasonable as a matter of law, such as the force used by the deputy marshals in the courthouse elevator or the response to Karmue's requests for medical attention.  See, e.g., Mucci v. Town of N. Providence, 815 F. Supp. 2d 541, 548 (D.R.I. 2011) (collecting cases).  The United States, however, does not address whether a government agent's driving may be the subject of a negligence claim when brought in the alternative to a claim for constitutional violations under the Fifth Amendment.  The cases cited by the United States in its brief are inapposite, as they address circumstances involving only intentional uses of force or conduct otherwise found to be reasonable.

Proving a claim of negligence under Rhode Island law requires the plaintiff to show that he was owed a duty by defendant; the defendant breached that duty; the defendant's conduct proximately caused an injury; and plaintiff suffered "actual loss or damage."  Holley v. Argonaut Holdings, Inc., 968 A.2d 271, 274 (R.I. 2009).  The causal connection between defendant's conduct and plaintiff's injury must be proved by "competent evidence" and cannot "be based on conjecture or speculation." Skaling v. Aetna Ins. Co., 742 A.2d 282, 288 (R.I. 1999).

In Rhode Island, a person driving a vehicle has a duty to operate the vehicle with reasonable care, and a person injured because the driver failed to exercise reasonable care has a cause of action against the driver for breaching that duty. See DaMaio v. Ciccone, 59 A.3d 125, 130 (R.I. 2013); De Nicola v. United Elec. Rys. Co., 182 A. 1, 2 (R.I. 1935).  In its motion for summary judgment, the United States supplied no reason why Karmue cannot advance a claim against the United States on the premise that Deputy Moore negligently drove the van.  The court's ruling as to Karmue's similar constitutional claim is premised on the lack of facts to show that Deputy Moore drove the van in an intentionally unsafe or criminally reckless manner, which does not mean a fact finder—if it were to credit Karmue's version of events and draw every reasonable inference in his favor—could not reasonably find that Deputy Moore drove the van negligently.

The United States also contends that Karmue has not identified any evidence to show that he was injured because of any alleged negligence.   The evidence favoring the United States's position includes several medical reports contemporaneous with the incident, testimony from Karmue's own medical expert (as well as the United States's own experts), and testimony or affidavits from the EMTs who attended to Karmue.  Karmue, however, testified that he suffered pain because of the transport van's sudden stop.  Karmue challenges the accuracy of at least some aspects of the medical reports.  And one of Karmue's treating medical providers testified that he could not rule out that Karmue suffered a herniated disc when he hit the metal partition in the van on April 23.  That evidence is minimally

sufficient to generate a genuine dispute of material fact about whether Karmue suffered any injuries and move his negligence claim to trial.  At the summary judgment stage the court cannot weigh the evidence or decide which version of the evidence to credit; rather, if there is a genuine dispute of material fact, the matter must be resolved through trial.

For those reasons, the United States is not entitled to summary judgment as to Count V.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (doc. no. 174) is granted in part and denied in part.  Karmue's motion for sanctions (doc. no. 170) is denied.  Defendants' unopposed motion to seal (doc. no. 177) certain medical records is granted.  The parties' joint motion to stay the remaining case management deadlines pending this order (doc. no. 192) is denied as moot. Defendants Moore, DaSilva, Carvalho, and Doe are dismissed as party defendants. The United States remains as a defendant and the only claim left for trial is Count V, negligence under the FTCA.

SO ORDERED.

_____
Landya McCafferty
United States District Judge
Sitting by Designation.

February 3, 2023

cc:    Counsel of Record

46